## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

HARBOR BUSINESS COMPLIANCE
CORPORATION,

    Plaintiff,

        vs.

FIRSTBASE.IO, INC.

    Defendant.
_____

:
:
:
:
:
:
:
:
:
:
:
:
:

**CIVIL ACTION NO.**

███████████████

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Harbor Business Compliance Corporation ("Plaintiff" or "Harbor Compliance"), by and through its undersigned attorneys, Royer Cooper Cohen Braunfeld LLC, files this Civil Action Complaint (this "Complaint") against Defendant, Firstbase.io, Inc. ("Defendant" or "Firstbase")[1], and avers as follows:

## INTRODUCTION

1. This action (this "Action") involves the pilfering of Harbor Compliance's confidential information and trade secrets by Firstbase, a so-called business "partner" that was, in actuality, nothing more than a common thief. Harbor Compliance, the unsuspecting victim, believed to be entering into a partnership agreement with Firstbase to be its exclusive, nationwide provider to a growing and lucrative market of customers, but what was actually planned was a Trojan horse operation for Firstbase to steal and otherwise misappropriate Harbor Compliance's valuable company assets and dismantle the so-called partnership immediately thereafter. When

---

[1] Harbor Compliance and Firstbase are each referred to herein as a "Party" and, collectively, as the "Parties."

confronted, Firstbase doubled down and brazenly refused to cease and desist its offending conduct. This Action was filed soon thereafter.

## PARTIES

2.      Harbor Compliance is a corporation formed under the law of the Commonwealth of Pennsylvania, with its principal place of business located at 1830 Colonial Village Lane, Lancaster, Pennsylvania 17601.

3.      Firstbase is a corporation formed under the law of the State of Delaware, with its principal place of business located at 26 Mercer Street, New York, New York, 10013

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1331 because Harbor Compliance asserts claims against Firstbase under the Defend Trade Secrets Act of 2016 (the "DTSA"), a federal statute, and this Court maintains supplemental jurisdiction over Harbor Compliance's Pennsylvania state law claims pursuant to 28 U.S.C. § 1367(a).

5.      This Court also maintains subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332(a) because: (i) Harbor Compliance is a corporate citizen of the Commonwealth of Pennsylvania, and Firstbase is a corporate citizen of the States of Delaware and New York, such that Harbor Compliance and Firstbase are completely diverse from one another; and (ii) in light of Firstbase's conduct as set forth in this Complaint below, Harbor Compliance seeks in excess of $75,000 in damages, exclusive of interests and costs, in an amount to be fully determined at trial.

6.      This Court has personal jurisdiction over Firstbase because, *inter alia*, Firstbase consented to and waived any right to object to this Court's personal jurisdiction, as set forth in Section 7.5 of the Partnership Agreement (as defined in this Complaint below) at the center of this dispute, which states:

> This Agreement, and any and all disputes directly or indirectly arising out of or relating to this Agreement, will be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without reference to the choice of law rules thereof. ***Each of the Parties hereby irrevocably consents and submits to the exclusive jurisdiction of the state and federal courts located in Lancaster County, Pennsylvania for any such disputes, and hereby irrevocably waives any objections to the laying of venue in such courts***. The Parties further agree that service of process, summons, notice or documents to a Party by registered or certified mail, or by internationally recognized private courier service (in each case to the address set forth above) shall be the effective service of process for any action, suit or proceeding brought against such Party in any such court.

*See* **Exhibit 1**, Partnership Agreement § 7.5 (Choice of Law and Exclusive Forum) (emphasis added).

7.      Venue is proper in this Judicial District pursuant to Section 7.5 of the Partnership Agreement (as defined in this Complaint below) and 28 U.S.C. 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this Action occurred in this Judicial District; and under 28 U.S.C. 1391(b)(2) because a substantial part of the property that is the subject of this Action is situated in this Judicial District.

## FACTUAL BACKGROUND

## I.      Firstbase Targets Harbor Compliance and Pursues an Ostensibly Synergistic Business Relationship

8.      Harbor Compliance is a software-focused provider of a wide array of compliance solutions for companies of all types and sizes. Since 2012, Harbor Compliance has worked with more than Thirty-Five Thousand (35,000) account users to register for and maintain compliance on behalf of its clients across all industries. In doing so, Harbor Compliance utilizes its unique blend of highly confidential and proprietary reference data, entity data, technology, methodologies, and "know-how," which was obtained through many years of industry experience.

9.      Firstbase, according to its website (https://www.firstbase.io/about), is a new entity in the process of "building an all-in-one Company [operating system ('OS')] to help define how founders across the globe launch, manage, and grow their businesses."

10.     Naturally, Harbor Compliance's offerings were attractive to Firstbase, which required comprehensive software solutions to get its self-proclaimed "all-in-one Company OS" off the ground.

11.     The relationship between the Parties began on or about March 14, 2020, when Firstbase became a Harbor Compliance customer by purchasing Harbor Compliance's branded registered agent service, which is offered to the consuming public at large.

12.     Impressed by this limited exposure to Harbor Compliance's sophisticated offerings, Firstbase decided to go back for more. At this point, Firstbase's interest in Harbor Compliance's offerings seemed genuine and legitimate. It was not until later (as discussed below) that Firstbase's ultimate goal became clear: to peek behind the curtain and gain exposure to—and ultimately attempt to usurp—Harbor Compliance's proprietary business model and approach that enabled it to obtain a unique position in the compliance market as a tech-enabled registered agent service provider. Firstbase knew that this proprietary information could benefit its own business significantly.

13.     Indeed, in or around early February 2022, Firstbase began to pursue Harbor Compliance for the ostensible purposes of entering into a license agreement.

14.     Specifically, Firstbase said it wanted to license Harbor Compliance's white-labeled[2] registered agent service software to provide Firstbase's customers and clients the same

---

[2] "A **white-label product** is a product or service produced by one company (the producer) that other companies (the marketers) rebrand to make it appear as if they had made it." *See* https://en.wikipedia.org/wiki/White-label_product.

(or substantially the same) services that Harbor Compliance otherwise brands and offers for sale under its own trade name to the consuming public.

15.    On or about February 8, 2022, an employee of Firstbase, Rahul Sheth ("Mr. Sheth"), sent a message to Harbor Compliance, stating that Firstbase was "[v]ery interested in using [Harbor Compliance's] API to offer a compliance product to our customers. We are incorporating 1k companies/mo[nth] and growing 40% M[onth]O[ver]M[onth]. We have incorporated over 12k companies since we launched last year."

16.    Less than twenty-four (24) hours later, on February 9, 2022, Mr. Sheth eagerly followed up with another message: "Hi – My name is Rahul and I represent www.firstbase.io, an all-in-one company management platform. We're currently incorporating 1K companies per month and growing 30% month-over-month. We are looking for an exclusive nationwide registered agent partner for our founders and believe Harbor Compliance would be a great fit. I also think there could be an API partnership (I've applied for the beta program). I'd love to talk in more detail!"

17.    Following the multiple serious overtures from Mr. Sheth, Firstbase and Harbor Compliance began discussions surrounding Harbor Compliance becoming the exclusive nationwide registered agent and incorporation services partner for Firstbase, along with providing other related services to Firstbase clients as the Parties' business relationship progressed (*e.g.*, the filing of annual reports, foreign qualifications, and tax registrations). In retrospect, this was likely all a ruse to allow Firstbase to access and ultimately abscond with Harbor Compliance's valuable, highly confidential, proprietary business methods and information. But, again, back in February 2022, Firstbase had not yet given Harbor Compliance a reason to be suspicious.

18.    In fact, on February 16, 2022, Mr. Sheth emailed Harbor Compliance to reiterate that Firstbase was seeking an exclusive nationwide registered agent partner, and he attached a document entitled "Firstbase Partnership" to the email (the "Term Sheet"). A true and correct copy of the Term Sheet is attached hereto as **Exhibit 2** and is incorporated by reference as if fully set forth herein.

19.    The Term Sheet states that Firstbase had a current business incorporation volume of 1,200 per month and a 20% month-over-month growth rate:

| Total Firstbase Incorporations | Current Incorporation Volume | Current Growth Rate |
| --- | --- | --- |
| ~12,000 till date | 1,200/month | 20% month-over-month |



See Term Sheet, at p. 1.

20.    To service this exponentially growing volume of incorporations, the Term Sheet proposed to launch a new product called "Firstbase Agent" which would be an "[a]utomated compliance solution to solve ongoing headaches of managing a business such as filing

amendments, annual reports, and foreign qualifications."[3]  *Id.*  Firstbase Agent would also include options for new businesses seeking to incorporate and register in certain jurisdictions.  *Id.*

21.     Although Firstbase Agent would be branded as a Firstbase product, in actuality (and as set forth in the Term Sheet), Firstbase proposed that Firstbase Agent would be a "white-labeled registered agent service … that's powered by the partner"—in this case Harbor Compliance.  *Id.*

## II.     Firstbase Ups the Ante, Specifically Requesting Access to Harbor Compliance's Confidential, Proprietary Information and Entering into a Full-Fledged Partnership Agreement to Get Even More

22.     By March 2022, as meaningful negotiations continued, Firstbase began openly requesting information concerning Harbor Compliance's proprietary, confidential, and trade secret information and business methodologies.

23.     For example, Firstbase requested information related to*, inter alia*, (a) the mechanism and methodology through which Harbor Compliance efficiently serves as the legal registered agent of customers in states in which Harbor Compliance does not have a physical location; (b) the mechanisms and methodology through which Harbor Compliance efficiently processes mail on behalf of its customers; (c) the names of third-party service providers in Harbor Compliance's network; (d) information on Harbor Compliance's customer intake forms; (e) the mechanisms and methodology through which Harbor Compliance's API would be sending data to Firstbase (*e.g.*, whether Firstbase's API/Customer Relationship Management ("CRM") abilities could be linked to Harbor Compliance's API/CRM to retrieve data automatically at the point of input); and (f) how to leverage client-facing features such as ongoing compliance reminders and filings through such mechanisms and methodologies for transferring data.

