UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

HARBOR BUSINESS COMPLIANCE CORP., :
                    Plaintiff, :
                     :
         v. :   No. 5:23-cv-00802
                     :
FIRSTBASE.IO, INC., :
                    Defendant. :

**O P I N I O N**
**Motions to Dismiss, ECF Nos. 18 and 22 – Granted in Part, Denied in Part**

**Joseph F. Leeson, Jr.**                                                                 **April 26, 2023**
**United States District Judge**

I.     **INTRODUCTION**

        This case involves the unsuccessful business relationship of two companies. Plaintiff Harbor Business Compliance Corporation ("HC") initiated the above-captioned action against Defendant FIRSTBASE.IO., INC. ("Firstbase") alleging that Firstbase, after acquiring trade secrets of HC, breached the Partnership Agreement between the companies relating to the licensing, marketing, and sale of HC's white-labeled registered agent service.[1] Firstbase has filed a Motion to Dismiss four (4) of the six (6) counts in the Complaint. For the reasons set forth below, the Motion to Dismiss is granted in part as to the claim for Unjust Enrichment, which is dismissed with prejudice, and denied in all other respects.

---

[1]     A white-label product or service is produced by one company (producer) that other companies (marketers) rebrand to make it appear as if they had made it. *See* Compl. ¶ 14, n.2.

## II.     BACKGROUND

On March 1, 2023, HC filed a Complaint against Firstbase with six counts: (I) Breach of Contract; (II) Breach of Implied Covenant of Good Faith and Fair Dealing; (III) Misappropriation of Trade Secrets under Pennsylvania Law;[2] (IV) Misappropriation of Trade Secrets under Federal Law;[3] (V) Common Law Unfair Competition; and (VI) Unjust Enrichment.[4]  *See* Compl., ECF No. 1.[5]  According to the Complaint:

"Harbor Compliance is a software-focused provider of a wide array of compliance solutions for companies of all types and sizes."  Compl. ¶ 8.  Since 2012, HC has worked with more than thirty-five thousand (35,000) account users to register for and maintain compliance by utilizing "its unique blend of highly confidential and proprietary reference data, entity data, technology, methodologies, and 'know-how,' which was obtained through many years of industry experience."  *Id.*  Firstbase is a "new entity in the process of building an all-in-one Company [operating system ('OS')] to help define how founders across the globe launch, manage, and grow their businesses."  *Id.* ¶ 9 (internal quotations omitted).

On or about March 14, 2020, Firstbase purchased HC's branded registered agent service. *Id.* ¶ 11.  In February 2022, Firstbase contacted HC about wanting to license HC's software to provide Firstbase's customers the same (or substantially the same) services that HC brands and offers for sale under its own trade name to the consuming public.  *Id.* ¶ 14.  Firstbase sought an exclusive nationwide registered agent partner with HC.  *Id.* ¶ 18.

---

[2]     Pennsylvania Uniform Trade Secrets Act ("PUTSA")
[3]     Defend Trade Secrets Act ("DTSA")
[4]     The Complaint includes two counts labeled "Count V."  The first Count V begins on page 47 of the Complaint and is for "Common Law Unfair Competition."  The second Count V begins on page 49 of the Complaint and is for "Unjust Enrichment."  For purposes of this Opinion and to avoid confusion, the second Count V for "Unjust Enrichment" will be referred to as Count VI.
[5]     An unredacted copy of the Complaint is filed under seal at ECF No. 3.

By March 2022, as negotiations continued, Firstbase requested information concerning HC's confidential business methodologies, such as the methodology through which HC processes mail on behalf of its customers, the names of third-party service providers in HC's network, information on HC's customer intake forms, the mechanisms and methodology through which HC's API would be sending data to Firstbase, and how to leverage client-facing features such as ongoing compliance reminders and filings through such mechanisms and methodologies for transferring data.  *Id.* ¶ 23.  Firstbase also requested HC's proprietary, confidential, and trade secret compilations of detailed, state/commonwealth/territory-specific jurisdictional requirements and information, of internal and external processes, of "know how" utilized by HC in connection with performing efficient, expeditious, and consistent quality services to the consuming public at large, which HC had developed over the course of many years in the industry and through working and building relationships directly with contacts at the relevant agencies located in each of the states/commonwealths/territories throughout the United States (the "JX Databases"), and of HC's marketing and sales data and information for effective productization, pricing, packaging, and the like.  *Id.* ¶¶ 24-25.  HC provided the same pursuant to a Non-Disclosure Agreement ("NDA").  *Id.* ¶ 26.

