UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

HARBOR COMPLIANCE CORP.,            :
                    Plaintiff,       :
                                     :
          v.                         :        No.  5:23-cv-0802
                                     :
FIRSTBASE.IO, INC.,                  :
                    Defendant.       :
_____

**O P I N I O N**
**Pl. Motions in Limine (Waldbusser- API), ECF Nos. 99, 146 - Granted in Part, Denied in Part**
**Pl. Motions in Limine (Waldbusser- Use), ECF Nos. 100, 147 - Denied**
**Pl. Motions in Limine (Hudson), ECF Nos. 101, 149 - Granted in Part and Denied in Part**
**Def. Motions in Limine (Urbanchuk), ECF Nos. 103, 150 - Denied**

**Joseph F. Leeson, Jr.**                                          **April 3, 2024**
**United States District Judge**


## I.      INTRODUCTION

This case involves the unsuccessful business relationship of two companies.  Plaintiff

Harbor Compliance Corporation ("Harbor") initiated the above-captioned action against

Defendant FIRSTBASE.IO., INC. ("Firstbase") alleging that Firstbase, after acquiring trade

secrets of Harbor, breached the Partnership Agreement between the companies relating to the

licensing, marketing, and sale of Harbor's white-labeled registered agent service.[1]  Both parties

have filed motions in limine to preclude and/or limit the other side's expert witness testimony

and/or reports.  The motions are fully briefed and, for the reasons set forth below, Firstbase's

motion is denied, and Harbor's motions are denied in part and granted in part.

_____

[1]      A white-label product or service is produced by one company (producer) that other
companies (marketers) rebrand to make it appear as if they had made it.  *See* Compl. ¶ 14, n.2,
ECF No. 1.

## II.      BACKGROUND

Now remaining[2] are Harbor's claims for: (I) Breach of Contract; (II) Breach of Implied Covenant of Good Faith and Fair Dealing; (III) Misappropriation of Trade Secrets under Pennsylvania Law;[3] (IV) Misappropriation of Trade Secrets under Federal Law;[4] and (V) Common Law Unfair Competition.  *See* Compl., ECF Nos. 1, 3.[5]  Additionally, Firstbase has filed counterclaims for: (I) Breach of Contract; and (II) Fraudulent Inducement to Contract.  *See* Answer, ECF Nos. 34, 37.  The factual background was discussed in a prior opinion, *see* ECF No. 32, and will not be repeated herein.  Trial is scheduled to begin on April 8, 2024.

The parties have filed motions in limine to preclude and/or limit the other side's expert witness testimony and/or reports.  The four motions are as follows: First, Harbor filed a Motion in Limine to Exclude the Opinions and Proposed Testimony of Steve Waldbusser on the topic of "use."  *See* Waldbusser Use Mot., ECF Nos. 100, 147.  Firstbase filed a Brief in Opposition.  *See* Waldbusser Use Opp., ECF Nos. 109, 154.  Second, Harbor filed a Motion in Limine to Exclude Certain API Related Opinions and Testimony of Steve Waldbusser.  *See* Waldbusser API Mot., ECF Nos. 99, 146.  Firstbase filed a Brief in Opposition.  *See* Waldbusser API Opp., ECF Nos. 110, 153.  Third, Harbor filed a Motion in Limine to Exclude the Testimony of Chad Hudson.  *See* Hudson Mot., ECF Nos. 101, 149.  Firstbase filed a Brief in Opposition.  *See* Hudson Opp., ECF Nos. 108, 152.  Fourth, Firstbase filed a Motion in Limine to Exclude the Expert Report and Testimony of Greg Urbanchuk.  *See* Urbanchuk Mot., ECF Nos. 103, 150.  Harbor filed a Brief

---

[2]      On April 26, 2023, the count for Unjust Enrichment was dismissed with prejudice.  *See* ECF No. 32.  On November 6, 2023, summary judgment was denied based on genuine issues of material fact.  *See* ECF No. 95.

[3]      Pennsylvania Uniform Trade Secrets Act ("PUTSA")

[4]      Defend Trade Secrets Act ("DTSA")

[5]      Throughout the Opinion, there are references to two separate documents for each pleading, motion, and brief because one is sealed and the other was filed in redacted form.

in Opposition.  *See* Urbanchuk Opp., ECF Nos. 111, 151.  Firstbase filed a Reply.  *See*

Urbanchuk Reply, ECF Nos. 113, 142.

## III.    LEGAL STANDARD

### A.    Expert Testimony – Review of Applicable Law

"Under the Federal Rules of Evidence, it is the role of the trial judge to act as a

'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also

reliable."  *Kannankeril v. Terminix Int'l*, 128 F.3d 802, 806 (3d Cir. 1997) (citing *Daubert v.*

*Merrell Dow Phamaceuticals*, 509 U.S. 579, 589 (1993)).  "The Federal Rules of Evidence

embody a 'strong and undeniable preference for admitting any evidence having some potential

for assisting the trier of fact.'"  *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996)

(quoting *DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).  "Exclusion of

expert testimony is the exception rather than the rule because 'vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence.'"  *Keller v.*

*Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 674 (E.D. Pa. 2008) (quoting Fed. R.

Evid. 702 (advisory committee notes) (citing *Daubert*, 509 U.S. at 595)).

"Rule 702, which governs the admissibility of expert testimony, has a liberal policy of

admissibility."  *Kannankeril*, 128 F.3d at 806 (citing *Holbrook*, 80 F.3d at 780).  Rule 702 of the

Federal Rules of Evidence dictates:

> A witness who is qualified as an expert by knowledge, skill, experience, training,
> or education may testify in the form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not that:
>     (a) the expert's scientific, technical, or other specialized knowledge will help
>     the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) the testimony is based on sufficient facts or data;
>     (c) the testimony is the product of reliable principles and methods; and

>(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Ev. 702.  Recent amendments to the Rule "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."  *See* Fed. R. Ev. 702, Advisory Comm. Notes 2023 (stating that although "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility[; t]hese rulings are an incorrect application of Rules 702 and 104(a)"). "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). *See also Daubert*, 509 U.S. at 593-94 (requiring the court to apply a two-element test for determining the admissibility of expert testimony: "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue").

"The first requirement, whether the witness is qualified as an expert, has been interpreted liberally to encompass 'a broad range of knowledge, skills, and training.'"  *ID Sec. Sys. Can., Inc. v. Checkpoint Sys.*, 198 F. Supp. 2d 598, 602 (E.D. Pa. 2002) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).  "If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility."  *Kannankeril*, 128 F.3d at 809.

Under the second restriction, an expert's opinion must "be reliable, or based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Ellison v. United States*, 753 F. Supp. 2d 468, 475 (E.D. Pa. 2010) (internal quotations omitted). "[T]he inquiry as to whether a particular scientific technique or method is reliable is a flexible

one." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742.  The United States Supreme Court has advised the district courts to consider:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8 (citing *Daubert*, 509 U.S. 579 (1993); *United States v. Downing*, 753 F.2d 1224, 1237 (3d Cir. 1985)).  "However, the factors stated above are 'simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.'" *Qeisi v. Patel*, No. 02-8211, 2007 U.S. Dist. LEXIS 9895, at \*13-14 (E.D. Pa. Feb. 9, 2007) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999)).  "[T]he relevant reliability concerns may focus upon personal knowledge or experience," instead of "scientific foundations." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

"The final [restriction] requires that the expert testimony 'fit' by assisting the trier of fact." *ID Sec. Sys. Can., Inc.*, 198 F. Supp. 2d at 602-03 (citing *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000)).  "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Oddi*, 234 F.3d at 145 (quoting *In re Paoli*, 35 F.3d at 743)).  The standard is not high, *id.*, and "the test does not require that the opinion have 'the best foundation' or be 'demonstrably correct,' but only that the 'particular opinion is based on valid reasoning and reliable methodology.'" *ID Sec. Sys. Can., Inc.*, 198 F. Supp. 2d at 603 (citing *Oddi*, 234 F.3d at 146).

