# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HARBOR BUSINESS COMPLIANCE CORPORATION, | : | CIVIL ACTION |
| | : | |
| Plaintiff / Counter-Defendant, | : | |
| | : | **The Honorable** |
| v. | : | **Joseph F. Leeson, Jr.** |
| | : | |
| FIRSTBASE.IO, INC., | : | |
| | : | |
| Defendant / Counterclaimant. | : | No. 5:23-cv-00802 |

## FILED UNDER SEAL

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OMNIBUS POST-TRIAL MOTION TO MOLD <u>THE JURY VERDICT AND FOR OTHER RELIEF</u>

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

STATEMENT OF THE QUESTIONS INVOLVED ...................................................... 6

SUMMARY OF THE ARGUMENTS ............................................................................ 7

ARGUMENT ................................................................................................................... 7

I. The Court Should Award Harbor Compliance The Maximum
Amount Of Exemplary Damages Under The DTSA And The PUTSA
With Respect To Its Trade Secret Misappropriation Claims. ................................. 7

   a. The Court Should Award The Maximum Amount Of Exemplary
      Damages Because Of The Duration Of Firstbase's Misappropriative Conduct. ............... 2

   b. The Court Should Award The Maximum Amount Of Exemplary
      Damages Because Firstbase Was Conscious Of The Resulting Injury To Harbor
      Compliance. ............................................................................................................. 4

   c. The Court Should Award The Maximum Amount Of Exemplary
      Damages Because Of Firstbase's Efforts To Cover Up Its Malfeasance. ......................... 9

   d. Courts Both Inside And Outside Of The Third Circuit Have Routinely
      Awarded Two Times (2x) The Amount Of Compensatory Damages
      For Trade Secret Misappropriation In Factually Analogous Circumstances. ................... 13

II. The Court Should Award Harbor Compliance A Permanent
Injunction Against Firstbase. ............................................................................... 20

   a. Firstbase Must Return And/Or Destroy Harbor Compliance's
      Confidential Information And Registered Agent Data. ................................................. 22

   b. Firstbase Must Stop Using Harbor Compliance's Trade Secrets
      Beyond The Date Of The Damages Award. ................................................................ 23

III. The Court Should Award Harbor Compliance Reasonable Attorneys'
Fees, Costs, And Expenses. ................................................................................. 25

a.  Harbor Compliance's Reasonable Attorney's Fees. ......................................................... 27

    i.  The Requested Rates Are Well Below Prevailing Market Rates,
        Demonstrating Their Reasonableness.......................................................... 28

    ii.  The Number Of Hours Spent On The Litigation Was Reasonable. ........................... 30

b.  Harbor Compliance's Reasonable Costs. ........................................................ 33

c. Additional Market Data Further Supports The Reasonableness Of The
   Total Fees, Expenses And Costs Requested By Harbor Compliance. ............................. 35

IV.  Pre-Judgment Interest At Six Percent (6%) Per Annum Should Be Added
     To The Amended Judgment, And Post-Judgment Interest Should Also Be Assessed. .... 37

CONCLUSION.......................................................................................................... 39

**Page(s)**

**Cases**

*Adv. Fluid Sys., Inc. v. Huber,*
295 F. Supp. 3d 467 (M.D. Pa. 2018) ..............................................................1, 10

*Advanced Research Sys., Inc. v. Coldedge Techs., Inc.,*
No. 2317 EDA 2015, 2016 WL 5210561 (Pa. Super. Ct. 2016) .............................1

*Arlington Ind., Inc. v. Bridgeport Fittings, Inc.,*
2016 WL 3522964 (M.D. Pa. June 28, 2016)...............................27, 29, 30, 31, 34

*Astro-Med, Inc. v. Plant,*
2008 WL 2883769 (D.R.I. July 25, 2008), *amended in part*, 2010 WL 537101
(D.R.I. Feb. 12, 2010) .........................................................................................18

*Avco Corp. v. Turn & Bank Holdings, LLC,*
659 F. Supp. 3d 483 (M.D. Pa. 2023) ..................................................................25

*B.B. Microscopes v. Armogida,*
532 F. Supp. 2d 744 (W.D. Pa. 2007) ..................................................................17

*Maldonado v. Houstoun,*
256 F.3d 181 (3d Cir. 2001)..................................................................................29

*Certified Labs. of Tex., Inc. v. Rubinson,*
303 F. Supp. 1014 (E.D. Pa. 1969) ...................................................................1, 17

*Cook Medical Incorporated v. Griffin,*
2008 WL 858996 (S.D. Ind. Mar. 25, 2008).........................................................23

*Den-Tal-Ez, Inc. v. Siemens Capital Corp.,*
566 A.2d 1214 (Pa. Super. Ct. 1989)...............................................................20, 21

*DiscoverOrg Data, LLC v. Guida Advisory Servs., Inc.,*
2021 WL 720641 (D.N.J. Feb. 24, 2021) ...................................................9, 17, 18

*ECEM European Chem. Marketing B.V. v. Purolite Co.,*
451 Fed. Appx. 73 (3d Cir. Nov. 14, 2011) ..........................................................37

*Gorini v. AMP, Incorporated,*
2004 WL 1354465 (M.D. Pa. Mar. 14, 2004) *aff'd* 117 Fed. Appx. 193 (3d
Cir. Dec. 8, 2004)..................................................................................................27

*Harbor Compliance Corp. v. Firstbase.io, Inc.,*
2024 WL 1442165 (E.D. Pa. Apr. 3, 2024) ..........................................................24

*Howes v. Medical Components, Inc.*,
    761 F. Supp. 1193 (E.D. Pa. 1990) ..........................................................30, 34, 35

*Lanni v. New Jersey*,
    259 F.3d 146 (3d Cir. 2001)...........................................................................28

*Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.*,
    637 F. Supp. 2d 290 (E.D. Pa. 2009) ...........................................................37

*Miller UK Ltd. v. Caterpillar Inc.*,
    2017 WL 1196963 (N.D. Ill. Mar. 31, 2017)............................................18, 19

*Minehan v. McDowell*,
    2023 WL 199276 (E.D. Pa. Jan. 17, 2023) ...................................................29

*Moore v. Kulicke & Soffa Indus.*,
    318 F.3d 561 (3d Cir. 2003)...........................................................................20

*Oakwood Laboratories LLC v. Thanoo*,
    999 F.3d 892 (3d Cir. 2021)...........................................................................13

*PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*,
    2020 WL 1526940 (W.D. Pa. Mar. 31, 2020) ............................................ *passim*

*PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*,
    2021 WL 2327509 (W.D. Pa. June 8, 2021), *aff'd sub nom. PPG Indus. Inc. v.*
    *Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156 (3d Cir. 2022) .................................14

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
    2021 WL 3423345 (E.D. Tex. Aug. 5, 2021) ................................................21, 22

*Rode v. Dellarciprete*,
    892 F.2d 1177 (3d Cir. 1990).................................................................27, 28, 30

*Sabinsa Corp. v. HerbaKraft, Inc.*,
    2022 WL 17446485 (D.N.J. Dec. 6, 2022) ...................................................29

*Shin Da Enterprises v. Yong*,
    2024 WL 22074 (E.D. Pa. Jan. 2, 2024) .......................................................30, 34

*Smith v. Philadelphia Housing Auth.*,
    107 F.3d 223 (3d Cir. 1997)...........................................................................28

*Thomas v. Hughes*,
    27 F.4th 995 (5th Cir. 2022) .........................................................................21

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*,
    225 U.S. 604 (1912)......................................................................................25

*William A. Graham Co. v. Haughey*,
646 F.3d 138 (3d Cir. 2011)...............................................................38

**Statutes**

12 P.S. Similarly, Section ....................................................................20

41 P.S. § 202 ......................................................................................37

12 Pa.C.S.A. § 5303(a) ........................................................................20

12 Pa. C.S.A. § 5304(a)-(b) ...............................................................7, 1

12 Pa.C.S.A. § 5305(3) ........................................................................26

12 Pa. Cons. Stat. § 5304(a) ...............................................................14

18 U.S.C.A. § 1836(b)(3)(B)-(C)............................................................8

18 U.S.C.A. § 1836(b)(3)(C) .................................................................7

18 U.S.C. Firstbase. Section ................................................................20

18 U.S.C. § 1836 (b)(3) .......................................................................20

18 U.S.C § 1836 (b)(3)(D) ...................................................................26

28 U.S.C. § 1920 .................................................................................35

28 U.S.C. § 1961 ............................................................................37, 39

28 U.S.C. § 1961(a) .............................................................................38

New Jersey Trade Secrets Act ..............................................................17

Pennsylvania Uniform Trade Secrets Act............................................ *passim*

RICO ...................................................................................................14

**Other Authorities**

10 Fed. Prac. & Proc. Civ. § 2666 (4th ed.).........................................26

Fed. R. Civ. P. 12(b)(6)..........................................................................4

Fed. R. Civ. P. 30(b)(6)........................................................................11

Fed. R. Civ. P. 33 ..................................................................................5

Fed. R. Civ. P. 54(d)(2)(B)(ii) ........................................................26, 33

Plaintiff, Harbor Business Compliance Corporation ("Plaintiff" or "Harbor Compliance"), by and through its undersigned counsel, Royer Cooper Cohen Braunfeld, LLC, hereby submits this Memorandum of Law (the "MOL") in support of its Omnibus Post-Trial Motion to Mold the Jury Verdict and for Other Relief (the "Motion"), which jury verdict was returned on April 19, 2024 in the above-captioned action, in favor of Harbor Compliance, and against Defendant, Firstbase.IO, Inc. ("Defendant" or "Firstbase").

## INTRODUCTION

If there was ever a model case representing the need to redress unapologetic, willful and malicious conduct, and to deter it into the future, it is this one. After Harbor Compliance placed Firstbase on notice of its offending conduct almost a year and a half ago, and repeatedly asked Firstbase to stop misappropriating its intellectual property, Firstbase doubled down, decided to roll the dice, and ultimately lost its hand, as determined by a jury of its peers. Moreover, since trial, Firstbase has not realigned its moral compass and ceased its malfeasance. Although Harbor Compliance's trade secrets are embodied within the Firstbase Agent and Firstbase Start products, Firstbase continues to offer Firstbase Agent[1] and Firstbase Start[2] on its website. Additionally, Firstbase still has neither returned nor destroyed Harbor Compliance's confidential and proprietary information. As discussed more fully below, unless and until this Court puts a stop to Firstbase's misappropriation, it appears that Firstbase will proceed with "business as usual."

Following more than a year of contentious litigation, over 225 docket entries, and a 10-day jury trial, this case nears its conclusion. The jury has already returned a verdict in favor of Harbor Compliance, and against Firstbase, on each and every of Harbor Compliance's claims presented

---

[1] https://www.firstbase.io/agent (last accessed May 17, 2024)
[2] https://www.firstbase.io/start (last accessed May 17, 2024)

to them.  Likewise, the jury has already returned a verdict in favor of Harbor Compliance, and against Firstbase, on each and every one of Firstbase's counterclaims.  Nevertheless, a small number of issues remain for the Court's adjudication, which Harbor Compliance addresses through the Motion and this corresponding MOL.

At trial, the jury heard testimony concerning Firstbase's conduct throughout the summer and fall of 2022.  This included, but is in no way limited to, the fact that: (a) Firstbase plotted to become its own registered agent and cut out Harbor Compliance from the parties' business arrangement; (b) Firstbase subsequently stopped referring customers to Harbor Compliance despite the Partnership Agreement's exclusivity provision; (c) Firstbase invented a sham pretext to attempt to terminate the Partnership Agreement as part of its overall scheme to mislead Harbor Compliance; (d) Firstbase disregarded Harbor Compliance's cure rights despite the Partnership Agreement's term and termination provision; and (e) Firstbase offered empty promise after promise during so-called "negotiations" with Harbor Compliance about potentially amending the Partnership Agreement, which in reality were just more misleading tactics to further deceive Harbor Compliance into continuing to share proprietary and confidential information. Unfortunately, when Harbor Compliance learned of the misappropriation and repeatedly asked Firstbase to stop its offending conduct and simply comply with the Partnership Agreement, Firstbase refused to do so and instead continued with "business as usual."  Ultimately, the jury determined that Firstbase's trade secret misappropriation was willful and malicious and, separately, that Firstbase's unfair competition was malicious, reckless, willful or oppressive.  And still, the jury only heard half of the story – they were not privy to Firstbase's dilatory and obstructionist litigation tactics and gamesmanship that Firstbase employed throughout the entirety of this action.