24.     Firstbase also requested access to, and/or information encompassed within, Harbor

---

[3] The Parties ultimately agreed that the other product mentioned in the Term Sheet, "Firstbase Mailroom," would not be provided by Harbor Compliance.

Compliance's proprietary, confidential, and trade secret compilations of detailed, state/commonwealth/territory-specific jurisdictional requirements and information, internal and external processes, and "know how" utilized by Harbor Compliance in connection with performing efficient, expeditious, and consistent and quality services to the consuming public at large, which Harbor Compliance developed over the course of many years in the industry and through working and building relationships directly with contacts at the relevant agencies located in each of the states/commonwealths/territories throughout the United States (the "JX Databases").

25.     Moreover, Firstbase requested access to Harbor Compliance's marketing and sales data and information for effective productization, pricing, packaging, and the like.

26.     So, Harbor Compliance and Firstbase executed a Non-Disclosure Agreement on or about March 28, 2022 (the "NDA") at Harbor Compliance's insistence, as it is (and has always been) Harbor Compliance's top priority to protect its valuable confidential information and trade secrets.

27.     Following the signing of the NDA, Harbor Compliance shared with Firstbase its pointed answers to the above-referenced questions from Firstbase, as well as additional detailed information pertaining to the specific means through which the Parties anticipated servicing Firstbase's (a) existing users and (b) projected new users. This included but was not limited to (in each respect) information that would be required to be obtained from users to enable performance of the services by Harbor Compliance (broken down by service type and form of entity for whom the service(s) would be performed), the particular roles that Harbor Compliance would provide and/or be responsible for fulfilling through configuring (or re-configuring) its API or otherwise, and the particular roles that Firstbase would provide and/or be responsible for fulfilling; in short, the Parties' expected workflows based on anticipated projections, jurisdictional requirements, and

anticipated deadlines for making Harbor Compliance's services available to Firstbase clients (collectively, as memorialized, "Workflow Documents").

28.    Firstbase was clearly intrigued by the confidential, proprietary information, and trade secrets it was able to access during the negotiation process with Harbor Compliance, and it strategically positioned itself to access even more valuable data by moving forward with the partnership.

A.    **Terms of the Partnership Agreement**

29.    Between the execution of the NDA and in or around May 28, 2022, Harbor Compliance and Firstbase extensively, demandingly, yet successfully, negotiated the specific parameters for Harbor Compliance becoming the exclusive nationwide registered agent of, and white-labeled solution for, Firstbase. This culminated in the signing of a "Partnership Agreement" dated May 28, 2022 (the "Effective Date"), which, along with several addendums thereto, memorialized the terms of the partnership arrangement by and between Harbor Compliance and Firstbase (collectively, the "Partnership Agreement"). A true and correct copy of the Partnership Agreement is attached hereto as **Exhibit 1** and is incorporated by reference as if fully set forth herein.

30.    Firstbase entered into the Partnership Agreement for good and valuable consideration, including but not limited to obtaining Harbor Compliance's services for *deeply* discounted rates on behalf of Firstbase's customers referred to Harbor Compliance's service platform (the "Discounted Rates").[4] *Id.* at §§ 2-3.

---

[4] During the aforesaid negotiations, in addition to negotiating rates for registered agent (annual) and entity formation services, the Parties discussed a filing fee being assessed to change-of-agent filings as well, but the spirit of these discussions were neither finalized nor ultimately memorialized in the Partnership Agreement. This became a notable, contributing factor to the friction that later developed between the Parties, as detailed below.

31.     The Discounted Rates, given Firstbase's then-current volume of users, were extraordinarily low and, frankly, unheard of in the industry; however, Harbor Compliance agreed to them because it was dedicated to the potential upside of the opportunity presented by Firstbase.

32.     The term of the Partnership Agreement was the longer of (i) two (2) years from the Effective Date (*i.e.* May 28, 2024) or (ii) the conclusion of services under any then current and operative statement of work (each, a "SOW," and collectively, the "SOWs"). *See* Partnership Agreement § 2.1.

33.     At the time the Partnership Agreement was signed, "ADDENDUM 1 – STATEMENT OF WORK" ("SOW #1") provided for a twenty-four (24) month term, through June 1, 2024. *See* SOW #1.

34.     Section 1.3 of the Partnership Agreement contemplates, *inter alia*, Firstbase referring clients and customers to Harbor Compliance. *See* Partnership Agreement § 1.3.

35.     In Section 2.1 of the Partnership Agreement, Firstbase agreed not to "engage or approach or enter into any arrangement or contract with other Third Parties[5] with a purpose of licensing, distributing or providing software and services described in the attached addendums including Registered Agent, Business Formation and Change of Registered Agent Filings, and Annual Reports, in connection with the product and Services defined in the attached Addendums, other than under the provisions of this Agreement." *Id.* at § 2.1.

36.     Pursuant to Section 3 of the Partnership Agreement, Harbor Compliance and Firstbase agreed that "[e]ach Party shall retain and own all proprietary rights in and to (i) its business, (ii) any data provided, (iii) the Party's intellectual property, (iv) all data and materials

---

[5] Section 1.2 of the Partnership Agreement defines "Third Party" as "a third party service provider that directly competes with the Harbor Compliance services described in th[e] [Partnership] Agreement and subsequent Addendums." *See id.* at § 2.1.

owned by the Party; (v) the Services, and (v) the Party's respective platform, including all software, source code, modifications, updates and enhancements thereof or any other aspect of the services of Products." *Id.* at § 3.

37.    In Section 4 of the Partnership Agreement, both Harbor Compliance and Firstbase acknowledged, *inter alia*, that "business shall be conducted in a manner that reflects favorably at all times on the services, the good name, goodwill and reputation of the Parties[,]" "to avoid deceptive, misleading or unethical practices that are or might be detrimental to either Party[,]" not to "make false or misleading representations with regard to either Party's Products[,]" and to "not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to the other Party's Services and Products." *Id.* at § 4(v)-(z).

38.    Furthermore, in Section 4.1, Firstbase represented and warranted that it "has received the requisite authorization from Clients for Harbor Compliance, as a third-party, to act on the Client's behalf to perform the services under [the Partnership Agreement,]" and that Harbor Compliance "is authorized by [Firstbase] to act on behalf of Clients to perform the services under [the Partnership Agreement]." *Id.* at § 4.1.

39.    Section 7.3 of the Partnership Agreement prohibits the disclosure of Confidential Information, which definition thereof includes certain of Harbor Compliance's trade secrets, subject to the terms and conditions of Section 7.3. *Id.* at § 7.3.

40.    Relevantly, Section 7.3 also provides:

> In the event that the receiving Party **engages in**, or **threatens to engage in**, any act which violates any provision of this Agreement, the **Parties agree that the non-breaching Party will have no adequate remedy in monetary damages and accordingly, shall be entitled, in addition to all other remedies which may be available to it under law, to seek injunctive relief** (including, without limitation, temporary restraining orders, or preliminary or permanent injunctions) and **specific enforcement of the terms of**

> ***this Agreement***. The non-breaching party shall not be required to post a bond or other security in connection with the granting of any such relief. The provisions of this section shall survive the expiration or other termination of this Agreement for a period of two (2) years.

*Id.* (emphasis added).

41.     Consistent with Section 3 of the Partnership Agreement discussed above, Section 7.4 of the Partnership Agreement states, *inter alia,* that "[t]he Parties agree that Harbor Compliance shall retain and own all proprietary rights in and to (i) its business, (ii) any data provided by provider to customer, (iii) provider's intellectual property, (iv) all data and materials owned by the provider, (v) the Platform, including all software, source code, modifications, updates and enhancements thereof or any other aspect of the Services or Platform." *Id.* at § 7.4.

42.     As referenced above, SOW #1 was also entered into by and between Harbor Compliance and Firstbase as of the Effective Date. Notably, SOW #1 is governed by the Partnership Agreement, but it also represents a separate valid and enforceable contract that is governed by Pennsylvania law into which the Parties entered in exchange for good and valuable consideration. *Compare* Partnership Agreement *with,* SOW #1.

43.     The SOW is, in part, a license agreement by and between Harbor Compliance and Firstbase. *See* SOW #1 § 1.

44.     Notably, the Discounted Rates referenced in SOW #1, as aforementioned, were only made available to Firstbase by Harbor Compliance as of the Effective Date, after Harbor Compliance generously agreed to them, because of the annual volume guarantees that Firstbase agreed to refer to Harbor Compliance per SOW #1. *Id.* at § 2.

45.     In connection with the required development work contemplated by the Parties, SOW #1 states, in part, that "Firstbase.io and Harbor Compliance will make an equal investment

of service, development and other resources to define the registered agent process, configure the registered agent API, and service the initial clients." *Id.* at § 2 (the "Development Work").

46.     Furthermore, even after the initial launch, Harbor Compliance and Firstbase agreed to "continue to work to improve the efficiency of the process[,]" and, if necessary, "to negotiate in good faith to complete the registered API integration." *Id.*

47.     And, in connection with the implementation services contemplated by the Parties, SOW #1 requires payment from Firstbase to Harbor Compliance in exchange for those certain services performed by Harbor Compliance that are either in addition to or outside the scope of the services that Harbor Compliance was already obligated to perform by virtue of the Partnership Agreement and/or then-operative SOWs. *Id.* at § 4 (the "Implementation Services").

48.     The costs for which Firstbase is liable to Harbor Compliance in consideration of Harbor Compliance performing the Development Work and Implementation Services are set forth in Section 5 of SOW #1, which states, in pertinent part, that "[r]egistered agent fees, document filing, and hours applied to approved projects will be aggregated on a monthly basis and submitted to Firstbase.io for Payment. Payment is due by ACH 15 days after invoice." *Id.* at § 5.

49.     Finally, the Partnership Agreement can only be terminated pursuant to the terms and on the conditions of Section 2.2 therein. *See* Partnership Agreement at § 2.2.