By the end of May 2022, HC had begun creating the white-labeled Firstbase Agent.  *Id.* ¶ 53.  On May 28, 2022, after negotiating the parameters for HC to become the exclusive nationwide registered agent of, and white-labeled solution for, Firstbase, HC and Firstbase signed a "Partnership Agreement."  *Id.* ¶ 29.

The following month, Firstbase began marketing the HC white-label Firstbase Agent to its clients.  *Id.* ¶ 58.  However, HC alleges, Firstbase did not negotiate in good faith as required by the Partnership Agreement, and HC contributed a greater amount of work and money than it

otherwise would have, such as processing between six hundred (600) and one thousand (1,000) new orders per month.  *Id.* ¶¶ 62-66.  On August 29, 2022, HC delivered its redesigned API (application programming interfaces) to Firstbase.  *Id.* ¶ 68.

Despite HC's delivery, Firstbase never implemented the API as agreed, which prevented the system from becoming automated.  *Id.* ¶ 68.  Firstbase did not compensate HC for its work done to automate the system.  *Id.* ¶ 69.  Between May 2022 and January 31, 2023, HC delivered two thousand eight hundred seventy-two (2,872) total filings on behalf of Firstbase customers, some of which were canceled by Firstbase.  *Id.* ¶¶ 70-71.  There were more than an additional one hundred (100) orders placed by Firstbase in which Firstbase failed to provide sufficient information.  *Id.* ¶ 72.

In September 2022, Firstbase, accusing HC of trying to charge additional costs, contacted HC to amend the Partnership Agreement.  *Id.* ¶ 77.  On or about November 1, 2022, during one of the Parties' Status Meetings, a representative of Firstbase disclosed that Firstbase was attempting to exit the Partnership Agreement because one of its potential investors preferred Firstbase to run the Firstbase Agent itself, rather than relying on a white-label arrangement with HC.  *Id.* ¶ 91.  The next day, Firstbase sent a letter to HC noticing its intent to terminate the Partnership Agreement based on HC's alleged breaches.  *Id.* ¶ 92.  HC challenged the termination and attempted to negotiate with Firstbase, detailing the future potential of the partnership and advising Firstbase that HC was working on "automating CA, FL, NY and TX within the next two months."  *Id.* ¶ 94.  The companies continued to communicate regarding alleged breaches, curing the same, and termination of the Partnership Agreement.  *Id.* ¶¶ 95-107.

On November 17, 2022, Firstbase sent an email to its clients and contacts announcing the the expansion of its Firstbase Agent to the same four states HC had mentioned: California,

4
042623

Florida, New York, and Texas. *Id.* ¶ 102. On or around November 22, 2022, Firstbase's website pictured its new Firstbase Agent service, which HC alleges looked "remarkably similar" to the white-labeled Firstbase Agent that HC was obligated to provide under the Partnership Agreement. *Id.* ¶ 103. Two weeks prior, Firstbase had formed a new company called Firstbase Agent LLC, which was qualified/or registered to do business in several states. *Id.* ¶¶ 110-113. Firstbase Agent LLC engaged Northwest Registered Agent, LLC to provide registered agent services on behalf of Firstbase Agent LLC's and Firstbase's clients, which HC alleges is in direct violation of the Partnership Agreement. *Id.* ¶ 114. By the end of 2022, Firstbase had rolled out its Firstbase Agent to a total of nine (9) states, and to an additional twenty-three (23) states by the end of January 2023. *Id.* ¶¶ 119-120. HC alleges that Firstbase's conduct and rapid expansion of its purportedly "independently developed" services shows that Firstbase only partnered with HC to leverage HC's confidential business model and materials without compensating HC for use of its proprietary and trade secret information. *Id.* ¶ 122.

      Firstbase filed a Motion to Dismiss Counts III through VI of the Complaint. *See* Mot., ECF No. 22.[6] As to Counts III and IV (Misappropriation of Trade Secrets), Firstbase argues that the Complaint fails to adequately plead the existence of trade secrets under PUTSA and/or DTSA, that reasonable steps were taken to protect the information, or that Firstbase misappropriated the same. *See id.* 7-16. Next, Firstbase asserts that because Counts V and VI arise out of the same conduct underlying Plaintiff's trade secrets claims, they are preempted under PUTSA. *See id.* 16-19. Firstbase further contends, as to Count VI, that it should be dismissed because the doctrine of unjust enrichment is inapplicable where, as here, there is a written contract between the parties. *See id.* 19-20 (quoting *Wilson Area Sch. Dist. v. Skepton*,

---

[6]    An unredacted copy of the Motion to Dismiss is filed under seal at ECF No. 18.