"When there is a proper challenge to the admissibility of evidence, such as a motion to exclude expert testimony, the party offering the expert bears the burden of establishing the admissibility of such expert's testimony and report by a preponderance of the evidence." *Steven J. Inc. ex rel. Fenton v. Landmark Am. Ins. Co.*, No. 14-474, 2015 U.S. Dist. LEXIS 80278, at *8 (M.D. Pa. June 22, 2015). *See also Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).

## IV.   DISCUSSION

### A.   Harbor's Motion in Limine to Exclude the Opinions and Proposed Testimony of Steve Waldbusser on the topic of "use" is denied.

Firstbase offers the expert report of Steve Waldbusser regarding the technical evidence in this case to support its defense to Harbor's trade secrets claims. Waldbusser's "work in trade secret disputes has included analyzing intellectual property and other evidence to find factors that would weigh for or against trade secret status such as prior availability to the public and whether reasonable measures were taken to keep the information secret. [He has] also examined technical evidence to determine whether the defendant has used any trade secrets or, alternatively, whether the defendant used information from other sources including its own development." *See* Waldbusser Report ¶ 7, ECF Nos. 99-1 and 100-1. He filed a report dated September 6, 2023 ("Waldbusser Report"). *See id.* Among other things, he opines that Dr. Ricardo Valerdi, Harbor's technical expert, has not shown unauthorized use of any of the alleged trade secrets. *See id.* 7, 37-40.[6] Waldbusser issued a supplemental report dated October 8, 2023 ("Waldbusser Supp. Report"). ECF Nos. 99-2 and 100-2. This report addresses Valerdi's

---

[6]     All references are to page numbers in Waldbusser's report(s) unless a paragraph citation is specifically referenced.

supplemental report and opines that Valerdi again failed to show unauthorized use of any of the alleged trade secrets.  *See id.* 5, 11-49.

Harbor filed a Motion in Limine to Exclude the Opinions and Proposed Testimony of Steve Waldbusser on the topic of "use."  *See* Waldbusser Use Mot.[7]  Harbor moves, in the alternative, to limit Waldbusser's utilization of the word "use" to the precise definition and factual context in which it was employed by him in his expert reports.  *See id.*  Harbor argues that the definition of "use" as employed by Waldbusser is erroneous and would be confusing to the jury.  Specifically, Harbor contends that Waldbusser applied a limited and incorrect definition of use and, further, failed to consider the acquisition or disclosure of trade secrets, which are other forms of misappropriation.  *See id.* 5-6, 9-15 (citing Waldbusser Dep. 271:25 – 272:1 (defining "use"), ECF No. 100-3).  In light of these issues and the alleged absence in Waldbusser's reports of any methodology or independent analysis, Harbor suggests that Waldbusser's reports and anticipated testimony are not reliable, nor would they be helpful to the jury.  *See id.* 12-15.  In response, Firstbase asserts that Waldbusser's analysis simply responds to the type of use Valerdi described in his reports, which is appropriate rebuttal to assist the jury in determining the accuracy and veracity of Valerdi's conclusions.  *See* Waldbusser Use Opp. 1-2.  Firstbase argues that if Waldbusser's reports are unreliable because he failed to consider other forms of misappropriation then Valerdi's reports are unreliable for the same reason.  *See id.* 14.  Firstbase further contends that the methodology used by Waldbusser is clear.  *See id.* 15-17.

Initially, the Court notes that although his first report includes a "Definitions" section, Waldbusser does not define "use."  *See* Waldbusser Report 7-10.  In the "Definitions" section of Waldbusser's supplemental report, he includes a subsection titled "Use of source code;"

---

[7]       Harbor does not challenge Waldbusser's qualifications.

however, he makes no attempt to offer a legal definition of the term "use."  *See* Waldbusser

Supp. Report 8-9.  Rather, this subsection essentially explains how source codes deliver services

to Firstbase customers and that, in general, not all source codes are delivered, instead remaining

in a source code repository.  *See id.*  Accordingly, he does not offer an incorrect definition of

"use" as Harbor suggests, nor any legal definition of the term "use."  Harbor may cross-examine

Waldbusser about how he defines use, but only to the extent it is probative to any challenge of

his credibility and conclusions, and only if it does not confuse the jury.[8]

To the extent Harbor complains that Waldbusser failed to consider other forms of

misappropriation, this alleged failure goes to the weight, not the admissibility of his

Waldbusser's opinion.  The absence of any methodology as to the other forms of

misappropriation does not impact the reliability of the methods he did employ.  Moreover,

Waldbusser was engaged to address the opinions of Valerdi.  *See* Waldbusser Report ¶ 12;

Waldbusser Supp. Report ¶ 6.  Valerdi, who recognized the different forms of misappropriation

but discussed only unauthorized use, opined: ". . . Firstbase has accessed and used (and is

currently accessing and using) Harbor Compliance's trade secrets without authorization."  *See*

Valerdi Report (dated August 7, 2023) ¶ 98, ECF No. 109-1. *See also* Valerdi Supp. Report

(dated September 23, 2023) ¶ 54, ECF No. 109-2 (discussing "Firstbase's unauthorized use of

Harbor Compliance's Trade Secret").  Waldbusser's conclusion that "Dr. Valerdi has not shown

unauthorized use of any of the alleged trade secrets" is therefore fair rebuttal.  *See* Waldbusser

---

[8]     This qualification is not an invitation to Harbor to relitigate the arguments presented in its
motion.  The Court cautions Harbor against asking any questions that will confuse the jury
because the prejudicial nature of such examination may outweigh its probative value.  To the
extent it becomes necessary, the Court will entertain a request for an instruction regarding
Waldbusser's definition of "use."

Report 7; Waldbusser Supp. Report 5.  Waldbusser's testimony will be helpful to the jury as it assesses Valerdi's conclusions.

Finally, Waldbusser's opinion does not extend into legal conclusions or usurp the jury's role.  *Compare* Waldbusser Mot. 2-3 (arguing that "Firstbase should not be allowed to offer into evidence or otherwise allow Mr. Waldbusser to opine that Harbor Compliance has not shown misappropriation . . . ").  Nevertheless, counsel is advised that neither Waldbusser nor Valerdi may offer an opinion as to whether Harbor has satisfied its legal burden of proof of showing misappropriation, as this is in the role of the jury.  To eliminate any risk that the jury will confuse its role and will construe Waldbusser's opinion as a legal conclusion, this Court will entertain a request for an instruction in this regard.[9]

For all these reasons, Harbor's Motion in Limine to Exclude the Opinions and Proposed Testimony of Steve Waldbusser on the topic of "use" is denied.

**B.      Harbor's Motion in Limine to Exclude Certain API Related Opinions and Testimony of Steve Waldbusser is granted in part and denied in part.**

In Waldbusser's reports, he reaches at least three API-related opinions.  Specifically, Waldbusser concludes: (1) Harbor misled Firstbase about the readiness of the Harbor API; (2) Harbor misled Firstbase about the capabilities of the Harbor API; and (3) Harbor's API document design was readily ascertainable from public sources.  *See* Waldbusser Report 7, 40-44 (sections 14-16); Waldbusser Supp. Report 28 (section 12.2).  In addition to the experience noted above regarding his work in trade secret disputes, Waldbusser has "over thirty-five (35) years of

---

[9]      The Court considers the risk of prejudice to be minimal in light of the anticipated jury instructions explaining the jury's role, the burden of proof, and opinion testimony (Third Circuit Model Instruction for Civil Cases 2.11), among others, but will consider a request for an additional instruction in this regard.  Any such proposed instruction, which should be based on the parties' agreed-upon language, should apply to the testimony of Waldbusser and of Valerdi.

personal experience as a software developer and consultant, including the design of network

protocols, software development of network software, development of web-based systems,

design and development of application programming interfaces (APIs), and the analysis of

computer-based data [and has] designed and analyzed workflows both as a software developer

and in the context of litigation." *See* Waldbusser Report ¶ 5.