Specifically, the jury never learned that Firstbase refused to provide, and Harbor Compliance was therefore required to seek Court intervention to obtain, key pieces of evidence, including: (a) Firstbase's source code; (b) Firstbase's financial information and data (although that data was not brought current to 2024 despite repeated requests); nor (c) Firstbase's full and complete internal Slack message history, which ended up being one of the biggest "smoking guns" at trial. Relatedly, neither did the jury learn about or see the baseless letter from Firstbase's counsel dated October 30, 2023[3] gratuitously and offensively threatening the undersigned counsel with sanctions for pursuing Harbor Compliance's trade secret misappropriation claims against Firstbase—*the very same claims for which the jury ultimately awarded Harbor Compliance $11,068,044 in compensatory monetary relief.*

Firstbase has thrown up myriad obstacles and roadblocks to deter Harbor Compliance's prosecution of this action at nearly every turn; surely, to prevent Harbor Compliance from uncovering evidence of trade secret misappropriation and all of its other bad acts. Therefore, consistent with the jury's determination that Firstbase acted willfully and maliciously when misappropriating Harbor Compliance's trade secrets, and for the reasons set forth below, the Motion should be granted. Specifically, the Court should: (i) mold the jury's verdict to include exemplary damages of $22,136,088 for a total verdict of $50,051,802; (ii) in an amended judgment, award attorney's fees, expenses and costs in the amount of $1,910,864.71; (iii) in an amended judgment, award pre-judgment interest in the amount of $3,625,688.65 and post-judgment interest; and (iv) issue a permanent injunction to address Firstbase's ongoing

---

[3] The referenced October 30, 2023 correspondence from Firstbase's counsel to the undersigned is referenced in Firstbase's Pre-Trial Statement that was filed with the Court. *See* ECF No. 143, p. 18, Section III(B) (Bad Faith Fee Shifting). As will be discussed herein, the sending of the letter is also relevant to Harbor Compliance's request for fees, expenses and costs, and thus it is attached to the Declaration of Matthew Faranda-Diedrich, Esq.

misappropriation of Harbor Compliance's trade secrets, and other confidential and proprietary information.

## STATEMENT OF FACTS

Harbor Compliance initiated this action on March 1, 2023 asserting claims against Firstbase for Breach of Contract (Count I), Breach of the Implied Duty of Good Faith and Fair Dealing (Count III), Misappropriation of Trade Secrets under PA Law (Count III), Misappropriation of Trade Secrets under Federal Law (Count IV), Common Law Unfair Competition (Count V), and Unjust Enrichment (Count VI). ECF No. 1, 3. On April 6, 2023, Firstbase moved the Court to dismiss Counts III-IV under Fed. R. Civ. P. 12(b)(6). ECF No. 22. The Court dismissed Harbor Compliance's Unjust Enrichment Count, but denied the remainder of Firstbase's motion. ECF No. 33.

Thereafter, on May 11, 2023, Firstbase answered Harbor Compliance's Complaint and asserted counterclaims against Harbor Compliance for Breach of Contract (Count I) and Fraudulent Inducement to Contract (Count II). ECF No. 34. Harbor Compliance answered on May 31, 2023. ECF No. 43.

On June 29, 2023, Firstbase moved the Court to require Harbor Compliance to identify its trade secrets with reasonable particularity, and to stay discovery of the alleged trade secrets. ECF Nos. 51-22. On July 3, 2023, the Court denied Firstbase's motion on procedural grounds, without prejudice. ECF No. 54. Firstbase decided, on its own, not to resubmit the motion to the Court.

Pursuant to a proposed stipulation between the parties, the Court amended its then-operative Scheduling Order, in part, on August 14, 2023 to extend the deadline for paper fact discovery to September 5, 2023, the deadline for fact depositions to September 22, 2023, the deadline for expert depositions to September 28, 2023, and the deadline for the parties to file

dispositive motions to September 29, 2023.  ECF No. 64.

After the resetting of the schedule, however, Harbor Compliance was required to seek Court intervention on a number of occasions in connection with Firstbase objecting to produce documents and things responsive to Harbor Compliance's discovery requests, including: (a) on August 22, 2023 when Firstbase was ordered to produce its source code for inspection, *see* ECF No. 67; (b) on September 7, 2023 when Firstbase was ordered to produce its financial information and related data, *see* ECF No. 72; and (c) on September 25, 2023 when Firstbase was ordered to produce full and complete Slack messages no later than October 2, 2023, *see* ECF No. 76.  These examples are not exhaustive.[4]

On October 13, 2023, Firstbase moved the Court for partial summary judgment.  *See, e.g.*, ECF No. 81.  On November 6, 2023, the Court denied Firstbase's motion for partial summary judgment.  ECF No. 95.

A ten (10) day jury trial commenced on April 8, 2024.  At the conclusion of evidence and argument, the case was given to the jury on April 19, 2024.  Later that day, and after deliberations, the jury resoundingly found in favor of Harbor Compliance, and against Firstbase, awarding Harbor Compliance $1,090,271 in compensatory monetary relief as a result of determining that Firstbase breached the Partnership Agreement.  ECF No. 208, p. 1 ¶¶ 1-3.  The jury also expressly found in favor of Harbor Compliance, and against Firstbase, with respect to Harbor Compliance's trade secret misappropriation claims under the Defend Trade Secrets Action ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA").  The jury awarded monetary relief in the

---

[4] For example, Firstbase's Responses and Objections to Harbor Compliance's First Set of Interrogatories dated July 10, 2023 did not contain the verification required by Fed. R. Civ. P. 33. Despite numerous meet and confers with opposing counsel, and a telephone conference with the Court, Harbor Compliance did not receive Firstbase's Amended Responses and Objections to Harbor Compliance's First Set of Interrogatories (that it could rely upon) until August 18, 2023.

amount of $11,068,044, *see id.* 2 ¶ 8, and rendered a verdict that Firstbase's trade secret misappropriation was willful and malicious, *see id.* 3 ¶ 11. Additionally, the jury found in favor of Harbor Compliance, and against Firstbase, and awarded Harbor Compliance $14,757,399 in compensatory monetary relief, and $1,000,000 in punitive damages, in connection with Harbor Compliance's unfair competition claim. *Id.* at 2 ¶ 9.

After the jury returned its verdict, the Court stated, "Counsel, I'd like to excuse the jury with the thanks of everyone. Any reason not to do so?" ECF No. 219 (Day 10 Transcript) at 215:24 – 25. Firstbase's counsel responded, "Not at all, Your Honor. Thank you." *Id.* at 216:1. The undersigned responded in kind. *Id.* at 216:2. On April 22, 2024 the Court ordered that any post-trial motions and supporting briefs shall be filed no later than May 17, 2024. ECF No. 206. This timely Motion follows.[5]

## **STATEMENT OF THE QUESTIONS INVOLVED**

1.    Should the Court award Harbor Compliance the maximum amount of exemplary damages under the DTSA and PUTSA?

     *Suggested Answer:  Yes.*

2.    Should the Court enter the permanent injunction in the form of proposed order being submitted contemporaneously herewith?

     *Suggested Answer:  Yes.*

3.    Should the Court award Harbor Compliance reasonable attorneys' fees, costs, and expenses?

     *Suggested Answer: Yes.*

---

[5] Additional facts relevant to particular sections of the Motion and this corresponding MOL are cited under the sections to which they are relevant.

4.     Should the Court award Harbor Compliance pre- and post-judgment interest related to the total amount of Harbor Compliance's monetary relief?

*Suggested Answer:  Yes.*

## SUMMARY OF THE ARGUMENTS

Section I argues that the Court should award Harbor Compliance exemplary damages in the amount of two times (2x) the monetary relief the jury awarded in connection with finding in favor of Harbor Compliance on its Trade Secret claims (Counts III and IV) because, *inter alia*, the jury determined Firstbase's misappropriative conduct was willful and malicious.  Section II argues that the Court should also award Harbor Compliance a permanent injunction as provided under the DTSA and the PUTSA for, *inter alia*, the same reason.  Section III argues that the Court should award Harbor Compliance its reasonable attorneys' fees, costs, and expenses in light of its conduct. Finally, Section IV argues that pre-judgment interest at six percent (6%) per annum should be added to the Amended Judgment, and post-judgment interest should also be assessed.

## ARGUMENT

**I.     The Court Should Award Harbor Compliance The Maximum Amount Of Exemplary Damages Under The DTSA And The PUTSA With Respect To Its Trade Secret Misappropriation Claims.**

Both the DTSA and PUTSA allow for an award of exemplary damages where a fact finder has determined that a party's conduct was willful and malicious.  *See* 18 U.S.C.A. § 1836(b)(3)(C); 12 Pa. C.S.A. § 5304(a)-(b).  Here, after hearing ten (10) days of testimony, the jury unanimously determined that Firstbase's conduct was willful and malicious within the meaning of the DTSA and the PUTSA.  As detailed below, Firstbase's willful and malicious conduct in this case warrants the maximum amount of exemplary damages permitted under the foregoing statutes.  Harbor Compliance should be awarded exemplary damages in the amount of two times (2x) the amount

of compensatory damages that the jury already awarded Harbor Compliance, or $22,136,088, for a total damages award of $33,204,132 in connection with its trade secret claims.  *See* ECF No. 1, pp. 42-46 (Counts III and IV).

The DTSA provides as follows, in pertinent part, regarding the imposition of exemplary damages:

> (B) award—
>
> (i)(I) damages for actual loss caused by the misappropriation of the trade secret; and
> (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or
> (ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;
>
> (C) **if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph** (B)…

18 U.S.C.A. § 1836(b)(3)(B)-(C) (emphasis added).  Additionally, the PUTSA provides for an award of exemplary damages as follows:

> (a)     Monetary damages.--Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

  **(b) Exemplary damages.--If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award** made under subsection (a).

12 Pa. C.S.A. § 5304(a)-(b) (emphasis added).

  "In determining whether to award exemplary damages, courts have considered, as proof of willfulness and malice, the duration of misappropriative conduct, the defendant's consciousness of resulting injury, and any efforts to cover up malfeasance." *Adv. Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 493 (M.D. Pa. 2018) (citing *B.B. Microscopes v. Armogida*, 532 F. Supp. 2d 744, 756–57 (W.D. Pa. 2007) (finding defendant's actions were willful and malicious and awarding exemplary damages in two times (2x) the amount of compensatory damages)); *Advanced Research Sys., Inc. v. Coldedge Techs., Inc.*, No. 2317 EDA 2015, 2016 WL 5210561, at \*2 (Pa. Super. Ct. 2016). *See also, e.g.*, *Certified Labs. of Tex., Inc. v. Rubinson*, 303 F. Supp. 1014 (E.D. Pa. 1969) (trade secrets and restrictive covenant case awarding punitive damages of twice the amount of compensatory damages for flagrantly inducing breaches of contracts and concealing their violations).

  As discussed in the INTRODUCTION, this action is not a case of accident, mistake, or neglect. Nor is it a case in which Firstbase's motives were purely competitive. Rather, this case is about lies, inaccurate and misleading statements, deceitful actions and deliberate omissions, all of which were done to perpetrate Firstbase's scheme to steal Harbor Compliance's trade secrets. Indeed, the jury heard all of the evidence presented at trial, and determined that Firstbase's misappropriation of Harbor Compliance's trade secrets was willful and malicious within the meaning of the DTSA and the PUTSA. ECF No. 208, pp. 2-3, ¶¶ 8, 11. Therefore, consistent with the above-referenced case law, the Court can and should award Harbor Compliance the full

amount of exemplary damages; that is, twice the amount of compensatory damages already awarded to Harbor Compliance.

a.      The Court Should Award The Maximum Amount Of Exemplary Damages Because Of The Duration Of Firstbase's Misappropriative Conduct.