50.     Thus, in sum, the Partnership Agreement provided for Harbor Compliance to deliver, and to be paid by Firstbase for, the component parts of Firstbase Agent,[6] including: (a) use of Harbor Compliance software, including, but not limited to, Confidential Information,[7]

---

[6] At first, Firstbase was only using Harbor Compliance's services to service customers in the States of Wyoming and Delaware; however, the Parties intended, through use of Harbor Compliance's services, that the Firstbase Agent would thereafter be offered in additional jurisdictions with the passage of time, as further discussed herein below.

[7] Section 7.3 of the Partnership Agreement defines "Confidential Information" as "information that is disclosed by a Party to the other Party under th[e] [Partnership] Agreement that is marked confidential or would normally be considered confidential under the circumstances. Confidential Information includes, but is not limited to, the terms

proprietary information, and/or trade secret information contained therein (the "Harbor Compliance License"); (b) registered agent services (the "Registered Agent Services") consisting of (i) representation services, (ii) providing an application programming interface (or "API") (i.e., the Development Work), and (iii) document delivery; (c) document filing services (the "Document Filing Services"); and (d) the Implementation Services. And, again, in the Partnership Agreement (specifically in SOW #1), Firstbase agreed to pay Harbor Compliance for, *inter alia*, four (4) discrete services at the following price levels:

| Deliverable | Price |
|---|---|
| Five (5) licenses to Harbor Compliance software | ███████████ |
| Registered Agent Services | ███████████████████ |
| | ██████████████████ |
| Document Filing Services | ██████████████████ |
| | ████████████████ |
| Implementation Services | █████████████ |

*See* Partnership Agreement, SOW #1 §§ 1-4.

51.     As noted in the "Total Cost" chart included within SOW #1, these charges totaled at least ████████████████████████████ per year based on the ████████ ████████████ volume minimums discussed above, and not including any necessary Implementation Services.

*See* Partnership Agreement, SOW #1 § 5.

---

and conditions of th[e] [Partnership] Agreement, financial information, business models, software, reports, techniques, and prices." *See* Partnership Agreement § 7.3. The foregoing definition of Confidential Information is incorporated by reference into this Complaint as if set forth at length herein.

**III.    Harbor Compliance Consistently Performs Its Obligations Set Forth in the Partnership Agreement, While Firstbase Neglects Its Obligations and Refuses to Act in Good Faith**

52.    By May 28, 2022, Harbor Compliance had begun creating the white-labeled Firstbase Agent for its new partner, Firstbase.

53.    The creation of the white-labeled Firstbase Agent required a tremendous amount of resources from Harbor Compliance by way of, *inter alia*, Development Work and Implementation Services.

54.    This included, *inter alia*, Harbor Compliance (a) expending significant legal and financial resources to (i) assess the manners of performance required for Harbor Compliance to service Firstbase's particular commercial and customer needs, as Harbor Compliance's "partners" to whom it provides its white-labeled products and services ordinarily require modified deliverables and performance levels based on the specific context of the relationship; and (ii) ensure that Harbor Compliance's performance under the Partnership Agreement was compliant with United States laws and regulations; (b) expending significant time, energy, and monies at its own executive, development, and service levels to develop said deliverables that Harbor Compliance was to provide to Firstbase under the Partnership Agreement; (c) expending significant time, energy, and monies at its own administrative level to ensure that the corresponding time spent on the foregoing was accurately captured, reported, and invoiced to Firstbase by Harbor Compliance pursuant to the terms of the Partnership Agreement; and (d) training Harbor Compliance personnel on the above-referenced custom workflows and development of the API utilized in, *inter alia*, the Harbor Compliance License.

55.     Notably, the creation of the white-labeled Firstbase Agent, as aforementioned, required that Harbor Compliance share with Firstbase Harbor Compliance's proprietary trade secrets, including, but not limited to, Confidential Information.

56.     For example, as the Parties worked together, Harbor Compliance shared with Firstbase, *inter alia*, Harbor Compliance's internal, proprietary, confidentially-marked API documentation as of June 2022 (as amended from time to time, the "API Documentation") that it had been using in connection with its website application for many years. The proprietary API Documentation included (a) an overview of Harbor Compliance's API; (b) an introduction to said API; and (c) explanations concerning said API's (i) versioning; (ii) authentication methods; (iii) response codes; and (iv) pagination methods in connection with (A) accounts; (B) companies; (C) orders; (D) products; (E) business structures; and (F) jurisdictions.[8]

57.     By way of further example, as aforementioned, Harbor Compliance shared with Firstbase detailed, confidentially-marked JX Databases, API data structure as stipulated in the API Documentation, and information required to be obtained from client users to file annual reports in connection with the Parties' workflow discussions and as memorialized in the Workflow Documents.

58.     Starting in or around June 10, 2022, at the latest, Firstbase began marketing the Harbor Compliance white-label Firstbase Agent to its clients, including by listing Firstbase Agent as a new product on its website:

---

[8] Harbor Compliance updated the API Documentation from time to time while performing the services contemplated by the Partnership Agreement, and likewise shared the updated proprietary API Documentation with Firstbase.



A true and correct copy of Firstbase's website (http://www.firstbase.io/agent) depicted above as of June 10, 2022, as evidenced from the Internet Archive commonly referred to as the "Wayback Machine" (https://web.archive.org/web/20220610050152/https://www.firstbase.io/agent), is attached hereto as **Exhibit 3** and incorporated by reference as if fully set forth herein.

59. When marketing Firstbase Agent, Firstbase went so far as to put a fire emoji (which is "used to signify that something is cool, awesome, exciting, or more colloquially, 'on fire'"[9]) next to the announcement of the new product:



*See id.*

---

[9] *See* https://www.dictionary.com/e/emoji/fire-emoji/.

60.     After the new product launched[10], Harbor Compliance continued to dedicate substantial resources to the partnership by, *inter alia*, (A) providing ongoing enhancements to the functionality of the proprietary API that Harbor Compliance built, and the Harbor Compliance License; (B) working directly with the State of Delaware, Secretary of State, Division of Corporations (the "DE SOS") to ensure that consistent filing and approval processes would be employed by the DE SOS in connection with servicing Firstbase clients through the white-labeled Firstbase Agent; (C) proactively arranging weekly status meetings with Firstbase (each, a "Status Meeting," and collectively, the "Status Meetings"); and (D) consistent with the foregoing efforts, continuously and systematically updating the proprietary, confidentially-marked JX Databases, API Documentation, and Workflow Documents as required.

61.     Much of this work was subject to Sections 2 and 3 of SOW #1. *See* SOW #1 §§ 2-3. For example, in connection with Development Work, Section 2 of SOW #1 (discussed in this Complaint above) states, in relevant part, that "[a]fter the initial launch, both parties will continue to work to improve efficiency of the process. If additional resources are necessary both parties will negotiate in good faith to complete the registered agent API integration." *Id*. at § 2.

62.     However, Firstbase did not negotiate in good faith with Harbor Compliance as required by Section 2 of SOW #1. As a result, to refrain from breaching the Partnership Agreement itself, Harbor Compliance was forced to engage in a greater amount of Development Work than it otherwise would have had to if Firstbase had lived up to its end of the deal, continued to work to improve the efficiency of the intended process alongside Harbor Compliance, and contributed to the completion of the registered agent API integration.

---

[10] While the Partnership Agreement does not define the term "initial launch," *see* SOW #1 § 2, Harbor Compliance notified Firstbase on or about August 24, 2022 that the "initial launch" of the white-labeled Registered Agent product had been completed, and Firstbase did not interpose any form of objection.

63.     For example, Harbor Compliance bore the extreme burden of processing between six hundred (600) and one thousand (1,000) new orders placed by Firstbase per month. Harbor Compliance undertook this burden, as opposed to terminating the Partnership Agreement, because, *inter alia*, Firstbase represented to Harbor Compliance that it was moving forward with the API integration, stating, for example, that core order placement functionality would go live on October 14, 2022.

64.     Harbor Compliance invoiced Firstbase accordingly for all such Development Work and Implementation Services it was forced to perform on its own pursuant to Section 5 of SOW #1, but Firstbase categorically failed to pay such invoices.

65.     In similar vein, SOW #1 requires that in connection with Harbor Compliance performing Registered Agent Services, "[d]ocument deliveries will be provided to Firstbase.io in a manner agreed upon by the Parties." *See* SOW #1 § 2.

66.     Initially, the Parties had agreed upon a ███████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.

67.     So, Harbor Compliance spent significant time, energy, and monies building additional resources into its API to accomplish the foregoing, which represent Implementation Services governed by Section 4 of SOW § 1. *See id.* at § 4 (discussing Implementation Services, and Harbor Compliance being compensated therefor ███████████████).

68.     On or about August 29, 2022, Harbor Compliance delivered its redesigned API Documentation to Firstbase. However, Firstbase never implemented the API as agreed-upon, which prevented the Parties' document delivery system from becoming automated.

69.     As a result, and as aforesaid, Firstbase failed to compensate Harbor Compliance for its Implementation Services, despite the significant front-loaded work that was undertaken by Harbor Compliance over the course of numerous weeks to automate the Parties' document delivery system.

70.     Needless to say, Harbor Compliance's work was extensive: between May 2022 and January 31, 2023, Harbor Compliance delivered two thousand eight hundred seventy-two (2,872) total filings on behalf of Firstbase customers, two thousand one hundred twenty-four (2,142) of which pertained to ▮▮▮▮▮▮▮▮▮▮; six hundred seventy-four (674) of which pertained to change of registered agent filings; fifty-five (55) of which pertained to managed annual report services; and one (1) of which related to a dissolution filing specifically requested by Firstbase.

71.     Notably, certain of the above-referenced filings were subsequently canceled by Firstbase—meaning Firstbase placed an order with Harbor Compliance, Harbor Compliance took meaningful steps to begin servicing the order, and then Firstbase proceeded to cancel the order.

72.     Similarly, there were, *at a minimum*, approximately one hundred twenty-two (122) additional orders placed by Firstbase in connection with which Firstbase failed to provide sufficient information. This figure is not included in the above-referenced data.