895 A.2d 1250, 1255 (Pa. 2006) (holding "that the doctrine of unjust enrichment is inapplicable here since the relationships between the [parties] were founded upon written contracts")). The Motion to Dismiss is fully briefed. *See* Resp., ECF No. 24; Reply, ECF No. 28.

### III. LEGAL STANDARDS

#### A. Motion to Dismiss - Review of Applicable Law

Under Rule 12(b)(6), the court must "accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted). Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. *Id.* at 234 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* (explaining that determining "whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense"). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Also, "a document integral to or explicitly relied upon in the complaint may be considered." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotations omitted). The defendant bears the burden of demonstrating that a plaintiff has failed to state a

claim upon which relief can be granted. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

      **B.**      **Misappropriation of Trade Secrets- Defend Trade Secrets Act ("DTSA") – Review of Applicable Law**

The elements of a federal trade secret misappropriation claim under DTSA are: (1) existence of a trade secret; (2) that is related to a product or service used in, or intended for use in, interstate or foreign commerce; and (3) misappropriation of that trade secret. *See Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021). The DTSA "defines a trade secret as information that 'the owner thereof has taken reasonable measures to keep ... secret' and that 'derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.'" *Mallet & Co. v. Lacayo*, 16 F.4th 364, 380-81 (3d Cir. 2021) (quoting 18 U.S.C. § 1839(3)). "The DTSA defines 'misappropriation' as the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;' or the 'disclosure or use' of a trade secret without the consent of the owner." *Teva Pharm. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 674 (E.D. Pa. 2018) (quoting 18 U.S.C. §§ 1839(5)(A), (B)).

      **C.**      **Misappropriation of Trade Secrets- Pennsylvania Uniform Trade Secrets Act ("PUTSA") – Review of Applicable Law**

Under Pennsylvania law, the prima facie elements of the tort of misappropriation of a trade secret under PUTSA are: "(1) the existence of a trade secret; (2) communication of the trade secret pursuant to a confidential relationship; (3) use of the trade secret, in violation of that confidence; and (4) harm to the plaintiff." *Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 566 (3d Cir. 2003). A trade secret is defined under Pennsylvania law as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (citing 12 Pa. C.S.A. § 5302 and *Rohm and Haas Co. v. Lin*, 992 A.2d 132, 143 n.4 (Pa. Super. Ct. 2010)).

Misappropriation includes, among other things, "disclosure or use of a trade secret of another without express or implied consent by a person who:

> (i)  used improper means to acquire knowledge of the trade secret;
> (ii)  at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> (A)  derived from or through a person who had utilized improper means to acquire it;
> (B)  acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> (C)  derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
> (iii)  before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

12 Pa. C.S.A. § 5302.

### D.     Action for Unfair Competition – Review of Applicable Law

"Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (USA) v. Globus Med., Inc.*, No. 04-CV-1235, 2005 U.S. Dist. LEXIS 19962, at *24-25 (E.D. Pa. Sep. 14, 2005). "These courts turn to Restatement (Third) of Unfair Competition Section 1 to define the elements of unfair competition." *USA Corp. v. Hart*, 516 F. Supp. 3d 476, 504 n.175 (E.D.

Pa. 2021). "Under the Restatement, a defendant is liable for unfair competition if: (1) he engages in deceptive marketing, infringement of trademark or other protectable intellectual property, misappropriation of trade secrets, or acts or practices that are actionable under federal or state statutes; and (2) his conduct causes harm to the plaintiff's commercial relations." *Teva Pharm. USA, Inc.*, 291 F. Supp. 3d at 679 (citing Restatement (3d) of Unfair Competition § 1).

E. **Unjust Enrichment – Review of Applicable Law**

The elements of unjust enrichment are: (1) benefits conferred upon defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F. Supp. 2d 303, 319 (E.D. Pa. 2007) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999)). "[T]he most significant element of the doctrine is whether the enrichment of the defendant is unjust. The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Styer v. Hugo*, 619 A.2d 347, 350 (Pa. Super. Ct. 1993). A "claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'" *Torchia ex rel. Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985) (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. 1973). *See also Whitaker v. Herr Foods, Inc.*, 198 F. Supp. 3d 476, 492-93 (E.D. Pa. 2016). "[T]he essence of the doctrine of unjust enrichment is that there is no direct relationship between the parties." *Gee v. Eberle*, 420 A.2d 1050, 1060 (Pa. Super. 1980); *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir. 1985) (quoting *Gee*, 420 A.2d at 1060).