Harbor filed a Motion in Limine to Exclude Certain API Related Opinions and

Testimony of Steve Waldbusser. *See* Waldbusser API Mot.[10]  Specifically, Harbor moves to

exclude the three opinions mentioned above for essentially two reasons. *See id.* 1.  First, Harbor

argues that Waldbusser's opinions, which opine as to the truthfulness or untruthfulness of

Harbor's communications, are nothing more than a factual narrative of certain documents and

other information relating to the development and capabilities of Harbor's API, allegedly

usurping the role of the jury to make credibility and factual determinations. *See id.* 3-4, 5-8.

Waldbusser purportedly fails to link such narration to a reliable methodology to support his

conclusions, offers no specialized knowledge or expertise, nor any independent analysis or

investigation of the technical components of the API, allegedly rendering his opinion unreliable

and unnecessary to assist the jury. *See id.*  Second, Harbor contends that Waldbusser makes bald

assertions, unconnected to any analysis, that Harbor's API was readily ascertainable from public

sources and therefore could not be deemed a trade secret, which is a legal issue for the jury and

the court. *See id.* 3-4, 8-10.

In response to Harbor's first argument, Firstbase asserts that Waldbusser's report is not a

mere factual narrative of certain documents; rather, the challenged sections involve basically the

same method of analysis Valerdi used to reach a different conclusion. *See* Waldbusser Opp. 1-2,

---

[10]     Harbor does not challenge Waldbusser's qualifications.

8-9 (suggesting that it would be fundamentally unfair to exclude Waldbusser's opinion but allow Valerdi to testify).  Firstbase notes that Waldbusser explains, *inter alia*, the meaning and significance of API Keys and why, in light of what API could actually do, some of the representations Harbor made to Firstbase were false.  *See id.*  Firstbase argues that because many of the communications contain technical jargon, Waldbusser's opinion assists the trier of fact in determining whether Firstbase was misled about the capabilities of Harbor's API.  *See id.*  In opposition to Harbor's second argument, Firstbase asserts that the challenged sections do not contain unsupported or improper legal conclusions; rather, Waldbusser analyzes Harbor's API documentation and concludes that the API Documentation contain HTTP, REST, and JSON standards, all of which are publicly available.  *See id.* 2-3, 9-11.  Firstbase argues that this is helpful to the jury in assessing whether the alleged trade secret is public because it illustrates that some portion of the API Documentation is public.  *See id.*  Firstbase further contends that to the extent Waldbusser may have improperly used the legal term "readily ascertainable," it was only in response to Valerdi's use of the term.  *See id.* (citing Valerdi Report 38-40, section titled "Harbor Compliance's Trade Secrets Were Not Readily Ascertainable").

Harbor's first contention, that Waldbusser's opinions in sections 14 and 15 of his report are not based on any technical analysis or specialized knowledge and are therefore not helpful to the jury, is unpersuasive.  Rather, in order to understand the cited communications between Firstbase and Harbor, which refer to "API Document," "API endpoints," "launch timeline," "beta" software, "API keys," etc., it is necessary to have a technical understanding of the terms.  Waldbusser offers this technical expertise.  His expertise and explanation about the launch process, including whether Harbor's statements were accurate with regard to the technical aspects of the API, will assist the jury in determining whether Harbor's statements were truthful.

However, Waldbusser may not opine as to whether Harbor "misled" Firstbase as that is a state of mind and is for the jury to decide. *See Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 648-49 (E.D. Pa. 2004) (holding that although the expert could opine on the technical aspects of the defendant's communication to the FAA, he could not opine that the defendant "misled" the FAA because state of mind was not in his area of specialized knowledge). Firstbase, if it intends to show the reports to the jury, shall remove any reference to "misled" from sections 14 and 15 of Waldbusser's report and is precluded from offering testimony that Harbor "misled" Firstbase.[11]

Harbor's second argument, that Waldbusser's conclusions Harbor's API was readily ascertainable from public sources is unsupported, is incorrect. Although the challenged sections,[12] alone, do not contain substantial analysis, Waldbusser's report must be read as a whole. *See Clark v. Richman*, 339 F. Supp. 2d 631, 648 (M.D. Pa. 2004) ("If the court examined the report now as plaintiffs urge, the court's determinations regarding the veracity, reliability, or weight of isolated statements in the report would be without the benefit of the context to be provided by other evidence, the context in which the report as a whole must be considered."). When considered in its entirety, Waldbusser's methodology for concluding that Harbor's API was readily ascertainable from public sources is sufficiently explained in his report. *See, e.g.* Waldbusser Report ¶¶ 59-65, 82-84, 88-89, 124; Waldbusser Supp. Report ¶ 89 (Section 12.2 states: ". . . Earlier in this report I discussed the publicly available sources of information about incorporations. . . ."). Additionally, to the extent Waldbusser uses the term "readily ascertainable," it is a proper rebuttal to Valerdi's use of the same term. At the parties' request;

---

[11]     The parties are directed to confer to reach an agreed-upon redaction / replacement in Waldbusser's Report to the term "misled."

[12]     Waldbusser Report section 16; Waldbusser Supp. Report section 12.2

however, the Court will instruct the jury regarding the experts' use of this term as it relates to the jury's role as fact-finder.[13]

Harbor's Motion in Limine to Exclude Certain API Related Opinions and Testimony of Steve Waldbusser is granted in limited part as to whether Harbor "misled" Firstbase, but otherwise denied.

### C.     Firstbase's Motion in Limine to Exclude the Expert Report and Testimony of Greg Urbanchuk is denied.

In support of its damages claim, Harbor offered an expert report authored by Gregory Urbanchuk ("Urbanchuk's Report") dated August 7, 2023.  *See* Ex. A, ECF No. 101-1.  At that time discovery was ongoing.  After completion of discovery and receipt of Firstbase's rebuttal expert report, Urbanchuk issued a supplemental report dated September 26, 2023 ("Urbanchuk's Supp. Report").  *See* Ex. C, ECF No. 101-3.  Urbanchuk is an expert witness in complex commercial litigation in the areas of intellectual property, commercial damages, and valuation with over twenty years of experience providing forensic, dispute, and valuation consulting services.  Urbanchuk was engaged by Harbor to quantify its monetary harm.  Monetary damages are calculated by Urbanchuk for three categories of claims: (1) breach claims, (2) trade secret claims, and (3) unfair competition claims.  *See id.* 3-4, 13-15.  For the breach claims, Urbanchuk calculated Harbor's damages to total $1,127,198, "which was comprised of (1) Outstanding Guaranteed Minimums due under the Partnership Agreement and addenda of $648,502 and (2) Harbor Compliance's Unpaid Invoices, totaling $478,696."  *See id.* 3.  For the trade secret and unfair competition claims, Urbanchuk calculated Harbor's damages based on a disgorgement of Firstbase's profits.  *See id.* 3-4.  These profits, associated with the Firstbase Agent and Start

---

[13]     Any such proposed instruction, which should be based on the parties' agreed-upon language, should apply to the testimony of Waldbusser and of Valerdi.