*First*, the duration of the Firstbase's misappropriative conduct commenced as early as February 2022, and continued through trial (and beyond as explained in more detail below). Even now, over two (2) years later, it is "business as usual" for Firstbase. Specifically, Firstbase first contacted Harbor Compliance about the potential for a white-label service arrangement under the Partnership Agreement (*see* JX0254) in February 2022, and made multiple misrepresentations at that time regarding its current number of customers and growth rate. *See, e.g.*, JX0252 (2/9/2022 Email from Mr. Rahul Sheth to Ms. Megan Danz, stating Firstbase is, *inter alia*, "█████████ █████████████████████████████████████████"); JX0640, p. 7 (2/16/22 Email from Mr. Sheth to Mr. James Gilmer, attaching PDF listing "Total Firstbase Incorporations" as ███████ [to] date, "Current Incorporation Volume" as ███████, and "Current Growth Rate" as ███ ████████████). Firstbase misrepresented these figures to Harbor Compliance to induce Harbor Compliance to enter into the Partnership Agreement, despite the fact that the data was ███████ and, in the case of Firstbase's purported month-over-month growth rate, ███████ ███████. *Compare* JX0389 *with*, ECF No. 190 (Day 4 Transcript) at 124:23 – 125:2; *compare* JX0252 *with*, ECF No. 189 (Day 3 Transcript) at 71:1 – 8; *compare* JX0640 *with*, ECF No. 189 (Day 3 Transcript) at 76:13 – 77:8. Accordingly, the entire commercial relationship through which Firstbase was able to and did obtain access to Harbor Compliance's trade secrets was premised upon inaccurate and misleading statements.

Fast forwarding to November 2, 2022, after pilfering Harbor Compliance's trade secrets, Firstbase then started its next scheme of kicking Harbor Compliance to the curb by coming up

with a sham pretext to attempt to exit the Partnership Agreement after just a few short months. *See, e.g.*, JX0118 (11/2/22 Notice of Intent to Terminate Partnership Agreement). After Firstbase staked out its pre-textual position on termination, Harbor Compliance naturally opposed the same and correspondence between the parties ensued, including repeated demands for Firstbase to cease and desist use of Harbor Compliance's trade secrets. Notably, however, when Firstbase's Founder and CEO Mark Milastsivy was asked on the stand whether "Firstbase behave[d] any differently" **after** receiving Harbor Compliance's demand letter dated January 6, 2023, *see* JX0632, Mr. Milastsivy coldly responded that Firstbase proceeded with "**business as usual**[.]" *See* ECF No. 190 (Day 4 Transcript) at 54:18 – 55:12 (emphasis added). Accordingly, throughout nearly the entire time frame during which Firstbase was contractually obligated to exclusively refer its customers to Harbor Compliance, Firstbase engaged in misappropriation.

The same is true from trial to the present. Firstbase's corporate representatives were asked multiple times at trial whether Firstbase returned and destroyed Harbor Compliance's trade secrets, to which Firstbase responded that it had not done so because it did not want to "waste" its time. *See, e.g.*, ECF No. 199 (Day 3 Sealed Transcript) at 20:25 – 21:9; 30:11 – 17; 43:24 – 44:3; ECF No. 211 (Day 8 Transcript) at 65:8 – 22 (Mr. Filipe Senna stating, in part, "Why would I waste my time going one by one deleting it?"). Time efficiency was clearly not the reason Firstbase failed to delete the trade secrets, as evidence at trial established that  . *See* JX0138_00017 ( ); JX0413 ( ). To this day, nearly halfway through 2024, Firstbase still has not returned and destroyed Harbor Compliance's trade secrets, despite its obligation to do so under the Partnership Agreement. JX0254, pp. 4-5, § 7.3

(Confidentiality) ("Upon termination of this Agreement all Confidential Information must be returned to the discloser or destroyed."); *id* at 7, § 2 of SOW #1 (Registered Agent Services), ¶ 3 ("Upon termination of this contract, this data must be destroyed and removed from all Firstbase.io systems."). Again, Firstbase Agent and Firstbase Start remain commercially available offerings advertised on Firstbase's website, despite Harbor Compliance's trade secrets being embodied within these. And again, notwithstanding the verdict that was rendered by the jury, Firstbase is proceeding with "business as usual." Accordingly, the duration of Firstbase's improper conduct, which has continued unabated for the past two plus (2+) years, weighs in favor of awarding Harbor Compliance the maximum amount of exemplary damages under the DTSA and the PUTSA.

        b.     <u>The Court Should Award The Maximum Amount Of Exemplary Damages Because Firstbase Was Conscious Of The Resulting Injury To Harbor Compliance.</u>

***Second***, Firstbase was conscious about the resulting injury to Harbor Compliance as a result of its trade secret misappropriation. After Firstbase gained access to Harbor Compliance's trade secrets, *see, e.g.*, JX0252, JX0640, p. 7 (discussed above),[6] Firstbase continued its quest to pilfer Harbor Compliance's trade secrets via execution of the Partnership Agreement on May 28, 2022. Firstbase embarked on this quest with consciousness of the resulting injury that would ultimately ensue to Harbor Compliance.

For example, the jury determined that Firstbase misappropriated Trade Secret # 7: Entity Manager (dashboard). ECF No. 208, p. 4, ¶ 12.7. To this end, as the Court may recall, evidence was introduced at trial that Firstbase was ▮▮▮▮▮▮▮▮▮▮▮▮ Harbor Compliance to share certain of the underlying data necessary to power the ▮▮▮▮▮▮▮▮▮ that contributes to making

---

[6] *See also* JX0898, at 75:21 – 78:02; 90:22 – 91:23; 92:03 – 92:15; 102:24 – 104:03; 106:01 – 106:13; 107:07 – 107:10; 259:13 – 260:04; 260:09 – 261:01 (moved into evidence via video clip of Mr. Rahul Sheth's deposition).

Entity Manager so competitively advantageous. *See, e.g.*, JX0350_00014 (" █████████ █████████████████████████████████████[7]…) (emphasis added). *See also* JX0138_00003 (" █████████████████████████████████████ "); JX_0138_00010 (" ██████████ ████████████████████████ "); JX0350_00028 (" ██████████████████ ███████████████████████ ").

After Firstbase gained access to and was able to copy Harbor Compliance's trade secrets, it commenced efforts to become its own registered agent. *See, e.g.*, JX0350_00002 (" ████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ "). At the time, however, Firstbase did not have the capabilities of providing registered agent services on its own. *See, e.g.*, JX0350_00037 ( █████████████████████████████████████ █████████████████████████████████ "). So, Firstbase relied on the trade secrets it misappropriated from Harbor Compliance. *See, e.g.*, JX0350_00016 (" ████████████ ████████████████████████████████████████████████████████████ "). That permitted Firstbase to continue its unilateral plan to cut Harbor Compliance out of the Partnership Agreement, including cutting out Harbor Compliance from the expected revenue that Firstbase anticipated to generate. *See, e.g.*, JX0350_00017 (" █████████████████████████████ █████████████████████████████████████ ").



---

[7] In an exchange that surely evaporated any credibility that Firstbase had left with the jury, Mr. Senna claimed that "lol" – for laughing out loud – was not meant to connote that he was "necessarily laughing when typing" about asking Harbor Compliance for such information. ECF No. 215 (Day 6 Transcript) at 39:6 – 18.

In accordance with its scheme, by October 2022 Firstbase had stopped referring orders to Harbor Compliance under the Partnership Agreement. *See, e.g.*, JX0350_00034 ("█████████ ████████████████████████"); ECF No. 189 (Day 3 Transcript) at 89:13 – 19; ECF No. 199 (Day 3 Sealed Transcript) at 48:1 – 8. Starting around the same time, Firstbase began using Harbor Compliance's trade secrets ███████████████████████████████ ████████████. *See, e.g.*, ECF No. 199 (Day 3 Sealed Transcript) at 117:16-20; JX0330; ECF No. 211 (Day 8 Sealed Transcript) at 122:23 – 123:1; ECF No. 215 (Day 6 Transcript) at 39:6 – 18.

Nonetheless, at the very same time Firstbase was surreptitiously doing all of this, █ ███████████████████████████████████████████████████████ ███████████████████████████████████████. *See, e.g.*, JX0163. Titled "Firstbase : Harbor Compliance Partnership," and designated "Confidential" on the header of each page, Mr. Senna, Mr. Gilmer, and Mr. Brock Klinger ████████████████ ███████████████████████████████████████████. *See* ECF No. 200 (Day 4 Sealed Transcript) at 65:11 – 69:16. ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████. This information enabled Firstbase to expand its product offerings into additional jurisdictions other than just Wyoming and Delaware. *Id.*; JX0634. *See also* JX0119, pp. 2-3, 4-6, 8-9, 20-2, and 27-29; JX0060 (███████████████████████████"). *See also* JX0119, p. 3 (Mr. Senna stating to Brock Klinger, on September 1, 2022, ██████████████████ ███████████████████████████████████████████████████████ ███████████████████████ JX0163, p. 3 (stating, as of September 30,

2022, "… ██████████████████████████████████████████████████ ");

ECF No. 209 (Day 6 Sealed Transcript) at 28:12 – 19 (Mr. Senna confirming same).

This deliberate and misleading conduct continued through the time at which Firstbase believed it could operate the business on its own, without Harbor Compliance, and came up with a sham pretext to attempt to terminate the Partnership Agreement.  *See, e.g.*, JX0118; ECF No. 199 (Day 3 Sealed Transcript) at 125:3-20; 126:11 – 14; JX0062.  *See also* ECF No. 209 (Day 6 Sealed Transcript) at 34:2 – 17 ( ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ ).

In fact, Firstbase's consciousness of Harbor Compliance's resulting injury is demonstrated on the face of Firstbase's November 2, 2022 Notice of Intent to Terminate Partnership Agreement. JX0118.   Specifically, the notice provision was facially deficient.  *See id.* p. 1, ¶ 2 (" █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ ").  Yet, no details regarding the purported material breaches was provided.[8]

This was because Firstbase had zero respect for the cure period set forth in the Partnership Agreement, as evidenced by the November 2, 2022 date of its Notice of Intent to Terminate, on

---

[8] Firstbase's Letter to Harbor Compliance dated November 11, 2022, regarding "Orderly Termination of Partnership Agreement, fared no better.  JX0062.

the one hand, and Firstbase's subsequent conduct **during** the cure period, on the other hand. Without putting Harbor Compliance on notice of the alleged "repeated material breaches" and Harbor Compliance's "failure to cure" them (all claims that the jury found completely lacking), Firstbase did not provide Harbor Compliance with a chance to remedy Firstbase's complaints, substantiated or not. Section 2.2 of the Partnership Agreement provides the noticed party (i.e., Harbor Compliance, in this case) fifteen (15) days after receiving written notice to cure a purported breach. JX0254, p. 2 § 2.2(i). However, a mere **five (5) days** after sending Harbor Compliance its November 2, 2022 notice, Firstbase formed Firstbase Agent LLC to directly compete with Harbor Compliance with Harbor Compliance's trade secrets. *See* JX0048 (Firstbase Agent LLC's Certificate of Formation dated **November 7, 2022**). During this same timeframe, Firstbase was using Harbor Compliance's trade secrets █████████████████ to perform the exact same services Firstbase had agreed in the Partnership Agreement would be exclusively provided by Harbor Compliance. *See, e.g.*, JX0046 (█████████████████████████████ ), p. 5 (Exhibit A) (██████████████████). And, perhaps most brazenly, and also **during** the cure period, Firstbase emailed its clients and contacts soliciting business and announcing its expansion into New York, California, Texas, and Florida, ██████████████████████ █████████████. JX0634 at Tab 1, pp. 6-7.