73.     Firstbase failing to provide Harbor Compliance with sufficient information that was required for Harbor Compliance to perform under the Partnership Agreement on behalf of Firstbase customers was not an uncommon occurrence.

74.     In fact, Harbor Compliance estimates approximately ten percent (10%) of orders placed by Firstbase between the Effective Date and January 31, 2023, resulted in issues that hampered service by Harbor Compliance under the Partnership Agreement.

75.     Notwithstanding Firstbase's failures in these regards, Harbor Compliance was and remains dedicated to performing the services under the Partnership Agreement, which required, *inter alia*, that the Harbor Compliance team work relentlessly around the clock (outside of normal operating hours) to perform the services.

76.     Indeed, between June 2, 2022 and October 31, 2022, Firstbase utilized the resources and services of Harbor Compliance pursuant to the Partnership Agreement, specifically placing eight thousand five hundred thirty-three (8,533) orders with Harbor Compliance in connection with selling its new white-labeled Firstbase Agent product to Firstbase customers.

## IV.    Firstbase's Master Plan Is Finally Revealed: Attempt to Amend the Partnership Agreement With More Self-Serving Terms, Then Drop Harbor Compliance as a Partner and Abscond With Its Confidential, Proprietary Information and Trade Secrets

### A.    Proposed Amendments to the Partnership Agreement

77.     Despite the successful rollout of Firstbase Agent, Firstbase began, in September 2022, to push to amend the Partnership Agreement to obtain more favorable terms for itself.

78.     Specifically, on September 1, 2022, Firstbase's Founder and Chief Executive Officer, Mark Milastsivy ("Mr. Milastsivy") wrote an email to Harbor Compliance, *inter alia*, informally disputing one of Harbor Compliance's invoices for Implementation Services, and accusing Harbor Compliance of "killing" the Parties' relationship by "trying to charge [Firstbase] for all sorts of nonsense." Moreover, Mr. Milastsivy stated to Harbor Compliance: "Get it together guys – and if you don't think it's possible, we can work together towards legally finishing the relationship and we will just build our own infrastructure." A true and correct copy this September 1, 2022 email is attached hereto as **Exhibit 4** and is incorporated by reference as if fully set forth herein.

79.    Accordingly (and perhaps inadvertently), Firstbase betrayed its true, long-term intentions in the above-referenced correspondence. *See id.* ("Get it together guys – and if you don't think it's possible, we can work together towards legally finishing this relationship and *we will just build our own infrastructure*.") (Emphasis added). Indeed, now that it had access to (and the intent to steal) Harbor Compliance's proprietary trade secrets and Confidential Information, including, but not limited to, the JX Databases, API Documentation, and Workflow Documents, Firstbase no longer needed Harbor Compliance's services. However, Firstbase was not, as of September 1, 2022 quite ready to walk away from the relationship and, therefore, continued to string Harbor Compliance along by continuously using Harbor Compliance, essentially as a free "hot line," to answer questions as they arose and seek advice at nearly every turn.

80.    Notably, in the September 1, 2022 email, Mr. Milastsivy also informed Harbor Compliance that Filipe Senna ("Mr. Senna") "is the ultimate decision maker" and instructs Harbor Compliance to "[t]hink of him as the CEO of Agent!" *Id.*

81.    Although Harbor Compliance vehemently disputes Mr. Milastsivy's foregoing characterization of the Parties' relationship as of September 1, 2022, Harbor Compliance still desired at the time to continue to work with Firstbase in good faith.

82.    So, Harbor Compliance extended an olive branch to Firstbase and entertained amending and restating certain provisions of the Partnership Agreement.

83.    For example, given that tensions had been developing between the Parties with respect to the classifications under the Partnership Agreement and operative SOWs of certain services that Firstbase had been requesting that Harbor Compliance perform and, in particular, whether Harbor Compliance should be billing Firstbase hourly for rendering such services, Harbor Compliance entertained revisiting certain language of the Partnership Agreement based upon Mr.

Senna's projected volume of services for the fourth quarter of 2022 and the 2023 time frame, all in an effort to make the partnership mutually beneficial to both Parties.

84.    Mr. Senna provided and/or agreed to a number of projections, appearing hopeful from Harbor Compliance's perspective that doing so would lead to an amended partnership agreement between the Parties. For example, Mr. Senna provided and/or agreed to the following 2022 Fourth Quarter Formation Volume projections:



85.    In or around the same time period (*i.e.*, September 2022), Mr. Senna also projected and/or agreed to the following Formation Volume For the First Half of 2023:



86.     Furthermore, in or around the same time period (*i.e.*, September 2022), Mr. Senna projected and/or agreed to the following Formation Volume for the Second Half of 2023, broken down by jurisdiction—in the interest of brevity, however, the table below only sets forth the Total Projections for the second half of 2023:

87.     The projections contained in the tables above were based in part on numbers obtained by Mr. Senna from the United States Census Bureau and, notably, conform to the graph set forth in the Term Sheet that was provided by Firstbase as set forth above in this Complaint. *See* Term Sheet, at p. 1.

88.     Consistent therewith, the Parties had a Status Meeting on or about September 13, 2022, during which time Firstbase and Harbor Compliance verbally agreed to continue to expand the services offered under the Partnership Agreement and the jurisdictions in which such services would be offered.

89.     To expand the services offered under the Partnership Agreement to those located in an increased number of jurisdictions with the passage of time, the Parties, out of necessity,

---

[11] Includes projections *solely* for June in connection with the following jurisdictions, which were ***not*** provided in the table in the interest of brevity: IL, VA, GA, PA, NJ, CO, NC, OH, WA, MA, MI, MD, AZ, MN, MO, IN, OR, LA, UT, TN, SC, WI, OK, NV, AL, CT, KY, KS, IA, AR, DC, ID, NE, MS, NM, MT, NH, MR, HI, RI, WV, VT, SD, AK, ND.

agreed to engage in additional Development Work and Implementation Services, among other efforts contemplated by the Partnership Agreement.

90.     However, for reasons set forth below, a written amendment to the Partnership Agreement was not ultimately executed by the Parties. Instead, by in or around November 2022, it became evident that Firstbase had unilaterally decided that it was ready to walk away from the partnership relationship entirely.

**B.     Firstbase Attempts to Drop Harbor Compliance as a Partner, While Stealing (and Continuing To Use) Its Confidential, Proprietary Information**

**i.     Firstbase Attempts (Unsuccessfully) to Terminate the Partnership**

91.     On or about November 1, 2022, during one of the Parties' Status Meetings, a representative of Firstbase (perhaps inadvertently) disclosed that Firstbase was attempting to exit the Partnership Agreement because one of its potential investors preferred Firstbase to run Firstbase Agent itself, rather than relying on a white-label arrangement with Harbor Compliance.

92.     Then, on or about November 2, 2022, Firstbase sent a letter to Harbor Compliance entitled "Notice of Intent to Terminate Partnership Agreement" disclosing "as a courtesy" Firstbase's "intent to terminate" the Partnership Agreement, effective November 17, 2022 based on alleged "repeated material breaches" (the "11/2/22 Letter"). The 11/2/22 Letter purported to rely on Section 2.2(i) of the Partnership Agreement as the grounds for termination.

93.     Harbor Compliance timely responded by letter dated November 5, 2022 explaining that Firstbase's attempt to exercise the termination provision of Section 2.2(i) via the 11/2/22 Letter was defective because, *inter alia*, Firstbase had failed to provide any details related to the "repeated material breaches," let alone sufficient details that would permit Harbor Compliance to exercise its fifteen (15) day cure rights contained within Section 2.2(i).

94.     Also on November 5, 2022, Harbor Compliance followed up on negotiations from September 2022 by delivering to Firstbase a document entitled "Proposed Amendment Terms," detailing the current state of the partnership and its future potential.  Among other things, the Proposed Amendment Terms noted that Harbor Compliance was working on "automating CA, FL, NY and TX within the next two months."  Combined with existing states of Delaware and Wyoming, this would have amounted (and could have amounted)[12] to Firstbase Agent being available in a total of six (6) states pursuant to the Partnership Agreement.

95.     However, undeterred in its plan to terminate the Partnership Agreement by November 17, 2022, Firstbase wrote to Harbor Compliance again on November 11, 2022 (the "11/11/22 Letter").  Although the 11/11/22 Letter purported to provide additional details surrounding the alleged "repeated material breaches" by Harbor Compliance, in actuality the 11/11/22 Letter again betrayed Firstbase's true intention to terminate the Partnership Agreement by any means necessary.  Among other indicators of that intent, the 11/11/22 Letter was titled "Orderly Termination of Partnership Agreement."

96.     As alluded to above, both the 11/2/22 Letter and 11/11/22 Letter failed to comply with Section 2.2(i) of the Partnership Agreement because each letter, *inter alia*, respectively, lacked factual detail about the breaches that Firstbase was attempting to allege therein, thereby frustrating Harbor Compliance's ability to either investigate the allegations or exercise its contractual cure rights, to the extent any such cure was required.

97.     Indeed, there was no factual basis for Firstbase to attempt to exercise Section 2.2(i) of the Partnership Agreement via either the 11/2/22 Letter or the 11/11/22 Letter.

---

[12] Harbor Compliance did ultimately automate the white-labeled Firstbase Agent for purposes of servicing Firstbase clients in California, Florida, New York, and Texas; however, for the reasons detailed below, Harbor Compliance did not receive a single client referral from Firstbase in connection with any orders placed in these jurisdictions.

98.     Upon information and belief, Firstbase was aware that each of the 11/2/22 Letter and 11/11/22 Letter was deficient and constituted inadequate notices of termination pursuant to Section 2.2(i) of the Partnership Agreement prior to providing them to Harbor Compliance. Indeed, each of the 11/2/22 Letter and 11/11/22 Letter only came into existence because Firstbase was attempting to terminate the Partnership Agreement contrary to the expressed terms therein due to, *inter alia*, an ultimatum given by one or more potential investors to compete directly with Harbor Compliance, as detailed below.