## IV.     DISCUSSION

This Court finds that the Complaint, alleging that HC provided Firstbase with its JX Databases, which were developed over the course of many years in the industry, contains sufficient factual allegations pleading the existence of trade secrets under DTSA and PUTSA. *See Asset Planning Servs., Ltd. v. Halvorsen*, No. 21-2021, 2022 U.S. Dist. LEXIS 68073, at *18-19 (E.D. Pa. Apr. 13, 2022) (finding that the plaintiff had sufficiently pled facts to support its claims for misappropriation of trade secrets where the client lists, proprietary software, and benefit information available to employees and retirees, took years to develop). Further, the Complaint's allegations that the Firstbase Agent service on its website in November 2022 looked "remarkably similar" to the one HC provided are sufficient to plead Firstbase's misappropriation of HC's trade secrets. *See Whelan Assocs. v. Jaslow Dental Lab., Inc.*, 797 F.2d 1222, 1231-32 (3d Cir. 1986) (holding that "copying may be proved inferentially by showing that the defendant had access to the allegedly infringed copyrighted work and that the allegedly infringing work is substantially similar to the copyrighted work"). The Motion to Dismiss Counts III and IV is therefore denied.

At this early stage of the litigation, the Motion to Dismiss is also denied to the extent it asserts Counts V and VI are preempted by PUTSA. *See Ilapak, Inc. v. Young*, No. 5:20-cv-01877, 2020 U.S. Dist. LEXIS 94550, at *14 (E.D. Pa. May 29, 2020) (rejecting the defendant's argument that the common law unfair competition claim is preempted by PUTSA because "tort claims that may or may not be preempted by PUTSA are not dismissed this early in the proceedings"); *PNC Mortgage v. Superior Mortgage Corp.*, No. 09-5084, 2012 U.S. Dist. LEXIS 25276, *44 (E.D. Pa. Feb 27, 2012) ("Tort claims that may or may not be preempted by

PUTSA are not dismissed at the motion to dismiss stage."). The Motion to Dismiss Count V is denied.

To the extent the Motion to Dismiss Count VI is also based on the existence of a written contract, it is granted. "The Supreme Court of Pennsylvania has concluded that 'the quasi-contractual doctrine of unjust enrichment [is] inapplicable when the relationship between parties is founded on a written agreement or express contract.'" *Benefit Tr. Life Ins. Co.*, 776 F.2d at 1177 (quoting *Schott v. Westinghouse Electric Corp.*, 259 A.2d 443, 448 (Pa. 1969)). HC's reliance on *Alpart* for its statement that "[b]ecause the Federal Rules of Civil Procedure enable the plaintiffs to plead in the alternative, a claim for breach of contract and unjust enrichment can coexist at this early stage of litigation" is misplaced. *See* Resp. 23-24 (quoting *Alpart v. Gen. Land Ptnrs, Inc.*, 574 F. Supp. 2d 491, 507 (E.D. Pa. 2008)). HC takes the statement out of context. In *Alpart*, the plaintiff's unjust enrichment claim was based on the defendant's alleged breach of two contracts, one written and one oral. The court's statement regarding alternative theories allowed the unjust enrichment claim based on the disputed oral contract to survive the motion to dismiss stage. *See Alpart*, 574 F. Supp. 2d at 507. However, the court dismissed the unjust enrichment claim to the extent it was based on a written contract. *See id.* Here, HC does not allege breach of an oral contract by Firstbase, only a written contract. Accordingly, *Alpart* supports dismissal of the unjust enrichment claim under these facts. Count VI is dismissed with prejudice.[7]

---

[7] Any amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (explaining that leave to amend need not be granted if amendment would be futile or inequitable); *Benefit Tr. Life Ins. Co.*, 776 F.2d at 1177 (concluding that because the plaintiffs had a direct contractual relationship with the defendant, "under Pennsylvania law no basis exists for an action of unjust enrichment").

## V. CONCLUSION

Defendant's Motion to Dismiss Counts III, IV, and V is denied.  The Motion to Dismiss Count VI (Unjust Enrichment) is granted to the extent that it is based on the alleged breach of a written contract.  Count VI is dismissed with prejudice.

A separate order follows.

               BY THE COURT:

               */s/ Joseph F. Leeson, Jr.*
               JOSEPH F. LEESON, JR.
               United States District Judge