products, "totaled $14,757,399, which was comprised of (1) historical profits of $2,589,188 for the period from January 1, 2023, to July 31, 2023, and (2) prospective profits of $12,168,211 for the period from August 1, 2023, to March 28, 2027." *Id.*

Firstbase's Motion in Limine to Exclude the Expert Report and Testimony of Greg Urbanchuk is based on four arguments: (1) Urbanchuk improperly assumed that every dollar of profit earned by Firstbase is attributable to the alleged misappropriation; (2) unjust enrichment damages are not properly comprised of future/prospective profits; (3) even if the Court holds that Urbanchuk's disgorgement analysis is not excludable, there is no Seventh Amendment right to a jury and the issue of disgorgement damages must be considered by the Court and not the jury; and (4) Urbanchuk offers only simple arithmetic regarding the breach of contract claims that does not require specialized knowledge and is not helpful to the jury. *See* Urbanchuk Mot.[14]

### 1.    Urbanchuk's calculation of profits is reliable and helpful.

Urbanchuk calculated Harbor's monetary relief resulting from Firstbase's alleged misappropriate of trade secrets and unfair competition by quantifying Firstbase's profits associated with the Firstbase Agent and Start products. *See* Urbanchuk Supp. Report 19.  These profits are comprised of historical and prospective profits. *See id.* 20-24.  In calculating historical profits, Urbanchuk explained that he did not deduct any operating expenses because Mr. Sheikh, Firstbase's COO, "testified that it was not possible to attribute any of the operating expenses to the products at issue." *See id.* 20 (citing Sheikh's deposition testimony).  In his disgorgement of profits analysis, Urbanchuk explained that he was unable to conduct an apportionment analysis because Firstbase did not provide the necessary data. *See id.* 25.  In calculating prospective profits until March 28, 2027, five years after the date of the parties'

---

[14]    There is no suggestion that Urbanchuk is not qualified.

Confidentiality Agreement, Urbanchuk applied the terms of the parties' Confidentiality Agreement in which they viewed the economic life of the trade secrets as five years. *See id.* 21-23. Urbanchuk initially used Firstbase's own revenue projections, but once time passed and he had actual revenues instead of projections, he recalculated damages. *See id.* He also updated projections based, not on Firstbase's projections, but on actual profits from January to July 2023 because Firstbase's projections were substantially different than actual profits and Urbanchuk chose to be more conservative. *See id.* He then discounted Firstbase's cost of equity using the build-up method. *See id.* 23-24.

In its Motion, Firstbase asserts that Urbanchuk's report and testimony should be excluded because he improperly assumed every dollar of profit earned by Firstbase is attributable to the alleged misappropriation. Firstbase contends that Urbanchuk conflates causation and apportionment, resulting in an unreliable disgorgement analysis. Firstbase also argues that by simply assuming a causal link, Urbanchuk does not aid the trier of fact in ascertaining the specific amount of Firstbase profit that flowed from the purportedly wrongful conduct.

Initially, the Court finds that Urbanchuk has not confused causation and apportionment. Urbanchuk makes clear that his "analysis assumes liability with respect to all of Plaintiff's claims." *See* Urbanchuk Report 1 ("I offer no opinions on liability."). Urbanchuk explains that he assumes "for liability purposes – that Harbor Compliance has developed numerous trade secrets in the field of online business compliance services. These trade secrets provide economic value by (1) helping customers maintain accurate records and ensuring legal compliance in fifty states, and (2) providing savings of time and money by being implemented in an online platform that enables the automation of tasks that cannot be efficiently done manually." *See id.* 5. Urbanchuk "presumes that Firstbase misappropriated all of the foregoing Trade Secrets and

Confidential Information in order to offer the Firstbase Agent Plans currently available on its website." *See id.* 11.  Both parties submitted expert reports discussing the technical aspects of the alleged trade secrets and how they were incorporated into the Firstbase Agent services.  *See* Waldbusser Report; Valerdi Report.  Accordingly, if the jury determines that Firstbase is liable for misappropriation of trade secrets, the causal link between the trade secrets and the products that were created by incorporating those trade secrets will have been established.  *See Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 395 (3d Cir. 2016) (explaining that to satisfy the causal link the plaintiff must show that "the infringement contributed to the infringer's profits").  The jury may also find that Harbor is entitled to recover Firstbase's profits from the sale of those products.  *See* 15 U.S.C. § 1117(a) (For violations of trademark infringement, the plaintiff is entitled to recover: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . . In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction.").

Despite Firstbase's suggestion to the contrary, the burden of apportionment will have shifted to Firstbase.  *See id.* (holding that after the causal link is shown, the infringer bears the burden of apportioning the profits that were not the result of infringement" (internal quotations omitted)).  Whether there were "alternative explanations" for these profits that are not based on the alleged misappropriation as Firstbase suggests, *see* Urbanchuk Mot. 6, is therefore on Firstbase to prove.  *See Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 622 (1912) (concluding that the burden shifts to the defendant "after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment"); *Avco Corp. v. Turn & Bank Holdings, LLC*, 659 F. Supp. 3d 483, 508 n.131 (M.D. Pa. 2023) (awarding disgorged profits not because the trademark

holder established that sales for infringing services were due to infringement, but because the

infringer failed to prove that they were not due to infringement).  The Supreme Court has

explained this burden:

> If it can be shown that the infringement had no relation to profits made by the
> defendant, . . . *the burden of showing this is upon the poacher*. The plaintiff of
> course is not entitled to profits demonstrably not attributable to the unlawful use of
> his mark. *The burden is the infringer's* [sic] to prove that his infringement had no
> cash value in sales made by him.

*Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205-06 (1942)

(emphasis added ) (internal citations omitted); *Am. Eagle Outfitters, Inc. v. Walmart, Inc.*, No.

2:20-CV-00412-MJH, 2023 U.S. Dist. LEXIS 21638, at *9 (W.D. Pa. Feb. 6, 2023) (explaining

that "district courts continue to rely upon *Mishawaka* to support that the Lanham Act permits

*infringing defendants to present evidence* that some of the profits were unattributed to any

unlawful use of the trademark" (emphasis added)).  "There may well be a windfall to the trade-

mark owner where it is impossible to isolate the profits which are attributable to the use of the

infringing mark [b]ut to hold otherwise would give the windfall to the wrongdoer."  *See*

*Mishawaka Rubber & Woolen Mfg. Co.*, 316 U.S. at 206 ("If [it] does not do so, the profits made

on sales of goods bearing the infringing mark properly belong to the owner of the mark.").

    Firstbase's challenge to Urbanchuk's testimony is largely based on a misunderstanding of

this law.  Applying the correct law, Urbanchuk's opinion is reliable despite the absence of an

apportionment analysis.  Furthermore, Urbanchuk's calculations are not merely speculative.  He

initially used Firstbase's own profit projections.  *See, e.g. Hot Stuff Foods, LLC v. Hous. Cas.*

*Co.*, 771 F.3d 1071, 1079-80 (8th Cir. 2014) (rejecting the defendant's suggestion that the

plaintiff's sales projections were too speculative to support a lost profits determination because

the plaintiff compared actual sales during and after the recall with sales projections that were part

of its normal planning process).  After determining that these projections were too high in

comparison to actual sales; however, he recalculated prospective profits using actual sales.  This

method is widely accepted.  *See id.*; *Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC*, 423 F.