Thus, Firstbase began competing directly against Harbor Compliance with Harbor Compliance's own trade secrets **before the 15-day cure period ended**. *See, e.g.*, ECF No. 190 (Day 4 Transcript) at 33:9 – 34:6. Therefore, by failing to even provide Harbor Compliance with the *opportunity* to perform to Firstbase's satisfaction, and, instead, deciding to cut Harbor Compliance out of a Partnership Agreement that Firstbase itself predicted would generate ████

██████ in additionally monthly revenue by using inaccurate and misleading negotiation tactics, Firstbase demonstrated that it was conscious of the injury it was inflicting upon Harbor Compliance as a result of its misappropriation. This factor weighs in favor of awarding Harbor Compliance the maximum amount of exemplary damages as well. *See, e.g.*, *DiscoverOrg Data, LLC v. Guida Advisory Servs., Inc.*, 2021 WL 720641, at *2 (D.N.J. Feb. 24, 2021) (awarding exemplary damages of twice amount of compensatory damages, stating: "Defendant's conduct was willful and malicious insofar as it amounted to an intentional exploitation of Plaintiff's trade secrets without authorization and for Defendant's own personal gain.").

> c. <u>The Court Should Award The Maximum Amount Of Exemplary Damages Because Of Firstbase's Efforts To Cover Up Its Malfeasance.</u>

***Third***, while the jury expressly determined at trial that Firstbase's conduct rose to the level of willful and malicious within the meaning of the DTSA and the PUTSA, the jury was only made aware of a portion of Firstbase's misconduct. What the jury did not see was Firstbase's behavior as a litigant throughout the entirety of this action, which, taken as a whole, continued Firstbase's willful and malicious **cover up** of the misappropriation. Firstbase employed litigation tactics and gamesmanship to hide its treachery and, in turn, increase Harbor Compliance's costs and expenses at nearly every turn. As a result, Harbor Compliance was forced to seek Court intervention time after time to obtain key pieces of evidence such as Firstbase's source code, ECF No. 67, basic financial information, ECF No. 72, and the full production of Slack messages, ECF No. 76.

Taking each in turn, Harbor Compliance repeatedly argued throughout this litigation that Firstbase's source code likely contained some of the best evidence of misappropriation. Nevertheless, without articulating a legitimate objection, Firstbase steadfastly refused to permit a review of the code by Harbor Compliance's expert until the matter was brought to the Court's attention and the Court ordered that the review occur. Moreover, at trial, Firstbase's technical

expert, Mr. Steve Waldbusser testified that Firstbase's source code was deleted either on October 6, 2022 or in January 2023. *See, e.g.*, ECF No. 218 (Day 9 Transcript) at 113:20 – 114:9. However, Dr. Valerdi's inspection of Firstbase's source code occurred in September 2023, and, indeed, ██ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████. *See, e.g.*, ECF No. 210 (Day 7 Sealed Transcript) at 72:8 – 24. Thus, Firstbase's reason for withholding its source code from production became apparent: to cover up evidence of misappropriation. *See, e.g., Advanced Fluid Sys. Inc.*, 295 F. Supp. 3d at 493 (noting that Pennsylvania courts consider "efforts to cover up malfeasance" when determining if, or in what amount, exemplary damages under § 5304(b) are appropriate").

Firstbase's failure to voluntarily produce full financial information, including updated profit and loss statements, is further indicia of its cover up. Firstbase tried to paint a picture for the jury that Firstbase is an ██████ small start-up company. However, Firstbase failed to produce current financial information to support its version of these facts. In fact, the latest financial information that Firstbase produced stated ███████: that Firstbase ██████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████. JX1064. Before and during trial, Firstbase refused to produce its basic updated financial information for 2024, no doubt because such information would have only further solidified the fact that Firstbase is ████████████████████████████████ ████████████████████████. Indeed, by Firstbase's own estimation, its business, of which the Start and Agent products are integral parts, is valued anywhere between ████████ ████████. *See, e.g.*, JX0182 (at sheet titled "████████████████████).

Moreover, Firstbase did not produce full internal Slack messages until well after the close of paper fact discovery, and only after being ordered to do so by the Court. These Slacks turned out to be a complete "smoking gun" at trial, as evidenced most significantly in the devastating cross-examination of Mr. Senna. *See, e.g.*, ECF No. 215 (Day 6 Transcript) at 87:21 – 114:25. When the Court required that Firstbase produce full and complete Slack threads (public and private), listing corresponding dates and times and corresponding meta data by October 2, 2023, Firstbase dumped on Harbor Compliance more than 192,000 individual Slack messages, approximately 5,903 of which were produced in a language other than English. Because this voluminous document production occurred **after** the discovery end date, Firstbase's conduct directly impacted Harbor Compliance's ability to assess the merits of moving the Court for summary judgment, *see* ECF No. 64 (setting a September 29, 2023 deadline to file dispositive motions), and took place while Harbor Compliance was on the clock to respond to Firstbase's motion for partial summary judgment, *see* ECF No. 80. Moreover, all of Harbor Compliance's depositions of Firstbase's fact witnesses (and Fed. R. Civ. P. 30(b)(6) corporate designees) had already occurred during the month of September 2023. Thus, Firstbase was partially successful with its cover up antics insofar as Firstbase prevented Harbor Compliance from utilizing the late-produced Slack messages to uncover ███████████████████████ during the depositions of Firstbase's corporate designees. Simply put, Firstbase's "cover up" hampered Harbor Compliance's ability to fully prosecute this action.

At trial, the jury nevertheless saw ample evidence of Firstbase's cover up prior to rendering its verdict. For example, as set forth above and discussed on numerous occasions at trial, throughout the Fall of 2022 ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████. All the while, since *at least* as early as ███████████████, Firstbase was sending ██████ Slack messages about ████████ ████████████████████████████████████████ *See, e.g.*, JX0350_00011; JX0350_00012; JX0350_00013; JX_0350_00037; JX_0350_00014; JX_0350_00015; JX_00016; JX0350_00004; JX_00005; JX 0350_00017; JX0350_00038; JX0350_00002. At trial, Firstbase's Filipe Senna unapologetically referred to Firstbase's scheme as "Plan C." *See, e.g.*, ECF No. 191 (Day 5 Transcript) at 161:5 – 24. *See also* JX0346 (████████████████); JX0182 (████████████ ████████████████████). Notably, among other testimony pertaining to the scheme when Mr. Senna was asked whether he "had told Brock Klinger or Harbor Compliance that [he] was giving [his] team time and resources to implement [Firstbase's] own RA in all states," he responded: "No. Why would I tell him that?" *See* ECF No. 215 (Day 6 Transcript) at 65:6 – 11. Firstbase's cover up was intentional and wrongful – it was malfeasance of the highest order.

Further, Firstbase's counsel engaged Mr. Waldbusser, its liability expert, to refute Dr. Valerdi's, Harbor Compliance's liability expert's, opinion in this matter. However, Mr. Waldbusser's opinion was disingenuous at best. In fact, Firstbase's engagement of Mr. Waldbusser contained fatal flaws from the get-go that assisted Firstbase with its cover up. Despite taking a position in this case that Firstbase did not misappropriate Harbor Compliance's trade secrets, Mr. Waldbusser was, at best, willfully blind to facts demonstrating the fallacy of this position. For example, Mr. Waldbusser: (a) did not run or execute any of the versions of Firstbase's source code prior to issuing his report or sitting for his deposition, *see* ECF No. 218 (Day 9 Transcript) at 48:17 – 49:3; (b) could not recall whether he created an account and accessed Firstbase's portal prior to issuing his report or sitting for his deposition, *id.* at 50:9 – 21; (c) never spoke to Mr. Rahul Sheth, *id.* at 38:10-12; (d) never spoke to Mr. Mark Milastsivy, *id.* at 81:7 –

10; (e) never spoke to Mr. Rameel Sheikh, or anyone who worked at Firstbase in 2021 for that matter, *id.* at 81:24 – 82:5; (f) based his understanding of "use" under the DTSA and the PUTSA on his <u>own</u> definition; that is, pertaining to source code that is ultimately executed by a CPU for the purpose of delivering revenue-bearing services, *id.* at 85:5 – 15, which is contrary to controlling case law, *Oakwood Laboratories LLC v. Thanoo*, 999 F.3d 892, 910 (3d Cir. 2021); (g) did not consider circumstantial evidence in rendering his opinion, *id.* at 86:22 – 25; and (h) ██████████ ███████████████████████████████████████████████████, *see* ECF No. 212 (Day 9 Sealed Transcript) at 78:21 - 23. In short, Firstbase engaged Mr. Waldbusser to provide nothing more than self-serving, "hired gun" expert testimony to further cover up the evidence of Firstbase's misappropriation.

In light of all of the foregoing, Firstbase's intentional stealing and exploitation of Harbor Compliance's trade secrets, which the jury already expressly determined was willful and malicious within the meaning the DTSA and the PUTSA, warrants the maximum amount of exemplary damages.

        d. <u>Courts Both Inside And Outside Of The Third Circuit Have Routinely Awarded Two Times (2x) The Amount Of Compensatory Damages For Trade Secret Misappropriation In Factually Analogous Circumstances.</u>

A finding of exemplary damages in the amount of two times (2x) the amount of compensatory monetary relief that the jury awarded Harbor Compliance is consistent with the jurisprudence of federal courts both inside and outside the Third Circuit. Harbor Compliance is only seeking that which is specifically permitted under the DTSA and the PUTSA; and it is not uncommon for the maximum amount of exemplary damages to be awarded by a Court based on facts similar to those heard by the jury in this case.

Starting from within the Third Circuit, the Western District of Pennsylvania, as affirmed by the Third Circuit, awarded exemplary damages in twice the amount of the plaintiff's monetary award pursuant to 12 Pa. Cons. Stat. § 5304(a). *See PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 2020 WL 1526940, at *22 (W.D. Pa. Mar. 31, 2020). Specifically, the court awarded PPG Industries $8,805,925 in monetary damages, and $17,611,858 in exemplary damages, for a total misappropriation of trade secret award in the amount of $26,417,787. *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 2021 WL 2327509, at *11 (W.D. Pa. June 8, 2021), *aff'd sub nom. PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co. Ltd*, 47 F.4th 156 (3d Cir. 2022).

There, the plaintiff, PPG Industries, discovered that its former employees stole and then sold its trade secrets to its competitor, the defendant Jiangsu Tie Mao Glass Company ("TMG"). *PPG Indus., Inc.*, 2020 WL 1526940, at *1. PPG Industries learned that TMG engaged in a years-long effort to obtain its proprietary information from its former employees in exchange for large sums of money funneled to such employees. *Id*. In particular, PPG Industries claimed that TMG stole certain manufacturing processes and data compilations in order for TMG to jump start the sale of commercial glass products, which were commercially competitive with PPG Industries' products. *Id*. at *15. Thereafter, PPG Industries filed suit against TMG and two (2) of its former employees bringing claims under the federal RICO statute, breach of contract, and a misappropriation of trade secrets claim under the PUTSA. *Id*.

After concluding that TMG's misappropriation was willful and malicious, the *PPG* court turned to examining whether awarding exemplary damages was warranted. *Id*. at *20. The court held that the defendants acted in such a brazenly unlawful manner to misappropriate PPG Industries' trade secrets, it was therefore appropriate to grant PPG Industries' request for the

maximum amount of exemplary damages.  *Id*.  In finding so, the court explained that there were three (3) key willful and malicious acts that supported its exemplary damages award.

First, TMG recruited a PPG Industries' employee to feed it with PPG Industries' trade secrets knowing that such PPG Industries employee was subject to a confidentiality agreement. *Id*.  Second, the defendants removed PPG Industries' logo from the stolen proprietary documents. *Id*. at *22.  The defendants then provided the stolen files to one of PPG Industries' suppliers with the aim that such supplier would manufacture for TMG the proprietary technology contained in the stolen files.  *Id*.  Third, TMG encouraged a PPG Industries' employee to steal a proprietary document knowing said document was marked confidential and several pages were even marked as restricted from review by foreign nationals under the U.S. International Traffic in Arms Regulations.  *Id*.  All told, the court concluded by stating "[f]rankly, if Defendants' conduct does not warrant the maximum exemplary damages allowed under Pennsylvania law, then it would seem that nothing does."  *Id*.