99.     Notably, Section 2.2(ii)—as opposed to Section 2.2(i)—is the only provision of the Partnership Agreement that contemplates termination of the Partnership Agreement effective immediately, and, the only grounds for invoking Section 2.2(ii) are inapplicable to this Action; Firstbase did not attempt to rely on Section 2.2(ii) in either the 11/2/22 Letter or 11/11/22 Letter.

100.    The 11/2/22 Letter and 11/11/22 Letter were attempts by Firstbase to manufacture a sham pretext so that Firstbase could exit its binding contractual obligations, each of which constitutes a distinct, material breach of the expressed terms of the Partnership Agreement under Pennsylvania Law.

101.    As referenced above, the 11/2/22 Letter and 11/11/22 Letter also speak to Firstbase's state of mind at all times relevant to Firstbase attempting to steal Harbor Compliance's business model and exit the Partnership Agreement; being that Firstbase engaged in the aforesaid conduct willfully because it no longer desired to be privy to the Partnership Agreement and operative SOWs but had no justification for terminating them.

ii.   **Firstbase Utilizes Harbor Compliance's Confidential, Proprietary Information Without Authorization and Continually Breaches the Partnership Agreement in the Process**

102.   Unbeknownst to Harbor Compliance at the time, the November 17th date referenced in the 11/11/22 Letter was extremely significant to Firstbase because that was the date that Firstbase intended to announce the launch of a vast expansion of the Firstbase Agent to the exact same four (4) states mentioned by Harbor Compliance back on November 5, 2022: New York, California, Texas and Florida.   Indeed, during the afternoon of November 17th, Firstbase sent an email to its clients and contacts announcing the rollout of this additional offering, effective November 21, 2022.

103.   As confirmed by Firstbase's website as of on or around November 22, 2022, the new service looked **remarkably similar** to the white-labeled Firstbase Agent that Harbor Compliance became obligated and began to provide to Firstbase as of May 2022 under the Partnership Agreement.   *Compare* Exhibit 3 *with*, the true and correct copy of Firstbase's website (http://www.firstbase.io/agent)   as of on or around November 22, 2022, as evidenced from the Internet   Archive   commonly   referred   to   as   the   "Wayback   Machine" (https://web.archive.org/web/20221203060650/https://www.firstbase.io/agent),   which is attached hereto as **Exhibit 5** and incorporated by reference as if fully set forth herein.

104.   Notwithstanding all of the above, Harbor Compliance responded to Firstbase's above-referenced letters on November 17, 2022, within the required fifteen (15) day cure period, to detail the ways in which all alleged breaches had been fully addressed.

105.   Firstbase then wrote back in a letter dated November 30, 2022 (the "11/30/22 Letter") disputing Harbor Compliance's November 17th letter but, at the same time, forgoing the pursuit of any prior alleged material breaches; instead, Firstbase stated that it "is willing to provide

Harbor Compliance with the opportunity to improve its performance of Services and to continue under the terms of the Agreement, while reserving all rights" and that Firstbase "is willing to continue the parties' relationship pursuant to the terms of the Agreement." A true and correct copy of the 11/30/22 Letter is attached hereto as **Exhibit 6** and is incorporated by reference as if fully set forth herein.

106.     Pivotally, despite the Parties' agreement that Harbor Compliance was to be the exclusive nationwide provider of services making up the Firstbase Agent, in the 11/30/22 Letter, Firstbase further indicated there may be a scenario where "no Services are provided by Harbor Compliance," and it posited further that in any such scenario, Firstbase would not pay Harbor Compliance anything under the Partnership Agreement until, at the earliest, June 1, 2024. *See id.* at 3.

107.     Indeed, the statement that Harbor Compliance would provide "no Services" only makes sense if Firstbase intended to run Firstbase Agent *by itself*, independent of Harbor Compliance.   And that is precisely what Firstbase intended to do.

108.     In fact, in contrast to the eight thousand five hundred thirty three (8,533) orders that were placed between June 2, 2022 and October 21, 2022, Firstbase only placed seventy-seven (77) new orders with Harbor Compliance under the Partnership Agreement between November 1, 2022, and January 31, 2023.

109.     Thus, Firstbase was making good on its threat to cut Harbor Compliance out of the Parties' arrangement by providing certain of the services necessary to run and expand Firstbase Agent on its own.

110.     In fact, on or about November 7, 2022, Firstbase caused a new Delaware limited liability company to be formed, which it named Firstbase Agent LLC.

111.    Thereafter, Firstbase caused Firstbase Agent LLC to be qualified and/or registered to do business across a plethora of jurisdictions throughout the United States.

112.    Upon information and belief, Firstbase Agent LLC was formed by Mr. Milastsivy, on behalf of Firstbase, for the purpose of selling and offering for sale the "Autopilot" program (*i.e.,* the Firstbase Agent) that provides substantially the same services previously performed by Harbor Compliance under the Partnership Agreement, and which mimics the look and feel of Harbor Compliance's white-label platform and infrastructure that it licensed to Firstbase.

113.    Upon information and belief, Firstbase Agent LLC is owned and controlled by Firstbase directly, or indirectly through Mr. Milastsivy or otherwise.

114.    Upon further information and belief, Firstbase caused Firstbase Agent LLC to engage Northwest Registered Agent, LLC to provide registered agent services on behalf of Firstbase Agent LLC's ***and*** Firstbase's clients in direct violation of Section 2.1 of the Partnership Agreement.  *See* Exhibit 1 § 2.1 ("Firstbase.io agrees that it will not during the term of this Agreement, engage or approach or enter into any arrangement or contract with other Third Parties with a purpose of licensing, distributing or providing software and services described in the attached addendums including Registered Agent, Business formation and Change of Registered Agent Filings, and Annual Reports ….").

115.    Indeed, Northwest Registered Agent, LLC is a competitor of Harbor Compliance, and offers registered agent services competitive with the Registered Agent Services that Harbor Compliance is obligated to provide Firstbase-referred clients under the Partnership Agreement. Thus, Northwest Registered Agent, LLC is a Third Party as said term is defined in Section 1.2 of the Partnership Agreement.  *See id.* at § 1.2.

116.    On or about December 28, 2022, Firstbase emailed its clients and contacts soliciting business for the said "Autopilot" program (*i.e.*, the Firstbase Agent).

117.    Upon information and belief, even after Firstbase engaged Northwest Registered Agent, LLC to perform registered agent services on its behalf in violation of Section 2.1 of the Partnership Agreement, Firstbase ***could not have assembled the above-referenced offering (and those detailed below) as quickly as it did without making unauthorized use and/or disclosure of Harbor Compliance's trade secrets,*** including, but not limited to, the JX Databases, API Documentation, and Workflow Documents, in addition to certain other proprietary information exclusively owned by Harbor Compliance per the terms of the Partnership Agreement.

118.    As of the date of this Complaint, Firstbase was the only party who had the requisite access to implement Harbor Compliance's white-label platform and infrastructure into its customer-facing offerings, which, upon information and belief, was used by Firstbase to create the "Autopilot" program (*i.e.*, the Firstbase Agent) that Firstbase marketed and continues to market to its clients and contacts.

119.    Indeed, by in or around the end of 2022, Firstbase had rolled out its purportedly "independently developed" Firstbase Agent to customers looking to incorporate in nine (9) additional states (California, Colorado, Florida, Georgia, Michigan, New York, North Carolina, and Texas)—meaning that Firstbase had rolled out its product in a total of eleven (11) states by the end of 2022.    A true and correct copy of Firstbase's web page, https://www.firstbase.io/blog/2022-year-in-review, dated January 4, 2023, is attached hereto as **Exhibit 7** and is incorporated by reference as if fully set forth herein.

120.    The rapid expansion of states in which Firstbase offered to sell and did sell its Firstbase Agent continued, and, by in or around the end of January 2023, Firstbase had expanded

into  twenty-three (23) states, for a total of thirty-four (34) states serviced by the Firstbase Agent product.  A true and correct copy of Firstbase's web page,  https://www.firstbase.io/blog/firstbase-introduces-incorporation-in-23-new-states, dated January 24, 2023, is attached hereto as **Exhibit 8** and is incorporated by reference as if fully set forth herein.

121.    Hence, Firstbase's efforts continued and are continuing into 2023: on or about January 4, 2023, Firstbase emailed its clients and contacts soliciting business in similar fashion to how it had done previously after expanding into states and services that, prior to November 2022, were on track to be provided by Harbor Compliance pursuant to the Partnership Agreement.

122.    Again, Firstbase's conduct and rapid expansion of its purportedly "independently developed" services made abundantly clear that Firstbase was leveraging—indeed, stealing with the intention of replicating—the highly confidential business model and materials that Harbor Compliance had created without compensating Harbor Compliance for use of its proprietary and trade secret information, including, but not limited to, Harbor Compliance's Confidential Information (*e.g.*, the JX Databases, API Documentation, and Workflow Documents).

123.    Indeed, the Firstbase Agent that Firstbase began offering to its customers and contacts utilizes the same (or substantially the same) white-labeled API system, and/or "know-how" and proprietary information, which Harbor Compliance utilizes not just pursuant to the Partnership Agreement between itself and Firstbase, but also to offer its own branded products and services to the consuming public other than through Firstbase—*e.g.*, Registered Agent, Managed Annual Report Services, Managed Annual DBA Service, Foreign Qualifications, Amendments, Restatements, Dissolution, Certificate of Good Standing Retrieval, Incorporations, LLC Formations, etc.—to name a few.

124.    On January 6, 2023, Harbor Compliance sent Firstbase's counsel formal notice outlining the aforesaid material breaches of the Partnership Agreement by Firstbase that had transpired as of said date, and demanded that Firstbase cease and desist from such conduct by no later than January 21, 2023 (*i.e.*, consistent with the Partnership Agreement's fifteen (15) day cure period, *see* 2.2(i)).  Firstbase has rejected these demands, failed to cure one or more of the aforesaid material breaches, and, upon information and belief, continues to market the system built by Harbor Compliance as its own, all while not paying Harbor Compliance.  A true and correct copy of Firstbase's website (https://www.firstbase.io/agent) through which it offers Registered Agent as of the date of this Complaint is attached hereto as **Exhibit 9** and is incorporated by reference as if fully set forth herein.