App'x 274, 285 n.12 (4th Cir. 2011) ("[U]sing past profits as a basis for calculating future lost

profits is a widely accepted methodology." (citing cases)).  Using another widely-accepted

method, Urbanchuk then discounted Firstbase's cost of equity using the build-up method.  *See*

*Integrity Energy, Ltd. v. Hunter*, No. 1:18-CV-00978, 2021 U.S. Dist. LEXIS 125370, at *25

(N.D. Ohio July 6, 2021) (accepting the expert's calculation of lost profits, "using a well-

regarded, the most widely used method, the Build-Up method," to award damages resulting from

the defendant's breaches); *Metal Conversion Techs., LLC v. Envtl. Integrity Co., LLC*, No. 4:14-

CV-0163-HLM, 2016 U.S. Dist. LEXIS 201209, at *11 (N.D. Ga. Aug. 25, 2016) (denying the

motion to exclude the expert, who, *inter alia*, calculated the cost of equity using the build-up

method).  His conclusions are therefore reliable and, because he properly limited his calculations

to profits associated with the Firstbase Agent and Start products (which incorporated the alleged

trademarks), "fit" the instant action and will assist the jury.

### 2.    Urbanchuk's calculation of unjust enrichment damages is reliable.

In its second argument to preclude Urbanchuk's testimony regarding future/prospective

profits, Firstbase argues that such profits cannot be included in calculating unjust enrichment

damages.  However, Firstbase relies on cases involving damages for an unjust enrichment claim,

as opposed to damages for a trademark infringement claim based on the unjust enrichment

caused by the misappropriation.  For example, Firstbase argues:

> The District of Delaware very recently excluded a damages expert's analysis in a
> trade secrets case, and in so doing explained that "[t]ypically, as to an unjust
> enrichment claim, only the defendant's actual profits can be used as a measure of

damages in cases where profits can be proved, and the defendant is normally not assessed damages on wholly speculative expectations of profits."

Urbanchuk Mot. 20-21 (quoting *FinancialApps, LLC v. Envestnet, Inc.*, No. CV 19-1337-GBW-CJB, 2023 U.S. Dist. LEXIS 164136, at *26 (D. Del. Sep. 13, 2023)).  However, Firstbase, omitting the internal citation and quotations in the *FinancialApps, LLC* quotation above, ignores the distinguishing parenthetical that followed.  The court in *FinancialApps, LLC*, in support of the statement quoted above, cited "*Grove US LLC v. Sany Am. Inc.*, Case Nos. 13-C-677, 2019 U.S. Dist. LEXIS 32125, 2019 WL 969814, at *3 (E.D. Wis. Feb. 28, 2019) (internal quotation marks and citations omitted) (*allowing an expert to use hypothetical future profit figures* only because the expert was not using them to measure unjust enrichment damages, but instead *to assess the value of certain trade secrets at the time of misappropriation*)."  *FinancialApps, LLC*, 2023 U.S. Dist. LEXIS 164136, at *26-27 (emphasis added).  Accordingly, *FinancialApps, LLC*, recognizing the distinction between the use of prospective profits to assess the value of trade secrets at the time of misappropriation but not to measure unjust enrichment damages, supports Urbanchuk's analysis.  The request to exclude Urbanchuk's testimony on this basis is therefore denied.  *See Donsco, Inc. v. Casper Corp.*, No. 75-63, 1980 U.S. Dist. LEXIS 9850, at *6 (E.D. Pa. Jan. 15, 1980) (holding that "as under the Lanham Act, lost profits are recoverable in suits for unfair competition in Pennsylvania" and "a plaintiff may recover prospective profits lost from its established business due to the tortious conduct of defendant").

### 3.    Harbor has a right to a jury trial on its claims.

Firstbase asserts that even if Urbanchuk's disgorgement of profits analysis is not excludable, the Court should preclude him from testifying regarding disgorgement before the jury because disgorgement damages are an equitable remedy for which there is no Seventh

Amendment right to a jury.  *See* Urbanchuk Mot. 22-24.[15]  Firstbase notes that Urbanchuk

calculated damages for the trade secret and unfair competition claims only on a disgorgement of

Firstbase's profits.  *See id.*  Firstbase argues that Harbor's claim is not a "proxy" for any alleged

actual loss or royalty and, therefore, is equitable, not legal, in nature.  *See id.*  It relies on, *inter

alia*, a 2018 Federal Circuit decision concluding there is no Seventh Amendment right to a jury

trial because disgorgement was not available in the courts of law in 1791.  *See id.* (citing *Tex.

Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018)

("TAOS") (determining the plaintiff did not have a right to a jury trial on its request for

disgorgement of the defendant's profits as a remedy for misappropriation of trade secrets)).

In response, Harbor asserts that under the Supreme Court's two-part test, the

disgorgement damages it seeks are a legal remedy to be heard by the jury.  *See* Urbanchuk Opp.

23-26[16] (citing *Chauffeurs, Teamsters & Helpers Local No. 391 v. Terry*, 494 U.S. 558 (1990)).

Under this test, in order to determine whether a claim is legal or equitable, the court must: (1)

"compare the statutory action to 18th-century actions brought in the courts of England prior to

the merger of the courts of law and equity;" and (2) "examine the remedy sought and determine

whether it is legal or equitable in nature."  *Id.*  Harbor contends that the TAOS court limited its

analysis to the first part of the inquiry because the parties stipulated that the remedy sought was

not historically available.  *See id.* 25-26 (quoting *Chauffers* as stating "the nature of the remedy

is always to be given more weight than the nature of the historically analogous right").  Harbor

contends that the nature of its remedy, seeking the recovery of money from Firstbase's assets,

not a fund or specific property in its possession, is not equitable.  *See id.* 24-26 (citing *Dastgheib*

---

[15]     Firstbase also submitted a letter-brief on March 29, 2024.
[16]     Harbor also submitted a letter-brief on March 29, 2024.

*v. Genentech, Inc.*, 457 F. Supp. 2d 536, 541-42 (E.D. Pa. 2006)).  Harbor further asserts that the bases of its underlying claims are both contractual and quasicontractual, and that a common thread through all its claims is Harbor's contention that it provided confidential and proprietary information in reliance on misrepresentations made by Firstbase.

After careful consideration, this Court finds that Harbor's claims are both equitable and legal in nature, therefore entitling it to a jury trial.  "[W]here both legal and equitable issues are presented in a single case, 'only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims.'"  *Int'l Commun. Materials v. Employer's Ins.*, No. 94-1789, 1996 U.S. Dist. LEXIS 21825, at *7 n.3 (W.D. Pa. May 29, 1996) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959)).  This case centers around a partnership and confidentiality agreement signed by the parties that governed their business relationship and the alleged trade secrets.  All claims, whether sounding in breach of contract, misappropriation of trade secrets, or unfair competition, arise from alleged violations surrounding these agreements and therefore present legal issues.  *See Chauffeurs, Teamsters & Helpers, Local No. 391*, 494 U.S. at 569 (concluding that because the employees, in order to recover from the union, had to prove violations of the collective-bargaining agreement, the claims presented legal issues); *See also Amoco Oil Co. v. Torcomian*, 722 F.2d 1099, 1105 n.13 (3d Cir. 1983) ("There is certainly dictum -- and perhaps even a holding -- in *Dairy Queen* suggesting that damage actions for trademark infringement are legal in character." (citing *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962))).

The kind of relief sought by Harbor is also legal in nature.  The Supreme Court holds that "[i]n cases in which the plaintiff could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money

to pay for some benefit the defendant had received from him, . . . the plaintiff's claim was considered legal." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).  In such cases, the remedy sought "is not equitable -- the imposition of a constructive trust or equitable lien on particular property -- but legal -- the imposition of personal liability for the benefits that they conferred upon respondents." *Id.* at 213-14.  This holding has been applied to a request for disgorgement of a defendant's future profits.  *See Dastgheib*, 457 F. Supp. 2d at 544 ("Like the plaintiff in Great-West, Dastgheib does not seek 'particular funds or property in the defendant's possession.' 534 U.S. at 213. In fact, Genentech's future profits, which Dastgheib seeks to disgorge in whole or in part, have not yet been earned.").