Here, as in the *PPG* case, it was demonstrated at trial that Firstbase's conduct in carrying out its scheme to misappropriate Harbor Compliance's trade secret was nakedly willful and malicious.  Examples of this are plentiful as detailed earlier throughout this MOL.  For example, like TMG who extracted PPG Industries' trade secrets despite the parties' obligations to maintain confidentialities, Firstbase's scheme to misappropriate Harbor Compliance's trade secrets was carried out despite the confidentiality language and intellectual property protections binding the parties and aiming to shield Harbor Compliance from such misappropriation.  Indeed, throughout trial no one from Firstbase disputed the enforceability of the Confidentiality Agreement nor the confidentiality and intellectual property protections contained in the Partnership Agreement.  Yet,

Firstbase unabashedly carried out its scheme despite its contractual obligations expressly prohibiting such conduct.

Also like TMG in the *PPG* case, a key part of Firstbase's misappropriation scheme was to use the trade secrets as the foundation of its own competing product and to do so in a manner that conceals the origins of the product. TMG's ploy was to remove the PPG Industries' labeling in order to dupe PPG Industries' manufacturer into manufacturing a competing product. Here, even before the 15-day cure period lapsed, Firstbase publically launched its competing product by sending out an advertisement regarding its "expansion" of its "all-in-one-service" into New York, California, Texas and Florida. *See, e.g.*, JX0634 at Tab 1. Of course, Firstbase did not clarify in this advertisement that the incorporation and registered agent components of its "all-in-one-service" ██████████████████████████████████████████████████

████████. *Id.* Firstbase did not need to "rip" the Harbor Compliance label off since this was, after all, already a white-label arrangement. It is surely is no accident that Firstbase structured the arrangement as a white label one so that it would not need to explain to its customers its overnight conversion from **facilitator** of formation and registered agent services to **provider** of formation and registered agent services.

Finally, in support of its finding of willful and malicious misappropriation, the *PPG* court found it particularly significant that TMG stole documents belonging to PPG Industries despite the documents clearly being marked "PPG Confidential". *Id.* at *21. In the matter at hand, the especially brash conduct by Firstbase that was demonstrated at trial parallels, if not, surpasses, the malfeasance of TMG. Firstbase employed shameless efforts to extract Harbor Compliance's trade secrets and other valuable and confidential information so that Firstbase could set-up its competing business ████████████████████████████████████████████████. *See, e.g.*,

JX0350_00016 ("█████████████████████████████████████████████

███████████████████████"); *see also* JX0350_00017 ("████████████████████████

███████████████████████████████████████████████████████████"). It was

demonstrated at trial that Firstbase stopped at nothing in order to achieve its goal of being its own

registered agent, even if this meant that Firstbase had to cheat and deceive Harbor Compliance. It

follows then, consistent with cases from the Third Circuit, such as *PPG*, and many other courts,

that this Court should award Harbor Compliance the statutory limit of two times (2x) monetary

damages.

As alluded to above, the *PPG* court's award of the maximum amount of exemplary

damages is consistent with other decisions of the U.S. District Courts of the Western and Eastern

Districts of Pennsylvania. *See, e.g., B&B Microscopes,* 532 F. Supp. 2d at 756-57 (awarding

exemplary damages equivalent to twice the amount (2x) of monetary damages awarded pursuant

to the PUTSA where defendant "used B&B's name, reputation, contacts and resources" to develop

its own competing technology); *see also, e.g.*, *Certified Labs. of Tex., Inc.*, 303 F. Supp. at 1028-

1029 (awarding punitive damages of twice the amount (2x) of compensatory damages in a trade

secrets and restrictive covenant case due to defendants flagrantly inducing breaches of contracts

and concealing their violations).

Additionally, in *DiscoverOrg Data, LLC v. Guida Advisory Servs., Inc.*, the U.S. District

Court for the District of Delaware awarded exemplary damages in the amount of two times (2x)

monetary damages under the DTSA and New Jersey Trade Secrets Act after finding that the

defendant's conduct was willful and malicious insofar as it "amounted to an intentional

exploitation of [the] plaintiff's trade secrets without authorization and for [the] defendant's own

personal gain." 2021 WL 720641, at *1–2 (D.N.J. Feb. 24, 2021). In rendering the decision in

that case, the key point that Judge Bumb emphasized was that the "[p]laintiff presented evidence indicating that [the] [d]efendant knowingly, intentionally, and without authorization accessed at least 67,000 records from [the] [p]laintiff's database by utilizing the login information of one of [the] [p]laintiff's legitimate customers." *Id.* at *1. Here, like the defendant in *DiscoverOrg Data, LLC*, and as discussed throughout this MOL, Firstbase knowingly, intentionally, and without authorization accessed Harbor Compliance's trade secrets, including through deceitful tactics, to exploit them and directly compete with Harbor Compliance. But unlike the defendant in *DiscoverOrg Data, LLC*, and as discussed throughout this MOL, Firstbase did much more than use a third-party's log-in information to do so. An award of exemplary damages in the maximum amount provided by the DTSA and PUTSA is therefore warranted.

Outside the Third Circuit, courts have reached the same conclusion under factually similar circumstances. *See, e.g.*, *Miller UK Ltd. v. Caterpillar Inc.*, 2017 WL 1196963, at *11 (N.D. Ill. Mar. 31, 2017) (upholding jury's award of $24.9 million in compensatory damages and $49.7 million in exemplary damages); *Astro-Med, Inc. v. Plant*, 2008 WL 2883769, at *3 (D.R.I. July 25, 2008), *amended in part*, 2010 WL 537101 (D.R.I. Feb. 12, 2010) (awarding exemplary damages in an amount equivalent to double (2x) the monetary damages awarded by jury, finding defendants' acts of trade secret misappropriation were carried out despite a confidentiality agreement in place and demonstrated conscious disregard for the rights of others).

For instance, in *Miller UK Ltd.*, the defendant argued "that the jury was not presented with sufficient evidence to permit it to award exemplary damages after finding for [the plaintiff] on its ITSA claims." *Miller UK Ltd.*, 2017 WL 1196963, at *7. But the Northern District of Illinois, Eastern Division was unpersuaded and found "the evidence presented at trial was sufficient to allow the jury to find that [the defendant's] employees knew that [the plaintiff's] models were

confidential and knowingly used those models to design the Center-Lock coupler despite their contractual obligation to use [the plaintiff's] information only for development, sale, and support of the Bug/Pin Grabber Plus product." *Id.* Thus, the court denied the defendant's motion to vacate the jury's exemplary damages award. Notably, the court also denied the defendant's motion for remitter or damages retrial. *Id.* at *11. In fact, the court acknowledged the defendant's argument that "the jury's award of the largest statutorily permissible amount was the product of passion and prejudice rather than the evidence." *Id.* Shooting down this argument swiftly, the court stated, instead, that "a statutory cap on damages suggest that an award of damages at the capped maximum is not outlandish and that the mere fact of an award in that amount does not establish its impropriety." *Id.*

The same logic applies in the case presently before the Court. The jury has already determined that Firstbase's misappropriation was done willfully and maliciously. Moreover, as discussed above, the jury returned its verdict while only being presented at trial with evidence of only half of the "full" story; that is, the jury did not have knowledge of Firstbase's litigation tactics and gamesmanship. Firstbase's years-long, willful and malicious scheme to misappropriate Harbor Compliance's trade secrets, for which Firstbase has exhibited absolutely no contrition, and has instead ███████, which resulted in injury to Harbor Compliance of the kind expected by Firstbase, clearly entitles Harbor Compliance to the maximum amount of exemplary damages that the DTSA and the PUTSA expressly permit. For these reasons, as set forth in the proposed order being submitted herewith, Firstbase respectfully requests the Court award Harbor Compliance exemplary damages in the amount of $22,136,088 for a total award of $33,204,132 in connection with its trade secret claims (Counts III and IV).

## II.    The Court Should Award Harbor Compliance A Permanent Injunction Against Firstbase.

The jury's verdict of trade secret misappropriation under the DTSA and the PUTSA authorizes this Court to issue a permanent injunction against Firstbase.  Section 18 U.S.C. § 1836 (b)(3) of the DTSA states that "[i]n a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may (A) grant an injunction (i) to prevent any actual or threatened misappropriation [...] on such terms as the court deems reasonable...."  18 U.S.C. § 1836 (b)(3).  Similarly, Section 12 P.S. § 5303(a) of the PUTSA states that "[a]ctual or threatened misappropriation may be enjoined."  12 Pa.C.S.A. § 5303(a).  After a full trial on the merits, the jury already determined that Firstbase is liable for trade secret misappropriation under the DTSA and the PUTSA.

The federal courts in Pennsylvania have interpreted section 5303(a) of the PUTSA to require a four-part showing in order for a plaintiff to obtain a permanent injunction.  *See PPG Indus., Inc.*, 2020 WL 1526940, at *23.  A plaintiff must show "(1) the existence of a trade secret; (2) the communication of the trade secret pursuant to a confidential relationship; (3) the use or threatened use of the trade secret in violation of that confidence; and (4) harm" in order to be entitled to permanent injunctive relief.  *Id*. (citing *Kenset Corp. v. Ilanjian*, 600 F. App'x 827, 831 (3d Cir. 2015) (citing 12 Pa. Cons. Stat. § 5303(a)); *Moore v. Kulicke & Soffa Indus.*, 318 F.3d 561, 566 (3d Cir. 2003); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. Ct. 1989).  After upholding the award of exemplary damages, the *PPG* court applied the four-factor test to determine whether a permanent injunctive was appropriate.  Given that the court already found the trade secrets were misappropriated, the court rather summarily found that the first three (3) parts of the test were satisfied by PPG Industries.  *Id*.  In terms of the "harm" prong, the court held that PPG Industries demonstrated the same given that it would suffer even greater

harm "if Defendants were allowed to manufacture finished products based on the stolen technology and sell those products in direct or indirect competition with PPG". *Id.*

In terms of the duration of the injunction, the court in PPG noted that the PUTSA permits an injunction to remain in place until "'the trade secret has ceased to exist.'" *Id.* (citing 12 Pa. Cons. Stat. § 5303(a)). The court held that because the trade secrets would "last until the trade secrets that Defendants misappropriated cease to exist," the injunction would be granted and it would be permanent. *Id.*

On appeal to the Third Circuit, the defendant, TMG, argued that awarding monetary damages (including, for example, exemplary damages) for use of the trade secrets "during the same time period" amounts to a "double recovery" in light of the permanent injunction prohibiting use of the trade secrets. *PPG Indus. Inc.*, 47 F.4th at 163. The Third Circuit disagreed. Instead, the Third Circuit held that the award of monetary damages **and** permanent injunctive relief was appropriate because there was no overlap between the period of use to which the award of damages related and the period covered by the injunction. *Id.* To this end, the Third Circuit explained that "the forward-looking permanent injunction … was issued in March 2020, long after TMG's earlier and unlawful use of PPG's trade secrets. The damages and permanent injunction covered entirely separate periods of past and potential future use of misappropriated trade secrets." *Id.* at 163-64. Accordingly, the Third Circuit affirmed the district court's granting of the permanent injunction. *Id.* at 164. *See also ResMan, LLC v. Karya Prop. Mgmt., LLC*, 2021 WL 3423345, at *3–4 (E.D. Tex. Aug. 5, 2021) (holding plaintiff's monetary damages addressed harm from past use of trade secrets while permanent injunction issued by court addressed future harm, such that court was convinced no double recovery would occur by allowing both measures of damages to co-exist); *Thomas v. Hughes*, 27 F.4th 995, 1011–12 (5th Cir. 2022) (affirming award of money damages for

defendant's past misappropriation and injunctive relief to prevent future misappropriation because "without injunctive relief, [the defendant] could continue harming Plaintiffs, which would…defeat the entire purpose of this long, expansive litigation.").

        a.    <u>Firstbase Must Return And/Or Destroy Harbor Compliance's Confidential Information And Registered Agent Data.</u>

Harbor Compliance seeks a permanent injunction that includes, *inter alia*, a requirement that Firstbase immediately return and/or destroy all of Harbor Compliance's confidential and proprietary information.  Indeed, multiple portions of the Partnership Agreement require that Firstbase return and/or destroy this information, which, to date, it has failed to do.  *See* JX0254, pp. 4-5, § 7.3 (Confidentiality) ("Upon termination of this Agreement all Confidential Information must be returned to the discloser or destroyed."); *id* at 7, § 2 of SOW #1 (Registered Agent Services), ¶ 3 ("Upon termination of this contract, this data must be destroyed and removed from all Firstbase.io systems.").  There is absolutely no justifiable reason why Firstbase has not complied with the above-referenced provisions to date.  Certainly, Mr. Senna provided an invalid excuse when he jested at trial that it would take Firstbase a lot of time to do so.  *See, e.g.*, ECF No. 211 (Day 8 Transcript) at 65:8 – 22 (Mr. Filipe Senna stating, in part, "Why would I waste by time going one by one deleting it?").