125.    Firstbase also deleted recordings of certain Status Conferences and/or other telecommunications between the Parties during which the Parties discussed certain of Harbor Compliance's trade secrets and Confidential Information that Firstbase, upon information and belief, used to launch the Autopilot program (*i.e.,* the Firstbase Agent) first under the Partnership Agreement, and, subsequently, in violation of the Partnership Agreement, as detailed herein.

126.    Notably, on or about January 11, 2023, Harbor Compliance's permission to access Firstbase's server had been revoked by Firstbase, which prevented Harbor Compliance from performing services under the Partnership Agreement, which further demonstrates that Firstbase had no intention of referring the business solicited above to Harbor Compliance pursuant to the Partnership Agreement.

127.    Firstbase had revoked Harbor Compliance's permission to access its server in the past, such as when Firstbase began attempting to exit the Partnership Agreement in or around September 2022; however, in the past, such access had always been restored.

128.    In contrast, this time around, Harbor Compliance's access has not yet been restored through the date of this Complaint being filed with the Court.

129.    Notwithstanding, on or about January 17, 2023, Firstbase told Harbor Compliance that Harbor Compliance could not access Firstbase's server because Firstbase was performing maintenance, but "once there is any work available, the portal will be available and [Firstbase] will notify the team[.]"

130.    Although Harbor Compliance was without access to Firstbase's server and was, therefore, incapable of rendering performance under the Partnership Agreement at the time, on or about January 24, 2023, as aforementioned, Firstbase continued its emailing efforts of soliciting business from its clients and contacts in similar fashion to how it had done previously by informing them, in relevant part, as follows: "While Firstbase started with just Wyoming and Delaware, we know that founders may want to incorporate in another state for a variety of reasons. That's why we've been working tirelessly to bring our services to as many states as possible. Now, we're ready to announce incorporation in an incredible 23 new states – the biggest expansion in Firstbase history."

131.    Thus, Firstbase had been soliciting business by offering to its customers and contacts use of Firstbase's purported "Autopilot" program (*i.e.*, the Firstbase Agent) that provides substantially the same services previously delivered by Harbor Compliance under the Partnership Agreement, and which mimics the look and feel of Harbor Compliance's white-label platform and infrastructure, in thirty-four (34) of the fifty (50) US states.

132.    Harbor Compliance was, and remains, on track to provide the services under the Partnership Agreement.

133.    Yet, as a result of the aforesaid, Firstbase materially breached Section 2.1 of the Partnership Agreement, which alone constitutes a distinct, material breach of the expressed terms of the Partnership Agreement. *See* Partnership Agreement § 2.1.

134.    In addition, as a result of the aforesaid, Firstbase materially breached Section 4 of the Partnership Agreement, which alone constitutes a distinct, material breach of the expressed terms of the Partnership Agreement. *Id*. at § 4.

135.    Moreover, as a result of the aforesaid, Firstbase materially breached Sections 7.1, 7.3, and 7.4 of the Partnership Agreement, which alone constitutes separate and distinct material breaches of the expressed terms of the Partnership Agreement. *Id*. at §§ 7.1, 7.3-7.4.

136.    Further, by Firstbase making its intentions clear that it will not be referring any customers to Harbor Compliance under the Partnership Agreement, Firstbase committed additional distinct, material breaches of the expressed terms of the Partnership Agreement. *See, e.g.*, SOW #1 § 2.

137.    Separately, by Firstbase making its intentions clear that it will not be referring any customers to Harbor Compliance under SOW #1, Firstbase committed further, distinct, material breaches of the expressed terms of SOW #1. *Id*.

138.    And, as a result of Firstbase not referring customers to Harbor Compliance under SOW #1, Firstbase is not on track to reach the minimum guaranteed volume of ▮▮▮▮▮▮ ▮▮▮▮ units per year for the first (1st) of the two (2) years ending June 1, 2024 (i.e., June 1, 2023), which will constitute a separate and distinct material breach of the Partnership Agreement as of June 1, 2023 if Firstbase's conduct continues as set forth herein. *Id*.

139.    Additionally, since on or about September 1, 2022, Firstbase has failed to pay Harbor Compliance for, *inter alia*, the Development work and Implementation Services performed

by Harbor Compliance as contemplated by the Partnership Agreement and operative SOWs, each instance of which constitutes a distinct, material breach of the expressed terms of the Partnership Agreement and operative SOWs.

140.    Firstbase's conduct, as outlined above in this Complaint, has resulted and will continue to result in substantial monetary damages to Harbor Compliance, as well as substantial irreparable harm to Harbor Compliance if not restrained by this Court.

141.    In fact, in preparing to initiate this lawsuit to protect and restore its rights, Harbor Compliance learned that Firstbase actually has a pattern and business practice of entering into contractual agreements with certain "partners" solely for purposes of usurping confidential information about their businesses for Firstbase's own unlawful gain. One such example appears to be involving former Firstbase partner, Cloud Peak Law Group, P.C., as evidenced by a lawsuit pending in the Chancery Court of the State of Wyoming, captioned <u>Cloud Peak Law Group, P.C.</u> <u>v. Firstbase.IO, Inc.</u>, bearing Case No. CH-2022-0000006.

## COUNT I
### (Breach of Contract)

142.    The foregoing paragraphs are hereby incorporated as if set forth herein in full.

143.    The Partnership Agreement, including Addendums 1 through 6, by and between Harbor Compliance and Firstbase, which is attached hereto as **Exhibit 1**, is a valid and enforceable contract that is governed by Pennsylvania law.

144.    The Partnership Agreement was made as the Effective Date, and remains in effect for at least a two (2) year term following the Effective Date, as further detailed above in this Complaint.

145.    As aforesaid, Firstbase and Harbor Compliance entered into the Partnership Agreement for good and valuable consideration.

146.    As aforesaid, Harbor Compliance performed all of its obligations under the Partnership Agreement and properly exhausted any and all prerequisites to enforcing its contractual rights against Firstbase in this Action.

147.    As aforesaid, Firstbase materially breached the Partnership Agreement and certain SOWs, including, but not limited to SOW #1, in numerous, repeated, and distinct ways.

148.    For example, and as further fleshed out above, Firstbase breached the Partnership Agreement and certain SOWs, including, but not limited to, SOW #1, by soliciting business from its clients and contacts using the confidential business model that Harbor Compliance built, including, but not limited to, the proprietary, trade secret, and Confidential Information utilized therein, to provide certain of the services that Harbor Compliance is obligated to provide under the Partnership Agreement, in violation of the express terms of the Partnership Agreement. In addition to the instances of such conduct alleged above, the foregoing is evidenced by, *inter alia*, Firstbase emailing its clients contacts on or about November 17, 2022, stating: "On Monday, November 21st, we'll introduce our most exciting product update yet. In addition to Wyoming and Delaware, customers will be able to incorporate their LLC or C-Corp in New York, California, Texas, and Florida."

149.    Furthermore, by Firstbase making its intentions clear that it will not be referring any customers to Harbor Compliance under the Partnership Agreement, Firstbase committed additional distinct, material breaches of the expressed terms of the Partnership Agreement.

150.    Separately, by Firstbase making its intentions clear that it will not be referring any customers to Harbor Compliance under SOW #1, Firstbase committed further, distinct, material breaches of the expressed terms of SOW #1.

151.    Additionally, since on or about September 1, 2022, Firstbase has failed to pay Harbor Compliance for, *inter alia*, the Development work and Implementation Services performed by Harbor Compliance as contemplated by the Partnership Agreement and operative SOWs, each instance of which also constitutes a distinct, material breach of the expressed terms of the Partnership Agreement and operative SOWs.

152.    And, upon information and belief, Firstbase breached the expressed terms of the Partnership Agreement by engaging and/or approaching and/or entering into any arrangement with Northwest Registered Agent, LLC as aforesaid in violation of Section 2.1 of the Partnership Agreement.

153.    Firstbase's attempts to terminate the Partnership Agreement pursuant to the 11/2/22 Letter and 11/11/22 Letter, respectively, each constituted separate and distinct material breaches of the Partnership Agreement as well.

154.    Indeed, Firstbase's aforesaid separate and distinct material breaches of the Partnership Agreement and operative SOWs have caused, and unless the Court permanently restrains its conduct and compels Firstbase to specifically perform under the Partnership Agreement and operative SOWs, will continue to cause, Harbor Compliance immediate and irreparable harm, for which Harbor Compliance has no adequate remedy at law.

155.    Furthermore, Firstbase's aforesaid material breaches of the Partnership Agreement and/or operative SOWs have caused, and will continue to cause, Harbor Compliance to sustain monetary damages in excess of approximately Twelve Million Dollars ($12,000,000), the precise amount of which is to be fully determined at trial.

156.    To be clear, Firstbase's conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with

the intent to harm Harbor Compliance.  As a direct and proximate result of Firstbase's acts and omissions, Harbor Compliance has suffered significant harm for which it is entitled substantial damages, punitive damages, and attorney's fees, costs, and expenses associated with this Action, as well as injunctive relief.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

157.    The foregoing paragraphs are hereby incorporated as if set forth herein in full.

158.    Under Pennsylvania law, every contract contains an implied covenant of good faith and fair dealing requiring that a party to the contract refrain from acting in a way to obstruct the other party from receiving the benefits of the agreement.

159.    Firstbase breached the implied covenant of good faith and fair dealing in connection with the Partnership Agreement and/or operative SOWs.

160.    Under the Partnership Agreement and/or operative SOWs, Firstbase has authority to exercise discretion with respect to the number of customers that it refers to Harbor Compliance.

161.    Under the Partnership Agreement and/or operative SOWs, the manner of performance with respect to the number of customers that Firstbase refers to Harbor Compliance is not specifically prescribed.