Moreover, although Harbor's expert only opined as to disgorgement damages, Harbor seeks relief for "compensatory damages, punitive/exemplary damages, and attorney's fees, costs, and expenses" in its trademark claims under both federal and state law.  *See* Compl. ¶¶ 191, 204.  "Compensatory and punitive damages are textbook legal remedies."  *See AFAB Indus. Serv. v. Pac-West Distrib. NV LLC*, No. 19-0566, 2023 U.S. Dist. LEXIS 189966, at *10 (E.D. Pa. Oct. 23, 2023) (concluding that where Pac-West also seeks "compensatory and punitive damages for its common law trademark infringement, unfair competition, unjust enrichment, and breach of contract claims," Pac-West's request for an accounting of profits (disgorgement) did not provide a basis to strike its jury demand).  For all these reasons, Harbor's "right to a jury trial under the Seventh Amendment does not yield to a potential claim for equitable relief."  *Id.*

### 4.    Urbanchuk may testify regarding breach of contract damages.

Firstbase asserts that Urbanchuk should be precluded from testifying regarding damages for the breach claims because he uses only simple arithmetic, not specialized knowledge. However, "Courts have held that an expert's specialized knowledge, even if it involves

application of a seemingly simple methodology, may still satisfy Rule 702 if it is 'helpful to the

trier of fact.'" *Jacoby Donner, P.C. v. Aristone Realty Capital, LLC*, No. 17-2206, 2020 U.S.

Dist. LEXIS 156677, at *59 n.9 (E.D. Pa. Aug. 27, 2020) (quoting *Total Control, Inc. v.*

*Danaher Corp.*, 338 F. Supp. 2d 566, 569 (E.D. Pa. 2004)).  In an attempt to distinguish *Total*

*Control, Inc.*, where the court admitted expert testimony even though the expert used basic skills

of arithmetic in arriving at his damage calculations, *see* 338 F. Supp. 2d at 569 (finding that "as a

financial analyst, his ability to present a vast quantity of calculations derived from disparate

sources in an understandable format will assist the jury"), Firstbase argues that Urbanchuk

reviewed a "small number of uncomplicated documents, *see* Urbanchuk Mot. 26 n.4.  These

documents included the Partnership Agreement and Addendums thereto, which provided for

guaranteed minimum amounts for two different services (Registered Agent Services and

Business Formation Document Filing Services) based on different prices per minimum

units/guaranteed volumes, as well as nineteen invoices reflecting payments by Firstbase to

Harbor.  *See* Urbanchuk Report 15-19.  From these invoices, Urbanchuk eliminated amounts

related to the Managed Annual Report Services in accordance with Addendum 4 of the

Partnership Agreement.  *See id.* 18 n.65.  This decision was based on his analysis of the entire

Partnership Agreement and Addendums thereto, all of which had to be completed prior to

arithmetical calculations.  Urbanchuk's specialized knowledge in complex commercial litigation

in the areas of intellectual property, commercial damages, and valuation and twenty years of

experience providing forensic, dispute, and valuation consulting services was therefore utilized

in calculating damages.  His expert testimony will be helpful to the jury and is therefore

admissible.  *See Downing*, 753 F.2d at 1229 ("Under Rule 702, 'an expert can be employed if his

testimony will be helpful to the trier of fact in understanding evidence that is simply difficult,

[though] not beyond ordinary understanding.'" (quoting S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 451 (3d ed. 1982))).

Consequently, Firstbase's Motion in Limine to Exclude the Expert Report and Testimony of Greg Urbanchuk is denied in its entirety.

### D.   Harbor's Motion in Limine to Exclude the Testimony of Chad Hudson is granted in part and denied in part.

In rebuttal to Urbanchuk's original Report and in support of damages on its counterclaims, Firstbase offers an expert report dated September 6, 2023, by Chad Hudson ("Hudson Report").  *See* Ex. B, ECF No. 101-2.  Hudson issued a further rebuttal report on October 18, 2023, addressing Urbanchuk's Supplemental Report dated September 26, 2023.  *See* Hudson Rebuttal, Ex. D, ECF No. 101-4.  Hudson has approximately fifteen (15) years' experience in public accounting, providing advisory services in areas including business valuation, analysis of complex financial transactions, and calculating and refuting lost profits and other economic damages.[17]  *See* Hudson Report, Appx. A.

Harbor's Motion in Limine to Exclude the Testimony of Chad Hudson is two-fold.  First, Harbor asserts that Hudson should be precluded from presenting expert testimony at trial with respect to his opinion on Firstbase's damages because his report lacks any methodology and/or basis in formulating his conclusions and is therefore unreliable.  Second, Harbor argues that Hudson should be precluded from presenting expert testimony at trial with respect to his rebuttal regarding Urbanchuk's opinion on Harbor's damages for the trademark and unfair competition claims, including his calculation of Firstbase's historic profits, because it is based on an incorrect

---

[17]     Harbor does not challenge Hudson's qualifications.

understanding of the law.  Harbor further asserts that Hudson's opinion that Urbanchuk "failed to

attain reasonable certainty" is a conclusion that usurps the role of the judge and/or jury.

> **1.      Objections regarding damages to third-party vendors and Hudson's alleged reliance on materials not provided in discovery are overruled.**

Initially, Harbor contends that Firstbase's use of third-party vendors Cloudstaff and

Influx is in direct violation of the exclusivity provision found in Section 2.1 of the Partnership

Agreement and that Firstbase's attempt to recoup fees paid to Cloudstaff and Influx is made with

unclean hands.  However, the exclusivity provision is only in effect "during the term of this

Agreement," which is terminated "in the event of a material breach by the other Party."  *See*

Agreement 2.1-2.2, Ex. 1, ECF No. 1-1.  Harbor and Firstbase each contend that the Agreement

has been breached.  Accordingly, by the parties' own allegations, the exclusivity provision was

no longer in effect and does not preclude Firstbase from seeking damages for expenses paid to

Cloudstaff and Influx after termination of the Agreement.

Harbor also argues that Hudson's opinion should be excluded because it is based on

discussions with Firstbase's management, on Cloudstaff and Influx invoices and payment

confirmations, on Firstbase's Income Statement, and on "work papers," all of which Firstbase

has blocked Harbor from accessing.  This argument lacks merit.  As to the first allegedly blocked

information, Harbor asserts that when it tried to question Hudson at his deposition regarding his

conversations with Firstbase management, counsel for Firstbase instructed Hudson not to

answer.  *See* Hudson Mot. 3 (citing Hudson Dep. 99:35, 100:16-23, 103:20 - 104:21, Ex. E, ECF

No. 101-5).  However, at Hudson's second deposition, Firstbase instructed Hudson to answer

any questions regarding his conversations with Firstbase to the extent he relied on them in his

report.  *See* Sec. Hudson Dep. 146:8 – 153:25, Ex. B, ECF No. 108-2.  Second, Firstbase did

produce the Cloudstaff and Influx invoices and payment confirmations, although it may not have

been as quickly as Harbor preferred.  *See* Hudson Mot. 5, n.3.  The time of production, however,

did not impact Harbor's ability to question Hudson at his second deposition regarding which

invoices he included in his report based on his conversations with Firstbase management.  *See*

Sec. Hudson Dep. 151:24 – 165:7.  Harbor's complaint that the invoices do not specify the

services billed is therefore unavailing.  Also unavailing is Harbor's claim that it did not receive

Firstbase's income statements, the third allegedly blocked information, because these statements

were a topic of discussion at Hudson's second deposition and were marked as exhibits.  *See id.*

176:11-12, 238:4-7.  Finally, Hudson testified about what information was in his work papers

and everything therein was either produced as an exhibit or summarized in Hudson's report.  *See*

*id.* 237:8-20.  Because Harbor had access to this information, Hudson may rely on the same.[18]

> ## 2.    Hudson's testimony as to Firstbase's counterclaim damages is not admissible.