    As discussed throughout this MOL, Firstbase has also shown repeated disregard for protecting Harbor Compliance's Confidential Information such that the Court should issue the proposed order to, *inter alia*, protect Harbor Compliance's proprietary information. *See, e.g.*, ECF Nos 1, 3, pp. 38-39 ¶ 156 (seeking injunctive relief in connection with Harbor Compliance's Breach of Contract claim).  *At a minimum*, Harbor Compliance's request for injunctive relief should require that Firstbase comply with its return and/or destroy provisions under the Partnership Agreement by a date certain, as more completely set forth in the proposed Order for permanent

injunctive relief attached to the Motion at Ex. B.  *See Cook Medical Incorporated v. Griffin*, 2008 WL 858996, *1 (S.D. Ind. Mar. 25, 2008) (including in injunction a mandatory monthly submission of records for review by plaintiff).

      b.    <u>Firstbase Must Stop Using Harbor Compliance's Trade Secrets Beyond The Date Of The Damages Award.</u>

In this case, the jury heard testimony from Harbor Compliance's damages expert, Mr. Urbanchuk, concerning the amount of Firstbase's profits that should be disgorged pursuant to the DTSA and the PUTSA.  The jury heard testimony from Mr. Urbanchuk ███████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████.  Accordingly, Harbor Compliance seeks a permanent injunction that, *inter alia*, commences on ███████████████████████ ███████████████████████████████████—and, as of said date, prohibits Firstbase from using Harbor Compliance's trade secrets in connection with its Firstbase Agent and Firstbase Start products into the future.  For the reasons set forth below, this request is both consistent with case law of this circuit, and is warranted.

Here, this portion of the requested permanent injunction would prohibit Firstbase from using Trade Secret #1 (Jurisdictional Database), Trade Secret #3 (Workflow: New users – Domestic Formation Filings/Sign in as Incorporator + Registered Agent), Trade Secret #5 (Workflow: Existing Users – Domestic Change of Registered Agent in Delaware or Wyoming (previously incorporated with Firstbase)), Trade Secret #6 (Workflow: Annual Report Filings – Domestic & Foreign in All 50 states), Trade Secret #7 (Entity Manager (dashboard)), and Trade Secret #8 (Application Programming Interface Documentation (Registered Agent; Business Filings) as of March 29, 2027.  *See* ECF No. 208, pp. 3-4 ¶¶ 12.1 – 12.8 (identifying trade secrets jury determined Firstbase misappropriated).  The documents introduced and testimony given at

trial squarely satisfy the four-factor test set forth in *PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*

because, for starters, the jury already found that Firstbase misappropriated Harbor Compliance's

trade secrets, thereby satisfying Harbor Compliance's burden with respect to the first three (3)

factors.  In terms of the fourth prong, "harm," permanent injunctive relief is necessary to protect

Harbor Compliance from the substantial threat that Firstbase will continue to misappropriate

Harbor Compliance's trade secrets into the future.  As explained at length above, Firstbase's

brazen acts of misappropriation, of an openly contumacious nature,[9] belies that Harbor

Compliance (or the Court) should have any confidence whatsoever that Firstbase's ongoing

misappropriation will cease with anything short of Court intervention.  Thus, the issuance of a

permanent injunction is necessary to thwart the threat of future use by Firstbase of the

misappropriated trade secrets which would, in turn, result in harm to Harbor Compliance in the

form of continued loss of revenue, loss of business opportunities and loss of market advantages,

among other harms.

Additional support that Firstbase should be prohibited from using the trade secrets

identified above starting on March 29, 2027 is that Firstbase is incapable of distinguishing the

components of the Agent and Start products that it developed on its own, if any, versus those that

are derived from Harbor Compliance's trade secrets.  Indeed, at trial Firstbase presented no

testimony or documents that demonstrate that the Firstbase Start and Firstbase Agent products

were derived in any way by Firstbase as opposed to the misappropriated trade secrets despite

having the burden to make this distinction, as made clear by the Court.  *See e.g.*, *Harbor*

*Compliance Corp. v. Firstbase.io, Inc.*, 2024 WL 1442165, at *8 (E.D. Pa. Apr. 3, 2024); *See also*

---

[9] For example, Mr. Senna stating "Why would I waste by time going one by one deleting it?"
ECF No. 211 (Day 8 Transcript) at 65:8 – 22.

*Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 622 (1912) (concluding that the burden shifts to the defendant "after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment"); *Avco Corp. v. Turn & Bank Holdings, LLC*, 659 F. Supp. 3d 483, 508 n.131 (M.D. Pa. 2023) (awarding disgorged profits not because the trademark holder established that sales for infringing services were due to infringement, but because the infringer failed to prove that they were not due to infringement). The consequence of this is that so long as Firstbase continues to offer its Start and Agent products it will continuously misappropriate Harbor Compliance trade secrets.

Consistent with case law in the Third Circuit and other courts Firstbase should therefore be prohibited from using the trade secrets identified above in connection to Firstbase Agent and Firstbase Start starting on March 29, 2027 and thereafter in perpetuity. *See PPG Indus., Inc.*, 2020 WL 1526940, at *23 (holding that it is consistent with other courts' application of the PUTSA injunctive relief section, the injunction will be "truly permanent".). In sum, it is consistent with Pennsylvania jurisprudence to issue Harbor Compliance a permanent injunction while also being awarded money damages because the two (2) forms of relief are not mutually exclusive. Therefore, Harbor Compliance respectfully requests that the Court enter the proposed form of order, which includes the issuance of the injunctive relief sought herein.

## III.   The Court Should Award Harbor Compliance Reasonable Attorneys' Fees, Costs, And Expenses.

Even before accounting for a molding of the verdict to account for Firstbase's established willful and malicious conduct, Harbor Compliance's success at trial was excellent. Harbor Compliance was victorious on each and every claim presented to the jury, and achieving a total of $27,915,714 in affirmative recovery. Besides ruling in Harbor Compliance's favor on each of its

affirmative claims, the jury also found in Harbor Compliance's favor, and against Firstbase, on both of Firstbase's counterclaims, finding that Harbor Compliance did not breach the Partnership Agreement and also finding that Harbor Compliance did not fraudulently induce Firstbase into entering the Partnership Agreement.  ECF No. 208 (Jury Verdict Form) at questions 4, 7.  Finally, the jury found that Firstbase engaged in willful and malicious misappropriation, and the jury further found that Firstbase unfairly competed with Harbor Compliance in a malicious, reckless, willful, or oppressive manner.  *Id.* at questions 11, 14.

Based on its excellent results, and also based on the jury's finding that Firstbase willfully and maliciously misappropriated Harbor Compliance's trade secrets, Harbor Compliance may recover (in addition to exemplary damages) "attorney's fees and related nontaxable expenses" consistent with FRCP 54.  *See* Fed. R. Civ. P. 54(d)(2)(B)(ii) (to recover fees and expenses, movant must "specify the judgment and the statute, rule, or other grounds entitling the movant to the award").  Pursuant to PUTSA and the DTSA, Harbor Compliance seeks a total of $1,910,864.71, consisting of $1,408,637.66 in attorneys' fees and $502,227.05 in expenses and costs.  *See* 12 Pa.C.S.A. § 5305(3) (prevailing party may recover all its "reasonable attorney's fees, expenses and costs" if willful and malicious misappropriation exists); 18 U.S.C § 1836 (b)(3)(D) (court may award "award reasonable attorney's fees to the prevailing party").  Although "expenses" and "costs" are relatively synonymous in everyday language, under Fed. R. Civ. P. 54 the term "expenses" is quite broad in that it includes both taxable and nontaxable costs.  10 Fed. Prac. & Proc. Civ. § 2666 (4th ed.) (Wright & Miller).  Said another way, "expenses … include all the expenditures actually made by a litigant in connection with the action."  *Id.*  Harbor Compliance's request therefore includes "all the expenditures" it made in connection with the lawsuit through May 15, 2024, inclusive of all attorneys' fees, expenses and costs.  Harbor Compliance also seeks

any and all fees, expenses and costs expended in the future, either in connection with this and other post-trial motions, as well as related to any potential appeal of the final judgment.

a.     <u>Harbor Compliance's Reasonable Attorney's Fees.</u>

A party seeking to recover attorney's fees has the initial burden of demonstrating that its request is reasonable. *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990). To meet this burden, a party is required to "'submit evidence supporting the hours worked and rates claimed.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939 (1983)). A printout of hours claimed, arranged by date, individual, general nature of work, and the time spent to the nearest tenth (1/10) of an hour meets the Third Circuit's standards of specificity regarding the nature of required evidence to satisfy a fee petitioner's initial burden. *Gorini v. AMP, Incorporated*, 2004 WL 1354465, *4 (M.D. Pa. Mar. 14, 2004) *aff'd* 117 Fed. Appx. 193 (3d Cir. Dec. 8, 2004). Harbor Compliance has provided all of this information, and more, in its fee petition request in this case. *See* MFD Decl., at ¶¶ 2, 3, 30, 31, 35, 36, 37, and 39; *id.* at Exs. A, B, C, D, E, F, G, and H. Once a fee petitioner satisfies its initial burden, the burden then shifts to the opposing party to contest the fee request, but in doing so the opposing party must point to record evidence and must make their objections with sufficient specificity. *Arlington Ind., Inc. v. Bridgeport Fittings, Inc.*, 2016 WL 3522964, *2 (M.D. Pa. June 28, 2016). The district court may not "decrease a fee award based on factors not raised at all by the adverse party." *Rode*, 892 F.2d at 1183 (internal quotations and citations omitted).

To determine an appropriate attorney's fee award, a court should multiply the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Arlington Ind., Inc*, 2016 WL 3522964 at *2. This sum is commonly referred to as the lodestar, which is presumed to be the reasonable fee. *Rode*, 892 F.2d at 1183. Once the lodestar is determined, the party seeking

adjustment has the burden of proving that an adjustment is necessary in order to rebut the presumption of reasonableness. *Id.* Here, the reasonable hourly rates multiplied by the number of hours reasonably expended yields a lodestar of $1,408,637.66, which should be awarded by the Court as the reasonable fee in this case.

            i.       *The Requested Rates Are Well Below Prevailing Market Rates, Demonstrating Their Reasonableness.*

The party seeking fees must come forward with "sufficient evidence of what constitutes a reasonable market rate for the essential character and complexity of the legal services rendered … ." *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir. 2001). A reasonable hourly rate is typically calculated according to the prevailing market rates in the relevant community, taking into consideration the experience and skill of the prevailing party's attorneys and comparing their rates to the rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. *Rode*, 892 F.2d at 1183. Once the fee petitioner makes the initial demonstration of reasonable hourly rates, the opposing party may contest the rates with appropriate record evidence. *Smith v. Philadelphia Housing Auth.*, 107 F.3d 223, 225 (3d Cir. 1997). But, without such evidence, the fee petitioner "must be awarded attorney's fees at her requested rate." *Id.* When determining the reasonable market rate, the current market rate must be used, that is, the rate at the time of the fee petition, not the rate at the time the services were performed. *Lanni*, 259 F.3d at 149-50.