162.    Firstbase breached the implied covenant of good faith and fair dealing in its performance under the Partnership Agreement and/or operative SOWs by making its intentions known that it will not be referring any customers to Harbor Compliance under the Partnership Agreement and/or operative SOWs, and in fact by no longer referring any customers to Harbor Compliance under the Partnership Agreement and/or operative SOWs, while the Partnership Agreement and/or operative SOWs remain(s) (a) valid and legally enforceable contract(s).

163.    Indeed, Firstbase has exercised its discretion with respect to the number of customers that it refers to Harbor Compliance unreasonably, and, by attempting to take advantage of "gaps" in the Partnership Agreement and/or operative SOWs.

164.    If the Partnership Agreement and/or operative SOWs were interpreted to give Firstbase the unfettered right not to refer any customers to Harbor Compliance, Firstbase will have constructively terminated the Partnership Agreement and operative SOWs.

165.    However, Firstbase's unilateral decision to exercise its discretion unreasonably so as to not refer any customers to Harbor Compliance is not grounds for termination of the Partnership Agreement and/or operative SOWs, as evidenced by the plain language of Section 2.2 of the Partnership Agreement.

166.    Section 2.2 of the Partnership Agreement contains the only grounds for terminating the Partnership Agreement and/or operative SOWs. *See* Partnership Agreement § 2.2.

167.    Firstbase does not have the right to unilaterally opt out of all of its obligations under the Partnership Agreement at any time.

168.    Under Firstbase's interpretation of the Partnership Agreement and/or operative SOWs, Harbor Compliance is required to stand ready to service the needs of any potential customer actually referred by Firstbase at a moment's notice.

169.    Firstbase's interpretation of the Partnership Agreement not only requires that Harbor Compliance bear unreasonable burdens, but also evades the spirit of the Parties' bargain and interferes with Harbor Compliance's ability to perform under the Partnership Agreement.

170.    In fact, it completely eviscerates Harbor Compliance's benefit of the bargain.

171.    As set forth in more detail herein above, leading up to the execution of the Partnership Agreement and SOWs dated as of the Effective Date, and as evidenced by, *inter alia*,

the Term Sheet, Firstbase expressed to Harbor Compliance that it was seeking an exclusive nationwide registered agent partner to provide the services as aforesaid.

172.    Indeed, as aforesaid, the Term Sheet that Firstbase shared with Harbor Compliance on or about February 16, 2022 evidences said intent on the part of Firstbase.

173.    The foregoing was stated by Firstbase to Harbor Compliance to induce Harbor Compliance to enter into the Partnership Agreement and operative SOWs dated as of the Effective Date.

174.    However, as aforesaid, instead of using Harbor Compliance's services after the Effective Date as contemplated by the Partnership Agreement and operative SOWs, Firstbase began to compete directly with Harbor Compliance by, upon information and belief, engaging Northwest Registered Agent, LLC as aforesaid, and offering and providing and offering substantially the same services to substantially the same customers and prospective customers, respectively, via substantially the same channels of trade.

175.    All the while, Harbor Compliance has been offering its automated compliance solution software services directly to customers and prospective customers other than Firstbase not in a white-labeled fashion, in a manner not prohibited by the Partnership Agreement and/or operative SOWs.

176.    Thus, as aforesaid, during the time leading up to the commencement of this Action, as detailed throughout this Complaint, Firstbase has been and continues to usurp Harbor Compliance's expected revenues, including, but not limited to, revenues attributed to Harbor Compliance's Registered Agent Service, by interpreting the relevant provisions of the Partnership Agreement and operative SOWs unreasonably and in bad faith so as to attempt to manufacture a sham pretext to unlawfully exit the Partnership Agreement and operative SOWs.

177.    Moreover, as a result of Firstbase offering its "Autopilot" program (*i.e.*, the Registered Agent) and providing and/or publishing the API Documentation to and/or for certain third parties, Firstbase has been and continues to usurp revenue attributed to channel partnerships as well.

178.    Firstbase's conduct as aforesaid has caused, and unless the Court permanently restrains its conduct and compels Firstbase to specifically perform under the Partnership Agreement and operative SOWs, will continue to cause, Harbor Compliance immediate and irreparable harm, for which Harbor Compliance has no adequate remedy at law.

179.    Firstbase's conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance.

180.    As a direct and proximate result of Firstbase's acts and omissions, Harbor Compliance has suffered significant harm for which it is entitled substantial damages, punitive damages, and attorney's fees, costs, and expenses associated with this Action, as well as injunctive relief.

## COUNT III
### (Misappropriation of Trade Secrets under PA Law)

181.    The foregoing paragraphs are hereby incorporated as if set forth herein in full.

182.    Harbor Compliance is protected by the Pennsylvania Uniform Trade Secrets Act (the "PUTSA").

183.    Harbor Compliance has expended substantial resources in developing its trade secrets and Confidential Information for its exclusive benefit.

184.    Harbor Compliance does not disclose its trade secrets or Confidential Information to its competitors and has made more-than-reasonable efforts to protect their confidentiality,

including, but not limited to, by requiring Firstbase execute the NDA, as well as entering into the Partnership Agreement itself, which expressly provides in Section 7.3 that recipients of Confidential Information are prohibited from disclosing said Confidential Information except as pursuant to the terms and on the conditions set forth therein.

185.    Harbor Compliance also utilizes provisions in its Terms of Use and Service Agreement (the "TOU") located on its website (https://www.harborcompliance.com/terms-of-service), in addition to marking certain of its materials "CONFIDENTIAL," as part of its ongoing, more-than-reasonable effort to protect the confidentiality of its trade secrets and Confidential Information.

186.    Harbor Compliance entrusted and communicated its trade secrets and Confidential Information to Firstbase in confidence and Firstbase knew that Harbor Compliance intended for its trade secrets and Confidential Information to remain confidential by virtue of, *inter alia*, the NDA, TOU, confidentiality markings, and the plain language set forth in Section 7.3 of the Partnership Agreement.

187.    Upon information and belief, Firstbase breached the PUTSA by willfully, and through improper means, misappropriating certain of Harbor Compliance's trade secrets and Confidential Information, including the JX Databases, API Documentation, and Workflow Documents, and retaining the foregoing despite repeated demands and Firstbase's obligations under Section 7.3 of the Partnership Agreement.

188.    Moreover, as demonstrated by its scheme to damage Harbor Compliance for its own benefit, Firstbase threatens and is uniquely positioned to use and/or disclose Harbor Compliance's trade secrets and Confidential Information for its own benefit and/or the benefit of

one or more competitors of Harbor Compliance, including, but not limited to, Northwest Registered Agent, LLC, to Harbor Compliance's substantial detriment.

189.    Firstbase's conduct as aforesaid has caused, and unless the Court permanently restrains Firstbase's actual and threatened misappropriation of Harbor Compliance's trade secrets and Conditional Information, will continue to cause, Harbor Compliance immediate and irreparable harm, for which Harbor Compliance has no adequate remedy at law.

190.    Harbor Compliance did not consent to Firstbase's use of its trade secrets and Confidential Information in the manner employed by Firstbase, upon information and belief, to compete directly with Harbor Compliance as aforesaid.

191.    Furthermore, as a result of the aforesaid, Harbor Compliance has suffered substantial monetary damages, the precise amount of which will be determined at trial, including, but not limited to, compensatory damages, punitive/exemplary damages, and attorney's fees, costs, and expenses associated with this Action pursuant to the PUTSA.

192.    Pursuant to 12 Pa. C.S.A. § 5304(a), Harbor Compliance requests in addition to and/or in lieu of the forgoing the imposition of a reasonable royalty for Firstbase's unauthorized use and/or disclosure of Harbor Compliance's trade secrets and Confidential Information.

193.    Indeed, Firstbase's conduct has been willful, malicious, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, and with the intent to harm Harbor Compliance for its own financial gain and commercial advantage.

## COUNT IV
### (Misappropriation of Trade Secrets under Federal Law)

194.    The foregoing paragraphs are hereby incorporated as if set forth herein in full.

195.    Harbor Compliance, who is engaged in interstate commerce by providing expert services and purpose-built software for, *inter alia*, entity management, business licenses, and tax registrations all in one user-friendly portal, is protected by the DTSA.

196.    Harbor Compliance has expended substantial resources in developing its trade secrets and Confidential Information for its exclusive benefit.

197.    Harbor Compliance does not disclose its trade secrets or Confidential Information to its competitors and has made more-than-reasonable efforts to protect their confidentiality, including, but not limited to, by requiring Firstbase execute the NDA, as well as entering into the Partnership Agreement itself, which expressly provides in Section 7.3 that recipients of Confidential Information are prohibited from disclosing said Confidential Information except as pursuant to the terms and on the conditions set forth therein.

198.    Harbor Compliance also utilizes provisions in its TOU, in addition to marketing certain of its materials "CONFIDENTIAL," as part of its ongoing, more-than-reasonable effort to protect the confidentiality of its trade secrets and Confidential Information.

199.    Harbor Compliance entrusted and communicated its trade secrets and Confidential Information to Firstbase in confidence and Firstbase knew that Harbor Compliance intended for its trade secrets and Confidential Information to remain confidential, by virtue of, *inter alia*, the plain language set forth in Section 7.3 of the Partnership Agreement.

200.    Upon information and belief, Firstbase breached the DTSA by willfully, and through improper means, misappropriating certain of Harbor Compliance's trade secrets and Confidential Information, including the JX Databases, API Documentation, and Workflow Documents, and retaining the foregoing despite repeated demands and Firstbase's obligations under Section 7.3 of the Partnership Agreement.

201.    Moreover, as demonstrated by Firstbase's scheme to damage Harbor Compliance for its own benefit, Firstbase threatens and is uniquely positioned to use and/or disclose Harbor Compliance's trade secrets and Confidential Information for its own benefit and/or the benefit of one or more competitors of Harbor Compliance, including, but not limited to, Northwest Registered Agent, LLC, to Harbor Compliance's substantial detriment.