Harbor asserts that Hudson's damages conclusions are not reliable because he does not

apply or explain any methodology in reaching them.  *See* Hudson Mot. 2-8, 14-17.  In calculating

---

[18]    To the extent Harbor renewed its request for the work papers at the final pretrial conference, the Court directed the parties to submit letter-briefs by March 29, 2024.  After consideration of the same, the Court grants the request in part.  The parties disagree as to whether the papers are privileged.  *See* Fed. R. Civ. P. 26(b)(4)(B) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."); Fed. R. Civ. P. 26(b)(4)(B) ("Trial Preparation: Experts. . . . Rules 26(b)(3)(A) and (B) protect drafts of any report or disclosure required under Rule 26(a)(2), regardless of the form in which the draft is recorded.").  Nevertheless, Firstbase has offered to produce Hudson's work papers subject to an agreement that such production would not be deemed to waive any applicable privilege.  Although Harbor has not yet agreed, this Court accepts the proposal and directs that Firstbase produce the work papers no later than Friday, April 5, 2024, subject to the understanding that it has not waived any privilege.  If Harbor believes it is necessary to discuss any of these work papers at trial it must first move the Court for a ruling on privilege.

Firstbase's economic damages on its counterclaims, Hudson's Report states in its entirety:[19]

> Firstbase filed counterclaims against Harbor Compliance for alleged Breach of Contract, and Fraudulent Inducement to Contract. In order to identify areas wherein Firstbase may have incurred damages as a result of the alleged actions of Harbor Compliance, I have held discussions with Firstbase's management, analyzed financial information, and reviewed documents and information produced to date. Based upon the above, I have identified the following areas of damages:
> - $110,813.76 paid by Firstbase to Cloudstaff to handle the operational and governmental processes that should have been performed by Harbor Compliance in accordance with the Partnership Agreement.[20]
> - $62,100.78 paid by Firstbase to Influx to handle customer support tickets. This service would normally be performed by Firstbase personnel; however, they were required to assist Cloudstaff with the operational and government processes referenced above.[21]
> - $189,861.80 in refunds paid by Firstbase to its clients during the period August 2022 through December 2022 due to Harbor Compliance's inability to properly and timely service clients.[22]

Hudson Report 12 (section 5.2).  Harbor is correct that Hudson's Report is silent as to methodology, nor does it offer any information from which the Court can determine whether, for example, his method consists of a testable hypothesis, has been subject to peer review, is generally accepted, has a known or potential rate of error, or the existence of standards controlling the technique's operation and the relationship of the technique to methods which have been established to be reliable.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n.8. Accordingly, a *Daubert* hearing was scheduled.  *See* ECF No. 169.  Firstbase thereafter contacted this Court, stating that it agrees not to have Hudson testify regarding counterclaim

---

[19]     Hudson's Rebuttal Report makes no additional conclusions or comments regarding Firstbase's damages on its counterclaims.  *See generally* Hudson Rebuttal.
[20]     Cloudstaff invoices and Firstbase payment confirmations
[21]     Per discussions with Rameel Sheikh, Chief Operating Officer of Firstbase
[22]     Per discussions with Rameel Sheikh, Chief Operating Officer of Firstbase

damages[23] and requesting that the evidentiary hearing be cancelled.  Based on these representations, the Court cancelled the evidentiary hearing.  *See* ECF No. 171.

Harbor's request to preclude Hudson from presenting expert testimony at trial with respect to his opinion on Firstbase's counterclaim damages is granted.

### 3. Hudson's testimony and rebuttal to Urbanchuk's historical profits calculations are not admissible.

In his original and rebuttal reports, Hudson disputes Urbanchuk's calculation of Firstbase's historical profits on the trade secrets claims for failing to identify and/or deduct all costs.  *See* Hudson Report 7-8 (section 5.1.6); Hudson Rebuttal 4-6 (section 5.1.2).  Hudson originally opined that Firstbase's actual profits are significantly different from Urbanchuk's predictions and, further, that "Firstbase has not experienced a profitable month since October 2020."  Hudson Report 7-8.  In his Rebuttal Report, Hudson asserted that Urbanchuk mistakenly failed to identify all incremental costs, omitted five categories of operating expenses, and did not include any refunds in his determination.  *See* Hudson Rebuttal 4-6.

In seeking to preclude these reports and testimony, Harbor asserts that Hudson's opinion is unreliable because he does not apply nor explain any methodology in reaching his conclusions.  *See* Hudson Mot. 17-19.  Harbor argues that Hudson failed to demonstrate or even attempt to

---

[23]   Firstbase explained that it is not abandoning its counterclaims, but intends to support its damages with fact witness testimony, not with expert testimony from Hudson.  Although Harbor has attained what it sought- excluding Hudson's expert testimony on counterclaim damages, it raised a new complaint at the final pretrial conference suggesting it would be prejudiced if Firstbase is permitted to present fact witnesses.  However, Firstbase always had the ability to present fact witnesses on its damages claim so there is no prejudice.  The parties were directed to submit letter-briefs, which are dated March 29, 2024.  Therein, Harbor contends that the fact witnesses lack independent knowledge of damages.  However, to the extent any of the witnesses testified at their depositions that they are not knowledgeable about damages, Harbor may cross-examine the witnesses on this point.  Harbor may also make any appropriate objections based on, for example, lack of foundation or hearsay at the time of trial.

explain that the expenses he deducted were attributable to the trade secrets at issue. *See id.* 8-9, 17-19.  In fact, Hudson admitted that he was unable to perform such an analysis. *See id.* 18. Nevertheless, Harbor complains, Hudson concluded an additional $3,447,093 in expenses, which is a company-wide total and includes costs associated with product lines that are not part of Harbor's damages claims, should be deducted. *See id.* 19.

In opposition to the Motion, Firstbase does not disagree with Harbor's argument that Hudson failed to identify the methodology he used in making his calculations; instead, Firstbase suggests Harbor bears the burden. *See* Hudson Opp. 9-18.  Firstbase argues that whether it "had a method for attributing certain costs on its income statements to specific revenue line items is not the concern; the concern is whether it was possible for Harbor to separate Firstbase revenues derived from alleged misappropriation from revenues not derived from misconduct." *See id.* 17. Firstbase admits that it "does not have a 'method' for allocating operating expenses to specific income line items." *See id.* (quoting Hudson Report 5-6 and Sheikh Dep. 93).

As discussed in section C(1) above, Firstbase's arguments in its Motion in Limine to Preclude Urbanchuk from testifying are based on an incorrect assumption that Harbor holds the burden of apportioning profits.  Firstbase has continued its misplaced assumptions in support of Hudson's rebuttal opinion. *See* Hudson Opp. 11-18.  Firstbase relies heavily on the report and recommendation of the special master in *MSC Software Corp. v. Altair Engineering, Inc.*, 2015 WL 13273227 (E.D. Mich. Nov. 9, 2015). *See id.*  However, this decision offers neither precedential nor persuasive authority.  Firstbase's reliance on the Supreme Court's decision in *Westinghouse Elec. & Mfg. Co.*, 225 U.S. 604, does not save its argument.  Firstbase cites to *Westinghouse* for its holding that "the burden shifts to the defendant 'only… where no approximate apportionment is available.'" *See* Hudson Opp. 15 (citing *MSC*).  Contrary to

Firstbase's suggestion, however, the burden has shifted to Firstbase because no approximation is possible here.