In this case, RCCB has charged significantly less than ███████████████ by virtue of a ███████████████████████ on all 2023 rates. *See* MFD Decl. ¶ 5. The same ████ ██████ on 2023 rates continued in 2024 and through the present, effectively resulting in a further ███████████████████████████████████████. *Id.* at ¶¶ 6, 34. Thus, the ██████████████ rates sought by Harbor Compliance are clearly reasonable. And, the requested rates are a

28

reasonable market rate for similar services provided by attorneys of equivalent experience, skill and reputation. This fact is demonstrated by several attorney billing rate surveys that have been widely recognized and relied upon by courts in the Third Circuit, including:

(1) The Real Rate Report published by Wolters Kluwer ELM Solutions (the "Real Rate Report"). *Sabinsa Corp. v. HerbaKraft, Inc.*, 2022 WL 17446485, at *4 n.3 (D.N.J. Dec. 6, 2022) (the Real Rate Report "is generally regarded as the legal industry's leading benchmark for law firm rates and staffing trends based on actual invoice data. In particular, the Real Rate Report examines law firm rates over time and itemizes rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)."; *Minehan v. McDowell*, 2023 WL 199276, at *4 (E.D. Pa. Jan. 17, 2023) (recognizing same). The Real Rate Report is segmented by market, practice area, and attorney experience level.

(2) The American Intellectual Property Law Association ("AIPLA") Reports of the Economic Survey (the "AIPLA Report"). *Arlington Ind., Inc.*, 2016 WL 3522964, at *3 (relying on AIPLA Report when setting reasonable rate). Among other types of intellectual property-related claims, the AIPLA Report segments trade secret litigation.

(3) The fee schedule published by Community Legal Services, Inc. (the "CLS Fee Schedule"). *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001) (noting courts in Third Circuit have approvingly cited to the fee schedule in fee petition matters).

The following chart demonstrates that the requested rates for Harbor Compliance's attorneys and paralegals are *substantially less* than these comparable market rates:

| Position | CLS Fee Schedule[10] | AIPLA Report | Real Rate Report | **Rates Charged by RCCB** |
|---|---|---|---|---|
| Paralegal | $190-240 (1-10) $245-285 (senior) | | $196-350[11] | ███████ |
| Associate/ Counsel[12] | $265-315 (2-5) $320-415 (6-10) | | $334-689[13] | ███████ |

---

[10] *See generally* MFD Dec., at Ex. H.

[11] *See* MFD Dec., at Ex. F, p. 44 of Real Rate Report ("Commercial Litigation Paralegal" row, First Quartile, Median and Third Quartile).

[12] Because of variations in labeling of time-keepers between the various reports, the "Associate" row in the above-table refers to all non-Partner time-keepers with between 1-15 years' experience.

[13] The ranges listed are based on the following pages from the Real Rate Report (*see* MFD Dec., Ex. F): p. 19 ("Philadelphia PA Litigation Associate" row, First Quartile, Median and Third Quartile); 26 ("Philadelphia PA 3 to Fewer Than 7 Years" row, First Quartile, Median and Third Quartile); p. 40 ("Philadelphia PA Associate" row, First Quartile, Median and Third Quartile); p. 44 ("Commercial Litigation Partner" row, First Quartile, Median and Third Quartile); p. 88 ("Philadelphia PA Associate" row, First Quartile, Median and Third Quartile); p. 175 ("Commercial 51-200 Lawyers Associate" row, First Quartile, Median and Third Quartile).

| | | | | |
|---|---|---|---|---|
| | $425-525 (11-15) | | | |
| Partner[14] | $535-625 (16-20) $630-715 (21-25) $735-850 (25+) | | $463-999[15] | ███████ |
| Average | | $484-626[16] | | ███████ |

The rates requested are substantially below the prevailing market rates and are, therefore, entirely reasonable.

*ii.    The Number Of Hours Spent On The Litigation Was Reasonable.*

To determine whether a fee petitioner is requesting a reasonable number of hours, the starting point is the evidence of hours worked submitted by the fee petitioner. *Rode*, 892. F.2d at 1183. From this total, the district court should only exclude hours that are not reasonably expended, that is, those hours that are excessive, redundant, or otherwise unnecessary. *Id.* Here, Harbor Compliance has submitted a total of 3,758.5 hours expended on the matter, which includes hours related to preparing this post-trial motion.[17] If, any only if, the party opposing the fee petition makes a specific objection to the number of hours, the burden then shifts to the fee petitioner to justify the size of its request. *Arlington Ind., Inc.*, 2016 WL 3522964 at *7. But, if

---

[14] Because of variations in labeling of time-keepers between the various reports, the "Partner" row in the above-table refers to all time-keepers with between 16-25+ years' experience.

[15] The ranges listed are based on the following pages from the Real Rate Report (*see* MFD Dec., Ex. F): p. 19 ("Philadelphia PA Litigation Partner" row, First Quartile, Median and Third Quartile); p. 32 ("Philadelphia PA Fewer Than 21 Years and 21 or More Years" rows); p. 40 ("Philadelphia PA Partner" row, First Quartile, Median and Third Quartile); p. 44 ("Commercial Litigation Partner" row, First Quartile, Median and Third Quartile); p. 88 ("Philadelphia PA Partner" row, First Quartile, Median and Third Quartile); p. 175 ("Commercial 51-200 Lawyers Partner" row, First Quartile, Median and Third Quartile).

[16] S*ee* MFD Dec., Ex. G.

[17] "Courts in this district have regularly granted petitions to successful plaintiffs for time spent drafting the fee petition in dollar amounts similar to Plaintiff's request." *Shin Da Enterprises v. Yong*, 2024 WL 22074 at *5 (E.D. Pa. Jan. 2, 2024) (listing decisions awarding between $20,125 and $45,130 for preparation of fee petitions); *see also Howes v. Medical Components, Inc.*, 761 F. Supp. 1193, 1201 (E.D. Pa. 1990) (awarding $43,235 based on 204.5 hours spent preparing fee petition). Here, Harbor Compliance seeks a total of ██████ in relation to all of its post-trial motions including the exemplary damage multiplier (which makes up a majority of the legal argument and work done on this omnibus post trial motion), not just the fee petition request portion thereof.

the opposing party fails to specifically object, the district court may not *sua sponte* reduce the requested hours. *Id.*

The total hours expended on this litigation are reasonable in light of at least the following factors: (i) the complexities of the claims and defenses presented (which required the assistance of four (4) different expert witnesses and the issuance of nine (9) discrete reports); (ii) extensive discovery (including over 200,000 documents produced and eleven (11) depositions); (iii) substantial motion practice (including motions to dismiss and for summary judgment and several motions *in limine*); and (iv) the dilatory conduct of Firstbase during discovery (which caused Harbor Compliance to seek Court intervention in connection to several discovery disputes) and during the case in general. This last point, in particular, deserves further discussion to explain how Firstbase's conduct unnecessarily drove up litigations costs.

Harbor Compliance was forced to write to the Court on no less than six (6) occasions to obtain information that should have been produced during discovery or in connection with the expert reports exchanged by Firstbase, but was not. Most notably, without Court intervention, Harbor Compliance would not have obtained Firstbase's source code, financial information and related data necessary for Harbor Compliance to issue its own expert report on damages, nor Firstbase's full and complete Slack threads, all of which were pivotal to Harbor Compliance's success at trial. *See, e.g.*, ECF Nos. 67, 72, and 76.

Also, Firstbase asserted two (2) counterclaims against Harbor Compliance in this action for Breach of Contract and Fraudulent Inducement to Contract. ECF No. 34, pp. 45-46. As the jury's verdict indicated, Firstbase's claims lacked merit. ECF No. 208, pp. 1-2, ¶¶ 4, 7. These claims were absolutely frivolous, forcing Harbor Compliance to incur unnecessary costs and expenses throughout all phases of this litigation. Despite authorizing these counterclaims,

Firstbase's Founder and CEO testified that ████████████████████████████ ███████████████████████████████████; so, it is utterly unclear how Firstbase could have been fraudulently induced to enter into a contract that ████████████████████████ ████, and Firstbase introduced no credible testimony to the contrary. ECF No. 199 (Day 3 Sealed Transcript) at 22:15 – 22. What is more, Firstbase's Founder and CEO admitted to knowing the current status of Harbor Compliance's API prior to entering into the Partnership Agreement, precluding any argument Firstbase was defrauded on that subject area. ECF No. 189 (Day 3 Transcript) at 92:24 – 93:2. *See also* JX0353; JX0376; JX0362; JX0350_0000. And, while Firstbase's Founder and CEO attempted to maintain his position at trial that Firstbase did not know about Harbor Compliance's network of third-party providers used to achieve nationwide coverage, *see* ECF No. 189 (Day 3 Transcript) at 95:4 – 8, Mr. Milastsivy eventually admitted that Harbor Compliance **did** provide this information to Firstbase prior to execution of the Partnership Agreement, *id.* at 97:7 – 19 (referencing JX0695 attaching JX0696). *See also* JX0580 (Jurisdictional Database) at Column B. ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████. ECF No. 199 (Day 3 Sealed Transcript) at 59:2 – 64:15. Mr. Senna could not answer even simple questions on this topic at trial. ECF No. 215 (Day 6 Transcript) at 211:25 – 212:20. As discussed *supra*, evidence regarding how Harbor Compliance purportedly breached the Partnership Agreement was also entirely absent from ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████.

Not content to assert unsubstantiated counterclaims to drive up the costs of litigation, Firstbase also unnecessarily complicated proceedings (i) by making baseless sanctions threats (*see* MFD Dec., Exs. I, J), all of which were soundly rejected by the jury's verdict; and (ii) by designating an expert witness on damages, Chad Hudson, but then not calling Mr. Hudson as a witness at trial, thereby wasting tens of hours of attorney and paralegal time, not to mention related expenses and costs, spent on taking two (2) depositions of Mr. Hudson and preparing a motion *in limine* to exclude him from testifying at trial.

Finally, Harbor Compliance's lead trial counsel has confirmed that he personally reviewed, in real time on a monthly basis, each and every hour worked on this case and determined that the requested hours were reasonably expended. *See* MFD Dec. ¶ 27. Lead trial counsel, again in real time on a monthly basis and before bills were generated, proactively ███████████████████ ███████████ to ensure that there was no excessive, redundant or otherwise unnecessary time being billed to Harbor Compliance. *Id.* at ¶ 28. In total, ████████████████████████ ██████████████████████████████████████████████████████. *Id.* at ¶ 26.

b.  Harbor Compliance's Reasonable Costs.

Consistent with FRCP 54(d)(2)(B)(ii), Harbor Compliance is seeking "all the expenditures" it made in connection with the lawsuit thus far, as follows:

| | |
|---|---|
| Filing fees | $402.00 |
| Transcripts and Support | $64,265.37 |
| Expert Fees | $221,958.79 |
| E-Discovery | $68,075.82 |

| | |
|---|---|
| Postage, Shipping, Print, and Shred | $14,766.37 |
| Research | $1,047.80 |
| Trial Demonstratives and Litigation Support | $17,921.88 |
| Food | $1,763.83 |
| Travel | $4,681.51 |
| Parking | $1,537.03 |
| Service of process | $2,280.82 |
| Lodging | $24,346.28 |
| Total | $423,047.50 |

*See* MFD Dec. ¶¶ 31-34, Exs. C, D, E.

Courts have routinely approved the recovery of expenses and costs like the ones requested by Harbor Compliance. *See Arlington Indus., Inc.*, 2016 WL3522964, at *12-13 (noting recoverable non-taxable expenses may include postage, telephone, expert fees, travel, deposition transcripts, shipping, parking, lodging and food, and awarding a total of $510,471.92 split between two fee petitions including, *inter alia*, charges for lodging, travel, expert witness fees, postage, legal research and charges related to preparation of trial demonstratives as well as onsite assistance from trial director and related out-of-pocket and travel costs); *see also Shin Da Enterprises Inc. v. Yong*, 2024 WL 22074, *5, 6 and n.6 (E.D. Pa. Jan. 2, 2024) (awarding $117,950.64 in charges consisting of expert witness fees, transcript services, interpreters, litigation support, deposition support, process servers, witness fees, postage, filing fees, couriers, e-discovery services, costs associated with attendance at trial including hotel and transportation services, meals and legal research); *Howes v. Medical Components, Inc.*, 761 F. Supp. 1193 (E.D. Pa. 1990) (awarding charges related to expert witnesses fees and a jury consultant).

Here, Harbor Compliance has provided a detailed breakdown of all expenses and costs incurred, broken down by category. Each disbursement is either matched to a receipt or, if a receipt is not available, a corresponding representation by counsel in his declaration that the charges were accurate and incurred as stated. Finally, although a portion of the requested expenses and fees would be taxable as costs under 28 U.S.C. § 1920, Harbor Compliance may seek them now as part of the instant Motion. *See Howes*, 761 F. Supp. at 1200 (granting recovery of potentially-taxable costs as part of fee petition, and noting that double recovery would be avoided by provided for an appropriate off-set should plaintiff ever file a bill of costs under 28 U.S.C. § 1920).

      c.   <u>Additional Market Data Further Supports The Reasonableness Of The Total Fees, Expenses And Costs Requested By Harbor Compliance.</u>

The reasonableness of Harbor Compliance's request for $1,910,864.71 in fees, expenses and costs is also supported by market data tracking the average total expended in comparable trade secret litigation in the year 2023. The AIPLA Report tracks trade secret claims valued at different damage levels, referred to as the "at risk" figure. For trade secret claims with at "at risk" value of between $10,000,000 and $25,000,000, a survey of attorneys in private practice and in-house corporate counsel estimated a median total cost (fees and expenses) of $2,000,000 as of 2022:

| MEDIAN LITIGATION COSTS (CONTINUED) | $000s | | | | |
|---|---|---|---|---|---|
| | 2014 | 2016 | 2018 | 2020 | 2022 |
| **TRADE SECRET MISAPPROPRIATION SUIT** | | | | | |
| LESS THAN $1 MILLION AT RISK | | | | | |
| Initial case management | N/A | $30 | $25 | $50 | $38 |
| Inclusive of discovery, motions, and claim construction | $250 | $200 | $150 | $175 | $200 |
| Inclusive of pre and post-trial, and appeal when applicable | $500 | $400 | $550 | $500 | $750 |
| Cost if dispute was resolved through mediation | $50 | $25 | $25 | $40 | $95 |
| $1-$10 MILLION AT RISK | | | | | |
| Initial case management | N/A | $50 | $95 | $55 | $100 |
| Inclusive of discovery, motions, and claim construction | $500 | $350 | $1,000 | $1,000 | $350 |
| Inclusive of pre and post-trial, and appeal when applicable | $925 | $663 | $1,750 | $1,500 | $1,000 |
| Cost if dispute was resolved through mediation | $50 | $35 | $50 | $60 | $200 |
| $10-$25 MILLION AT RISK | | | | | |
| Initial case management | N/A | $50 | $150 | $100 | $200 |
| Inclusive of discovery, motions, and claim construction | $800 | $975 | $2,000 | $1,500 | $1,000 |
| Inclusive of pre and post-trial, and appeal when applicable | $1,500 | $1,250 | $4,125 | $2,750 | $2,000 |
| Cost if dispute was resolved through mediation | $100 | $50 | $100 | $125 | $300 |
| MORE THAN $25 MILLION AT RISK | | | | | |
| Initial case management | N/A | $100 | $400 | $250 | $250 |
| Inclusive of discovery, motions, and claim construction | $1,625 | $1,200 | $3,000 | $1,600 | $2,000 |
| Inclusive of pre and post-trial, and appeal when applicable | $2,650 | $1,650 | $7,500 | $4,500 | $2,750 |
| Cost if dispute was resolved through mediation | $113 | $55 | $200 | $175 | $300 |

*See* MFD Dec., Ex. G, p. 66. That same median figure is noted elsewhere in the AIPLA Report, along with a mean of $2,537,000 and a third quartile sum of $3,750,000:



Estimated Total Cost of a Trade Secret Misappropriation Suit
(P. I-210 to I-213, Q50Ai-Q50Ap)

| | Initial case management | Incl, discovery, motions, claim constr | Incl, pre to post-trial, & appeal if app | Cost of mediation | Initial case management | Incl, discovery, motions, claim constr | Incl, pre to post-trial, & appeal if app | Cost of mediation |
|---|---|---|---|---|---|---|---|---|
| — 3rd Quartile | $388 | $2,250 | $3,750 | $525 | $500 | $3,000 | $5,250 | $913 |
| — Median | $200 | $1,000 | $2,000 | $300 | $250 | $2,000 | $2,750 | $300 |
| ◆ Mean | $252 | $1,258 | $2,537 | $528 | $332 | $1,977 | $3,395 | $800 |
| — 1st Quartile | $79 | $400 | $825 | $125 | $100 | $1,000 | $1,000 | $138 |
| | $10-$25 million at risk (thousands) | | | | Greater than $25 million at risk (thousands) | | | |

*See id.* at 79. Here, Harbor Compliance is requesting $1,910,864.71 in fees, expenses and costs. Even considering additional charges related to any eventual appeal of the final judgment, it is clear that the total amount sought by Harbor Compliance will be significantly less than many of the

AIPLA total cost averages for comparable trade secret claims. This further supports the reasonableness of Harbor Compliance's request, and is a good independent cross-check of the lodestar figure.

### IV. Pre-Judgment Interest At Six Percent (6%) Per Annum Should Be Added To The Amended Judgment, And Post-Judgment Interest Should Also Be Assessed.

The decision to grant pre-judgment interest is left to the sound discretion of the district court, and that discretion is to be guided by considerations of fairness. *ECEM European Chem. Marketing B.V. v. Purolite Co.*, 451 Fed. Appx. 73, 79 (3d Cir. Nov. 14, 2011). It would be fair and just to award pre-judgment interest in this case for all of the reasons detailed throughout this memorandum. The Court should award pre-judgment interest to Harbor Compliance at the rate of six percent (6%) per annum, consistent with Pennsylvania's legal rate of interest. 41 P.S. § 202. Although this case satisfied both federal question (by virtue of the DTSA claim) and diversity (there being complete diversity of the parties, and more than $75,000 in dispute) jurisdiction, the number of Pennsylvania law (and therefore diversity-based) claims outnumbered federal claims by three (3) (PUTSA, Unfair Competition and Breach of Contract) to one (1) (DTSA). In a case involving similar overlapping bases for jurisdiction, the Third Circuit affirmed the district court's use of Pennsylvania's six percent (6%) legal rate for pre-judgment interest. *Id.* at 79-80. Even if this Court were inclined to strictly proceed on consideration of pre-judgment interest as a matter of federal and not state law, Harbor Compliance submits the same six percent (6%) figure should be utilized. In strictly federal question cases, a court awarding pre-judgment interest "may be guided by the post-judgment interest rate set forth in 28 U.S.C. § 1961." *Medtronic Sofamor Danek USA, Inc. v. Globus Medical, Inc.*, 637 F. Supp. 2d 290, 313 (E.D. Pa. 2009). Title 28 U.S.C. Section 1961, in turn, provides that the interest rate is calculated "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors

of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a). As of the date of this submission, the weekly average of the 1-year constant maturity Treasury yield is 5.142%. *See https://www.federalreserve.gov/releases/h15/default.htm* (Row titled "Treasury constant maturities 1-year"). Thus, being guided by the 5.142% federal rate actually further supports the fairness of applying the very similar Pennsylvania's six percent (6%) legal rate of interest.

Pre-judgment interest runs from the initial accrual date. *William A. Graham Co. v. Haughey*, 646 F.3d 138, 151 (3d Cir. 2011) In a similar case involving a claim for copyright infringement based on the misappropriation and use of confidential business materials by a competitor, the Third Circuit held that the accrual date was the date when the first infringement took place. *Id.* In *Haughey*, the Third Circuit affirmed the district court's award of pre-judgment interest dating back to 1992, which was the date of first infringement, even though the complaint was not filed until 2005. *Id.* at 141-42. This resulted in pre-judgment interest of $4,112,859 against one defendant and $570,542 against the other defendant. *Id.* at 142. Here, pre-judgment interest should run from March 28, 2022. Although confidential information (including trade secrets) was shared with (and misappropriated by) Firstbase prior to this date, March 28, 2022 is when the parties executed their Confidentiality Agreement. Thus, this is a fair and logical accrual date as it results in the full disgorgement of Firstbase's ill-gotten profits, consistent with *Haughey*. *Id.* at 147 ("Similarly, in cases where the goal is the defendant's disgorgement rather than rectification of the plaintiff's injury, fully attaining the goal of pre-judgment interest will require that it be awarded from the date of the first illicit profit."). Pre-judgment interest should therefore begin to run on original verdict, at six percent (6%) per annum, from March 28, 2022 through the date the amended judgment is entered. As detailed in the declaration of Matthew Faranda-

Diedrich, Esq., through May 17, 2024, that total amount of pre-judgment interest on the original jury verdict would be $3,625,688.65.

Additionally, Harbor Compliance requests post-judgment interest run on the amended judgment, inclusive of the $22,136,088 in exemplary damages added to the original verdict and $1,910,864.71 of attorney's fees, expenses and costs at the rate provided for in 28 U.S.C. § 1961.

## **CONCLUSION**

The jury's verdict could not have been more one-sided—in favor of Harbor Compliance. The jury expressly rendered a verdict finding that Firstbase's trade secret misappropriation was willful and malicious, and that its unfair competition was malicious, reckless, willful or oppressive. Thus, Harbor Compliance seeks a molded verdict that includes exemplary damages in the amount of two times (2x) the compensatory monetary relief the jury awarded with respect to its Trade Secret Claims (Counts III and IV). And given that Firstbase has shown absolutely no remorse for its conduct, and is proceeding with business as usual, Harbor Compliance seeks a permanent injunction to protect its Trade Secrets, which cannot simply be learned over a "cup of coffee," from being unlawfully exploited. Harbor Compliance respectfully contends that an award of attorneys' fees, costs, expenses, and pre- and post-judgment interest is warranted under the circumstances as well.

At the end of the day, both parties signed the Confidentiality Agreement, and both parties signed the Partnership Agreement. But Harbor Compliance embraced Firstbase, trusted Firstbase, and offered to take Firstbase under its wings, sharing with Firstbase its most sensitive information. On the other hand, Firstbase treated Harbor Compliance like just another "warm body." Indeed, Firstbase was well aware of the type of relief afforded under the DTSA and the PUTSA, and chose to willfully and malicious misappropriate, to unfairly compete and to breach the Partnership

Agreement.  Like any poker game, Firstbase overplayed its hand and lost.  Now, it is time for Firstbase to make good on its massive bet.

Respectfully submitted,

By: _/s/ Matthew Faranda-Diedrich_
MATTHEW FARANDA-DIEDRICH (203541)
SEAN S. LITZ (204229)
DAVID S. HOLLANDER (327709)
**ROYER COOPER COHEN BRAUNFELD LLC**
Two Logan Square
100 N. 18th Street, Suite 710
Philadelphia, PA 19103
215-839-1000 (tel)
484-362-2630 (fax)
mfd@rcblaw.com
slitz@rcblaw.com
dhollander@rcblaw.com

_Attorneys for Plaintiff,_
_Harbor Business Compliance Corporation_

Dated:  May 17, 2024