202.    Firstbase's conduct as aforesaid has caused, and unless the Court permanently restrains Firstbase's actual or threatened misappropriation of Harbor Compliance's trade secrets and Conditional Information, will continue to cause, Harbor Compliance immediate and irreparable harm, for which Harbor Compliance has no adequate remedy at law.

203.    Harbor Compliance did not consent to Firstbase's use of its trade secrets and Confidential Information in the manner employed by Firstbase, upon information and belief, to compete directly with Harbor Compliance as aforesaid.

204.    Furthermore, as a result of the aforesaid, Harbor Compliance has suffered substantial monetary damages, the precise amount of which will be determined at trial, including, but not limited to, compensatory damages, punitive/exemplary damages, and attorney's fees, costs, and expenses associated with this Action pursuant to the DTSA.

205.    Pursuant to 18 U.S.C. § 1836(b)(3), Harbor Compliance requests in addition to and/or in lieu of the forgoing the imposition of a reasonable royalty for Firstbase's unauthorized use and/or disclosure of Harbor Compliance's trade secrets and Confidential Information.

206.    Indeed, Firstbase's conduct has been willful, malicious, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, and with the intent to harm Harbor Compliance for its own financial gain and commercial advantage.

## COUNT V
## (Common Law Unfair Competition)

207.    The foregoing paragraphs are hereby incorporated as if set forth herein in full.

208.    At all times relevant to this Action, Harbor Compliance has sold and offered to sell its goods and services, such as the services contemplated by the Partnership Agreement and operative SOWs, to customers and prospective customers other than Firstbase.

209.    As of the Effective Date, Firstbase was incapable of independently selling and offering to sell goods and services similar to those of Harbor Compliance, did not independently sell or offer to sell goods and services similar to those of Harbor Compliance, and, thus, engaged Harbor Compliance to provide certain of its white-label services to Firstbase's clients, customers, and prospective customers under the Partnership Agreement and operative SOWs.

210.    However, as aforesaid, Firstbase has engaged in unlawful acts and/or practices with respect to the Partnership Agreement, all in an effort to gain an unfair competitive commercial advantage over Harbor Compliance by, *inter alia*, (a) upon information and belief, entering into or continuing to operate under the Partnership Agreement solely as a ruse to steal Harbor Compliance's business, including, but not limited to, its trade secrets and Confidential Information; (b) competing directly with Harbor Compliance during the term of the Partnership Agreement contrary to the provisions therein; and (c) devising a deliberate scheme to force early termination of the Partnership Agreement contrary to the provisions therein.

211.    Thus, Harbor Compliance and Firstbase now sell and offer for sale substantially the same goods and services to substantially the same customer base through substantially the same channels of trade.

212.    Firstbase previously marketed and sold Harbor Compliance's customer-facing, white-label platform and infrastructure through Firstbase, to Firstbase's customers and prospective customers.

213.    As aforesaid, Firstbase is currently marketing and selling an "Autopilot" program that, *at a minimum*, mimics the look and feel of Harbor Compliance's white-label platform and infrastructure it provided to Firstbase under the terms and on the conditions of the Partnership Agreement.

214.    Firstbase's direct and indirect communications with its clients and contacts, including, but not limited to, Firstbase's email blasts detailed above and as set forth on Firstbase's website, contained or contains, upon information and belief, false descriptions or designations of origin, false or misleading descriptions of fact, and/or false or misleading representations of fact with respect to said goods and services, which is likely to deceive as to the origin of those goods or services, particularly in connection with potential partners in the industry (a) with whom Harbor Compliance has discussed API integration and (b) who are already aware that Harbor Compliance has provided its white-label platform and infrastructure to Firstbase in the past.

215.    As aforesaid, Firstbase is now competing with Harbor Compliance in the same channels of trade by appealing to the same customers and prospective customers in connection with marketing and offering substantially the same services, which services Harbor Compliance is contemplated to perform under the Partnership Agreement; in thirty-four (34) states around the country in violation of the terms of the Partnership Agreement.

216.    Firstbase's unfair professional and business practices have unjustly minimized Harbor Compliance's competitive advantage and have caused and continue to cause Harbor Compliance to suffer damages.

217.    As a direct and proximate result of Firstbase's unfair professional and business practices, Harbor Compliance will continue to suffer irreparable injury, for which Harbor Compliance has no adequate remedy at law.

218.    Due to Firstbase's conduct as aforesaid, Harbor Compliance seeks damages in the form of Firstbase's profits being disgorged and/or Defendant being required to restore any and all revenues, earnings, profits, compensation, benefits, and rights of attribution that may have accrued to or been obtained by Firstbase as a result of its unfair competition, including, but not limited to, returning any revenue earned from the unlawful and unfair use of Harbor Compliance's trade secrets and Confidential Information, and permanent injunctive relief.

219.    Firstbase's conduct as aforesaid has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance.

## COUNT V
### (Unjust Enrichment)

220.    The foregoing paragraphs are hereby incorporated as if set forth herein at length.

221.    As a result of Firstbase's conduct as aforesaid, benefits were conferred on Firstbase by Harbor Compliance.

222.    As a result of Firstbase's conduct as aforesaid, Firstbase appreciated said benefits.

223.    As a result of the conduct as aforesaid, it would be inequitable to permit Firstbase to retain said benefits without payment of value to Harbor Compliance.

224.    Harbor Compliance seeks substantial damages, the precise amount of which will be determined at trial, including, but not limited to, significant damages tied to unreimbursed expenses and costs, lost profits, and lost opportunities, in the form of the imposition of reasonable royalty or otherwise.

225.    Firstbase's conduct has been willful, outrageous, undertaken with reckless indifference to the rights of Harbor Compliance, in bad faith, and with the intent to harm Harbor Compliance for its own competitive advantage.

**WHEREFORE**, Plaintiff Harbor Business Compliance Corporation respectfully requests that this Honorable Court enter judgment in its favor against Defendant Firstbase.io, Inc. in connection with each of the foregoing causes of action, and Order the following relief:

A.    That Defendant, and all other persons or entities acting in active concert or participation with Defendant, be permanently enjoined and restrained from violating the Partnership Agreement, including, but not limited to, Sections 2.1, 2.2, 4, and 7.3 therein, by, *inter alia*, possessing, using, copying, and/or disclosing any Confidential Information and/or trade secrets belonging to Plaintiff in a manner not contemplated by the Partnership Agreement;

B.    That Defendant be specifically required to perform under the Partnership Agreement, including, but not limited to, Sections 2.1, 2.2, 4, and 7.3 therein;

C.    That Defendant be specifically required to perform under the operative SOWs, including, but not limited to, SOW #1, by, *inter alia*, complying with Sections 2, 3, 4, and 5 of SOW #1;

D.    That Defendant be compelled, at its own cost and expense, to have its current and former employees' electronic devices, including any and all computers and cellphones, which were, *inter alia*, used in conjunction with (i) Defendant's performance under the Partnership Agreement and operative SOWs; (ii) Defendant's nonperformance under the Partnership Agreement and operative SOWs; (iii) Defendant's purported "independent development" of its "Firstbase Agent" without use of Plaintiff's services, (iv) Defendant internally contemplating entering into a business relationship with Plaintiff, both initially and with respect to proposed

amendments to the Partnership Agreement in or around September and October 2022; (v) Defendant and Plaintiff contemplating entering into a business relationship, both initially and with respect to proposed amendments to the Partnership Agreement in or around September and October 2022; (vi) Defendant and Plaintiff negotiating, mapping out, outlining, and/or otherwise discussing the terms and conditions, and/or provisions, of the Partnership Agreement; (vii) Plaintiff and Defendant executing the Partnership Agreement; and/or (viii) Defendant contemplating its attempted exit from the Partnership Agreement, both internally, with Defendant's investors, and with Plaintiff, from January 1, 2022 to the present, be forensically examined by an independent third party approved by Plaintiff to confirm that Defendant is not using any of Plaintiff's trade secrets or Confidential Information contrary to provisions of the Partnership Agreement and operative SOWs;

E.      That Defendant be required to disgorge all payments, benefits, and alleged work-related costs and expenses that it received from Plaintiff while engaging in some or all of the above-stated unlawful activities;

F.      That Defendant be required to disgorge all payments and benefits, including, but not limited to, revenues and profits, which it received from customers and clients while competing directly with Plaintiff contrary to the terms of the Partnership Agreement and while engaging in some or all of the above-stated unlawful activities;

G.      That the Court impose a reasonable royalty pursuant to the DTSA and PUTSA in connection with Defendant's continued use of Plaintiff's trade secrets and Confidential Information in connection with Defendant's continued offering for sale of the Firstbase Agent services platform, and the API it is now offering to partners, other than through Plaintiff;

H.     That   Plaintiff   be   awarded   actual,   compensatory,   consequential   and punitive/exemplary  damages, pre-judgment and post-judgment  interest, reasonable attorney's fees, costs, and expenses for Defendant's separate and distinct  material breaches of the Partnership Agreement and operative SOWs, including,  but not limited  to, SOW #1, as well as for Defendant's intentionally  tortious conduct;

I.      That   Plaintiff   be   awarded   actual,   compensatory,   consequential   and punitive/exemplary  damages, pre-judgment and post-judgment  interest, reasonable attorney's fees, costs, and expenses, pursuant to the DTSA and PUTSA and/or any other statutory or common law or rule; and

J.     That Plaintiff be awarded such other and further necessary and proper relief as this Court may deem just and proper.

Respectfully  submitted,

**ROYER COOPER COHEN BRAUNFELD LLC**

Dated: March 1, 2023                    By: */s/ Matthew Faranda-Diedrich*
Matthew Faranda-Diedrich  (203541)
Julie M. Latsko (315782)
David S. Hollander  (327709)
Two Logan Square
100 N. 18th Street, Suite 710
Philadelphia,  PA 19103
267-546-0275  (phone)
484-362-2630  (fax)
mfd@rccblaw.com
jlatsko@rccblaw.com
dhollander@rccblaw.com

*Attorneys for Plaintiff, Harbor Business Compliance Corporation*