The nature of the incorporation of the alleged trademarks into the Firstbase Agent and Start products, which Firstbase concedes requires expert analysis to explain, makes apportionment inherently impossible. *See Prest-O-Lite Co. v. Bournonville*, 260 F. 446, 447-48 (D.N.J. 1916) (concluding it was "inherently impossible" for the plaintiff to show which part of the sales were attributed to its mark and the "the burden was then cast upon the defendants to show what part, if any, were due to causes other than the use of the trade-mark"); *Carter Prods. v. Colgate-Palmolive Co.*, 214 F. Supp. 383, 419 (D. Md. 1963) (determining it was "impossible to make a reasonably accurate apportionment" because the secret combination of ingredients in Colgate's shave cream "became integral parts" of the product such that was "impossible to determine precisely what part of Colgate's profits from the sale of Rapid Shave No. 2 and Instant Barber Shave was attributable to the use of the 12(c) secret"); *Gen. Elec. Co. v. Grand Gaslight*, 46 F. Supp. 822, 823-24 (S.D.N.Y. 1942) (concluding that the difficulty of apportionment of profit to the various elements of the inside of a frosted bulb was "inherent in the nature of the device itself," and given the plaintiff's theory that its patented improvement gives to the bulb its whole commercial value, the burden shifted to the defendant). Moreover, Firstbase's COO "testified that it was not possible to attribute any of the operating expenses to the products at issue." *See* Urbanchuk Supp. Report 20 (citing Sheikh's deposition testimony). Because Firstbase could not and did not provide the necessary data, it was impossible for Urbanchuk to conduct an apportionment analysis. *See Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 260-62 (1916) (finding that apportionment was "inherently impossible" and "no formula [was] suggested by which it could be accomplished"). In a case such as this, where the

plaintiff is unable to apportion the profits from sale of its protected material that was used in combination with other elements of value not protected because of the infringer's action "in confusing his own gains with those which belong to plaintiff, or because of the inherent impossibility of making an approximate apportionment," the infringer cannot benefit. *See id.*; *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) (sustaining "recovery of the full amount of defendant's profits" where the defendant incorporated the plaintiff's trademarks into a single product and "made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits").

Firstbase's misunderstanding of the law is carried into Hudson's reports. Because Hudson's rebuttal opinions are based on an incorrect application of the law, his reports are neither reliable nor helpful to the jury in assessing Urbanchuk's conclusions. *See also Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (holding that "the District Court must ensure that an expert does not testify as to the governing law of the case"). Hudson's testimony also fails to assist the jury in determining disgorgement of profits because, as Firstbase concedes, "Hudson did not . . . opine as to the proper measure of Harbor's damages." *See* Hudson Opp. 11. Firstbase also concedes that it "does not have a 'method' for allocating operating expenses," *see id.* 17 (quoting Hudson Report 5-6 and Sheikh Dep. 93); therefore, a *Daubert* hearing is not needed before excluding this testimony.

Harbor's Motion in Limine to Exclude the Testimony of Chad Hudson is granted to the extend it seeks to preclude Hudson from presenting expert testimony at trial with respect to his rebuttal regarding Urbanchuk's opinion on Firstbase's historic profits.[24]

---

[24]     For the reasons set forth above rejecting Firstbase's arguments regarding Urbanchuk's alleged failure to consider causation, which were also based on a misapplication of the law,

      **4.**     **Hudson's testimony that Urbanchuk failed to attain reasonable certainty is not admissible.**

Harbor contends that Hudson's conclusion that Urbanchuk failed to attain reasonable certainty usurps the role of the jury and the court. *See* Hudson Mot. 19-20 (discussing Hudson Rebuttal 12-13 (section 5.1.6)). *See also* Hudson Report 5.1.9. Harbor asserts that this opinion renders a legal conclusion, which is up to the trier of fact. *Id.* (citing *Romero v. Allstate Ins. Co.*, 52 F. Supp. 3d 715, 722-23 (E.D. Pa. 2014) ("It is well established that expert testimony that usurps the role of either the jury or the court is not admissible."). This argument is only briefly responded to by Firstbase. *See* Hudson Opp. 20 n.6. Firstbase asserts that "Urbanchuk's analysis failed in proving damages with 'reasonable certainty' which is not an issue with Mr. Hudson's opinion, because Mr. Hudson's opinion is predicated on ascertainable amounts established in invoices paid by Firstbase." *Id.* However, the invoices paid by Firstbase relate to its counterclaim damages, while Hudson's opinion that the supplemental Urbanchuk report failed to attain reasonable certainty addressed Urbanchuk's calculation of Harbor's damages. *See* Hudson Report 11-12; Hudson Rebuttal 12-13.

"[A]n expert witness is prohibited from rendering a legal opinion. Such testimony is prohibited because it would usurp the District Court's pivotal role in explaining the law to the jury." *Berckeley Inv. Grp., Ltd.*, 455 F.3d at 217 (internal citation omitted). This Court agrees with Harbor that Hudson's opinion is an improper attempt to usurp the Court's role. Moreover, part of the reasoning supporting this conclusion has been found to be based on an incorrect interpretation of the law and therefore unreliable. *See, e.g.* Hudson Rebuttal 12 (opining that "the Supplemental Urbanchuk Report . . . Erroneously calculated Firstbase's historical profits,

---

Hudson's rebuttal as to causation is unreliable and inadmissible. *See* Hudson Report 5-6 (section 5.1.4); Hudson Rebuttal 11-12 (section 5.1.5).

including: Failing to account for Firstbase's variable costs; Failing to include any "Refunds" in its determination of Firstbase's historical profits; Erroneously assuming 100% of Firstbase's "Incorporation Sales" were attributable to the alleged misappropriation of trade secrets").

Harbor's Motion in Limine to Exclude the Testimony of Chad Hudson regarding whether Urbanchuk attained reasonable certainty is granted.[25]

## V.    CONCLUSION

For the reasons discussed herein, Harbor's Motion in Limine to Exclude the Opinions and Proposed Testimony of Steve Waldbusser on the topic of "use" is denied.  Harbor's Motion in Limine to Exclude Certain API Related Opinions and Testimony of Steve Waldbusser is granted in limited part as to whether Harbor "misled" Firstbase because this is a state of mind. Firstbase's Motion in Limine to Exclude the Expert Report and Testimony of Greg Urbanchuk is denied in its entirety.  Harbor's Motion in Limine to Exclude the Testimony of Chad Hudson is granted in part and denied in part.  Harbor's request to preclude Hudson from testifying as to whether Urbanchuk attained reasonable certainty, as to Urbanchuk's opinion on Firstbase's historic profits (including the disgorgement and apportionment analysis), and as to Firstbase's counterclaim damages is granted.  Hudson may not offer testimony respecting these issues. However, Hudson may offer rebuttal testimony as to Urbanchuk's opinion on Harbor's breach of contract damages.  Harbor's Motion in Limine is denied in this respect.

The parties are advised to inform their witnesses of these rulings so that excluded testimony is not improperly mentioned at trial.  Additionally, counsel is directed to confer and to

---

[25]    Hudson also usurps the role of the Court in opining that Urbanchuk failed to apply specialized knowledge, which was rejected above.  *See* Hudson Report 4 (section 5.1.2).

reach agreed-upon redactions or, if appropriate, replacement terms in the expert reports before

any report may be shown to the jury.

A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge