UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| HARBOR COMPLIANCE CORP., | : |
| Plaintiff, | : |
| | : |
| v. | :     No.  5:23-cv-0802 |
| | : |
| FIRSTBASE.IO, INC., | : |
| Defendant. | : |

_____

**O P I N I O N**
**Plaintiff's Omnibus Post-Trial Motion, ECF Nos. 230, 259- Granted in part, Denied in part**
**Defendant's Motion for Judgment as a Matter of Law, ECF No. 231- Denied**

**Joseph F. Leeson, Jr.**                                                    **February 4, 2025**
**United States District Judge**


## I.        INTRODUCTION

This case involved the unsuccessful business relationship of two companies.  Plaintiff

Harbor Compliance Corporation ("Harbor") initiated the above-captioned action against

Defendant FIRSTBASE.IO., INC. ("Firstbase") alleging that Firstbase, after acquiring trade

secrets of Harbor, breached the Partnership Agreement between the companies relating to the

licensing, marketing, and sale of Harbor's white-labeled registered agent service.[1]  Firstbase filed

counterclaims against Harbor arising from Harbor's alleged breach of the same agreement.  After

a two-week trial, the jury found for Harbor and against Firstbase on all claims.  The jury awarded

Harbor total damages of $27,915,714.  Both parties have filed post-trial motions.  For the reasons

---

[1]        A white-label product or service is produced by one company (producer) that other
companies (marketers) rebrand to make it appear as if they had made it.  *See* Compl. ¶ 14, n.2,
ECF No. 1.

set forth below, Firstbase's motion is denied.  Harbor's Omnibus Post-Trial Motion is granted in part and denied in part.

## II.    BACKGROUND

Harbor asserted the following counts: (I) breach of contract, (II) breach of implied duty of good faith and fair dealing, (III) misappropriation of trade secrets under Pennsylvania law (PUTSA),[2] (IV) misappropriation of trade secrets under federal law (DTSA),[3] and (V) unfair competition.[4]  Firstbase brought two counterclaims: (I) breach of contract and (II) fraudulent inducement.

In anticipation of trial, the parties filed pretrial memoranda.  *See* ECF Nos. 156, 160.  A final pretrial conference was held on March 27, 2024, at which time the Court addressed, *inter alia*, numerous objections to evidence and anticipated legal issues.  In an Opinion and Order dated April 3, 2024, the parties' motions in limine to preclude and/or limit the other side's expert witness testimony and/or reports were granted in part and denied in part.  *See* ECF Nos. 175-176. That Opinion is incorporated herein.  *See id.*

Jury selection and trial began on April 8, 2024.  On April 19, 2024, the evidentiary portion of the trial was complete and Firstbase moved for judgment as a matter of law based on insufficient evidence "as to all claims alleged."  *See* N.T. 47:17-19, Day 10, Trial 4/19/24, ECF No. 219.  However, Firstbase's argument was limited to two issues.  *See id.*  First, Firstbase argued that the out-of-scope invoices require negotiation between the parties in good faith, but it was established during trial that no one discussed these charges with Firstbase before the

---

[2]    Pennsylvania Uniform Trade Secrets Act ("PUTSA")
[3]    Defend Trade Secrets Act of 2016 ("DTSA")
[4]    Harbor's unjust enrichment claim was dismissed by Opinion and Order dated April 26, 2023.  *See* ECF Nos. 32-33.

invoices were issued.  Thus, by the plain language of the contract, this amount is uncollectible.
*See id.* 47:22 – 48:3.  Second, Firstbase asserted that as to all trade secrets, there was no direct
evidence at trial of trade-secret misappropriation; rather, Harbor's case was based entirely on
circumstantial evidence, which requires both access and substantial similarity, but Harbor failed
to show substantial similarity as a matter of law.  *See id.* 48:5-18.  After hearing Harbor's
response, the Court denied the motion.  *See id.* 50:19 - 51:4.  Harbor also moved for judgment as
a matter of law on its counterclaims, arguing that there was no evidence of damages.  *See id.*
51:6-25.  Firstbase responded in opposition, after which this Court denied the motion.  *See id.*
53:16-18.

The jury was instructed in the afternoon on April 19, 2024, and returned a verdict a few
hours later.  The jury unanimously found for Harbor and against Firstbase on all counts.[5]  The
jury awarded the following damages to Harbor: Count I- $1,090,271; Counts III and IV-
$11,068,044; Count V- compensatory: $14,757,399 and punitive: $1,000,000.  The jury also
answered several special interrogatories, finding that: (1) Firstbase's breach was material; (2) the
unfair competition by Firstbase was malicious, wanton, reckless, willful, or oppressive; and (3)
Firstbase's trade secret misappropriation was willful and malicious.  *See* ECF No. 208.  Finally,
the jury was asked whether Harbor had demonstrated the existence of each of the eight separate
trade secrets, to which it answered yes as to six of the trade secrets.  *See id.*  On April 23, 2024,

---

[5]    Before jury deliberations, Count II was dismissed without objection because it failed as a
matter of law.  *See* N.T. 134:18 – 135:10, Day 9, Trial 4/18/24, ECF No. 218 (The Court
explained that Pennsylvania law does not recognize a cause of action for breach of the implied
duty of good faith and fair dealing separate and distinct from a breach of contract claim and
because Harbor asserted a claim for breach of contract in Count I, Harbor's claim for breach of
implied duty of good faith and fair dealing in Count II failed as a matter of law.).

judgment was entered in the amount of $26,915,714.00, plus $1,000,000.00 in punitive damages. *See* ECF No. 213.

Both parties have filed post-trial motions. *See* Pl. Mem., ECF Nos. 230-259; Def. Mem., ECF No. 231. The motions are fully briefed. *See* ECF Nos. 240-242, 249-251, 260-264. The Court held oral argument on July 9, 2024. On August 22, 2024, this Court issued an Order denying one of Firstbase's motions: Motion to Stay Execution of Judgment Pending Post-Trial Motions and Appeal under Federal Rule of Civil Procedure 62(b). That Order, ECF No. 265, is incorporated herein. This Opinion addresses the remaining motions.

On October 15, 2024, the above-captioned action was stayed because Firstbase filed for bankruptcy in the United States Bankruptcy Court in the Southern District of New York, case number 24-11647. *See* ECF No. 266 (quoting 11 U.S.C. § 362(a)(1) (providing that a voluntary petition for bankruptcy "operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case")). At the time of that Order, Firstbase advised the Court that it intended to petition the bankruptcy court to lift the stay to allow resolution of the post-trial motions in the instant action. *See id.* n.1. On November 20, 2024, the parties filed a joint stipulation in the bankruptcy court to have the automatic stay lifted. By Order dated December 18, 2024, the United States Bankruptcy Court in the Southern District of New York entered an Order modifying the automatic stay "with respect to the Trial Court Action for the exclusive purpose of permitting the Trial Court to rule on the Post-Trial Motions, including the issuance of a decision and entry of the Final Judgment and for no other purposes." *See* ECF No. 267. In accordance with that Order, the instant Opinion and accompanying Order are issued.

## III.    LEGAL STANDARDS

### A.    Rule 50(b), Judgment as a Matter of Law – Review of Applicable Law

Under Rule 50(b), a "court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  Fed. R. Civ. P. 50(b).  Judgment as a matter of law "may be granted under Fed. R. Civ. P. 50(b) only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief."  *Powell v. J.T. Posey Co.*, 766 F.2d 131, 133-34 (3d Cir. 1985) (internal quotations omitted).  "Absent such a showing, a court's ruling should stand." *Est. of Lieberman v. Vida*, No. 22-2542, 2024 U.S. App. LEXIS 1156, at *11 n.6 (3d Cir. Jan. 18, 2024).  "The question is not whether there is literally no evidence supporting the unsuccessful party, but whether there is evidence upon which a reasonable jury could properly have found its verdict."  *Gomez v. Allegheny Health Servs.*, 71 F.3d 1079, 1083 (3d Cir. 1995). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  "Entry of judgment as a matter of law is a 'sparingly' invoked remedy."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

"A motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient."  *See Lightning Lube*, 4 F.3d at 1172. *See also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury.").  "The

failure to move for judgment as a matter of law at the close of all evidence wholly waives a party's right to mount any post-trial attack on sufficiency of evidence grounds." *Vargo v. Coslet*, 126 F. App'x 533, 535 (3d Cir. 2005) (citing *Yohannon v. Keene Corp.*, 924 F.2d 1255, 1262 (3d Cir. 1991)). The failure to move under Rule 50 for judgment as a matter of law does not, however, waive a party's rights under Rule 59. *See Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 365 (3d Cir. 1999).

### B.      Rule 59(a), Motion for New Trial – Review of Applicable Law

Under Rule 59(a), a new trial may "be granted where there was substantial error in the admission or exclusion of evidence; . . . where the jury's verdict was inadequate or excessive; or where the verdict is against the weight of the evidence. . . . A new trial may also be granted where the evidence was legally insufficient to go to the jury." *Snider v. Sterling Airways, Inc.*, No. 13-CV-2949, 2017 U.S. Dist. LEXIS 142799, at *5 (E.D. Pa. Aug. 29, 2017). Although the reasons the court may grant a new trial under Rule 59 are broad, "it should do so only when 'the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand.'" *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)). The "court's power to grant a new trial is [further] limited to ensure that [it] does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." *Leonard*, 834 F.3d at 386 (internal quotations omitted).

### C.      Rule 59(e), Motion to Alter or Amend Judgment – Review of Applicable Law

A party may seek to alter or amend judgment pursuant to Rule 59(e). The purpose of a motion to alter or amend judgment, also called a motion for judgment notwithstanding the verdict or a motion for reconsideration, "is to correct manifest errors of law or fact or to present

newly discovered evidence." *Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir.

1999); *Keifer v. Reinhart Foodservices, LLC*, 563 F. App'x 112, 114-15 (3d Cir. 2014).

"Accordingly, a judgment may be altered or amended if the party seeking reconsideration shows

at least one of the following grounds: (1) an intervening change in the controlling law; (2) the

availability of new evidence that was not available when the court granted the motion for

summary judgment; or (3) the need to correct a clear error of law or fact or to prevent manifest

injustice." *Max's Seafood Cafe*, 176 F.3d at 677.  "Rule 59(e) permits a court to alter or amend a

judgment, but it 'may not be used to relitigate old matters, or to raise arguments or present

evidence that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co.*, 554

U.S. at 485 n.5 (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp.

127-28 (2d ed. 1995)).  "The scope of a motion brought under Rule 59(e) is extremely limited."

*Amor v. Conover*, No. 5:21-cv-05574-JMG, 2023 U.S. Dist. LEXIS 145023, at *5 (E.D. Pa. Aug.

18, 2023) (internal quotation marks omitted).  "A motion to alter or amend judgment pursuant to

Rule 59(e) may not be granted where to do so would undermine the jury's fact-finding role and

trample on the defendant's seventh amendment right to a jury trial."  *Robinson v. Watts Detective*

*Agency, Inc.*, 685 F.2d 729, 742 (1st Cir. 1982).

### D.    Exemplary damages under trade secrets law – Review of Applicable Law

"The terms 'exemplary damages' and 'punitive damages' are synonymous, but the Trade

Secrets Act uses the former term while common law causes of action tend to invoke the latter."

*Advanced Fluid Sys. v. Huber*, 958 F.3d 168, 173 n.1 (3d Cir. 2020).  Federal law provides: "if

the trade secret is willfully and maliciously misappropriated, [the court may] award exemplary

damages in an amount not more than 2 times the amount of the damages awarded.  *See* 18 U.S.C.

§ 1836(b)(3)(C); *Estate of Accurso v. Infra-Red Servs.*, 805 F. App'x 95, 107 (3d Cir. 2020).

Similarly, "[u]nder Pennsylvania law, '[i]f willful and malicious [trade secrets] misappropriation exists, the court may award exemplary damages in an amount not exceeding twice [the amount of compensatory damages].'" *Id.* (quoting 12 Pa. Cons. Stat. § 5304(b)).  However, a willful and malicious misappropriation alone does not necessarily mean that the prevailing party is entitled to exemplary damages.  *See id.* (affirming the district court's denial of punitive damages to defendants on the PUTSA claim).  "Instead, courts consider a host of factors, including, but not limited to, the duration of misappropriative conduct, the defendant's consciousness of resulting injury, and any efforts to cover up malfeasance." *Arnold's Office Furniture, LLC v. Borden*, No. 5:20-cv-05470-JMG, 2022 U.S. Dist. LEXIS 150824, at *4 (E.D. Pa. Aug. 23, 2022) (considering exemplary damages under the DTSA and PUTSA) (internal quotations omitted). *See also Proofpoint, Inc. v. Vade Secure, Inc.,* No. 19-cv-04238-MMC, 2021 U.S. Dist. LEXIS 223204, at *10-11 (N.D. Cal. Nov. 18, 2021) (listing additional factors under the DTSA, including the degree of reprehensibility, the need to deter similar misconduct in the future, the amount of compensatory damages awarded, and the wealth of the defendant).

     **E.**    **Attorney's fees and costs under trade secrets law – Review of Applicable Law**

     The DTSA permits, but does not require, the court to award reasonable attorney fees for a "willful and malicious" misappropriation.  *See* 18 U.S.C. § 1836(b)(3)(D).  Likewise, under Pennsylvania's trade secrets law, a "court may award reasonable attorney fees, expenses and costs to the prevailing party [if] . . . willful and malicious misappropriation exists."  12 Pa.C.S. § 5305(3).  "Just because a jury finds willful and malicious misappropriation does not necessarily mean that the prevailing party is entitled to attorney's fees." *Arnold's Office Furniture, LLC v. Borden*, No. 5:20-cv-05470-JMG, 2023 U.S. Dist. LEXIS 97967, at *31 (E.D. Pa. June 6, 2023).

"The party seeking attorney's fees has the burden to prove that its request for attorney's fees is reasonable." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

### F.    Permanent injunction under trade secrets law- Review of Applicable Law

"Both the DTSA and PUTSA authorize injunctive relief." *Warman v. Local Yokels Fudge, LLC*, No. 19-1224, 2024 U.S. Dist. LEXIS 53453, at *7-8 (W.D. Pa. Mar. 26, 2024) (citing 18 U.S.C. § 1836(b)(3); 12 Pa. C.S. § 5303(a)).  Permanent injunctive relief is also available under state law for breach of contract and unfair competition claims.

For a permanent injunction to issue under federal law, a "plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The irreparable harm must be "causally attributable to the challenged infringement." *TD Bank N.A. v. Hill*, 928 F.3d 259, 280 (3d Cir. 2019).  "Although *eBay* identified irreparable harm and the adequacy of legal remedies as separate considerations, they typically constitute two sides of the same inquiry, for the 'availability of adequate monetary damages belies a claim of irreparable injury.'" *Id.* at 282 (quoting *Bennington Foods LLC v. St. Croix  Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008)).  "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court." *Id.* "Permanent injunctive relief, like preliminary injunctive relief, is an extraordinary remedy." *World Wide St. Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411, 415-16 (M.D. Pa. 2006).

"The elements for a permanent injunction under PUTSA are: (i) the existence of a trade secret; (ii) the communication of the trade secret pursuant to a confidential relationship; (iii) the

use or threatened use of the trade secret in violation of that confidence; and (iv) harm." *Warman*, 2024 U.S. Dist. LEXIS 53453, at *9 (internal citation omitted).  Outside the PUTSA framework, Pennsylvania law provides that "[t]o justify the award of a permanent injunction, the party seeking relief 'must establish that his right to relief is clear, that an injunction is necessary to avoid an injury that cannot be compensated by damages, and that greater injury will result from refusing rather than granting the relief requested.'" *Kuznik v. Westmoreland Cty. Bd. of Comm'rs*, 902 A.2d 476, 489 (Pa. 2006) (quoting *Harding v. Stickman*, 823 A.2d 1110, 1111 (Pa. Cmwlth. 2003)).

### G.    Pre- and post- judgment interest – Review of Applicable Law

"Prejudgment interest is awarded to restore a plaintiff to the position it would have been in had there been no wrongdoing." *AgroFresh Inc. v. Essentiv LLC*, No. 16-662 (MN), 2020 U.S. Dist. LEXIS 222898, at *84 (D. Del. Nov. 30, 2020) (internal citations and quotations omitted).  "In the absence of an explicit congressional directive, the awarding of prejudgment interest under federal law is committed to the trial court's discretion." *Ambromovage v. United Mine Workers*, 726 F.2d 972, 981-82 (3d Cir. 1984).  Also committed to the discretion of the district court is the rate of prejudgment interest.  *See Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986).  "In exercising that discretion, however, the court may be guided by the rate set out in 28 U.S.C. § 1961 (1982)." *Id.*  Interest is "given in response to considerations of fairness. It is denied when its exaction would be inequitable." *Bd. of Cty. Comm'rs v. United States*, 308 U.S. 343, 352 (1939).  Under Pennsylvania law, a "court has discretion to award or not award prejudgment interest on some claims, but must or must not award prejudgment interest on others." *Fid. Bank v. Commonwealth Marine & Gen. Assurance Co.*, 592 F. Supp. 513, 522 (E.D. Pa. 1984).  The court must first identify the nature of the breach

because: "(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled. (2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due." *Davis v. Borough of Montrose*, 194 A.3d 597, 613 (Pa. Super. 2018) (citing Restatement (Second) of Contracts § 354; *Cresci Constr. Servs. v. Martin*, 64 A.3d 254 (Pa. Super. 2013)). *See also TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 264-65 (Pa. 2012) (explaining that "Section 354 distinguishes between interest due on an obligation to pay a definite sum, which is recoverable as a matter of right under Subsection 354(1), and interest on losses incurred as a consequence of a breach of a promise to pay, which is subject to discretion under Subsection 354(2)."). Pre-judgment interest is calculated from the time the money becomes due or payable at a rate of 6% per year. *See Talen Energy Mktg., LLC v. Aluminum Shapes, LLC*, No. 19-4303, 2021 U.S. Dist. LEXIS 27140, at *10-11 (E.D. Pa. Feb. 12, 2021).

Post-judgment interest is mandatory. See 28 U.S.C.S. § 1961(a). Post-judgment interest is calculated based upon the underlying judgment plus the award of prejudgment interest, if any. *See Skretvedt v. E.I. Dupont de Nemours*, 372 F.3d 193, 217 (3d Cir. 2004).

## IV.    DISCUSSION

### <u>Defendant's Post-Trial Motions</u>

Firstbase filed a Motion for Judgment as a Matter of Law or, in the Alternative, Motion for a New Trial or Motion to Alter or Amend the Judgment. Firstbase argues: (1) there was insufficient evidence to support the misappropriation of trade secrets and unfair competition claims, (2) the verdict was against the weight of the evidence, (3) the damages for the

misappropriation of trade secrets and unfair competition claims should be vacated or reduced as

unsupported, (4) the judgment should be reduced to prevent double recovery, (5) Dr. Valerdi's

testimony exceeded the scope of his expert report and deposition, and (6) damages for the breach

of contract claim are unsupported and should be reduced.[6]

> **A.    There was sufficient evidence to support the misappropriation of trade secrets claims, and Firstbase's challenge to the sufficiency of the evidence for the unfair competition claim was waived.**

In its post-trial motion "[u]nder Rule 50(b)," Firstbase argues that Harbor failed to

present sufficient evidence to support its misappropriation of trade secrets and unfair competition

claims.  *See* Def. Mem. 1.  Firstbase suggests that these claims arise from the same alleged

conduct.  *See id.* at 1-2, 11-14.  It further argues that Harbor presented insufficient evidence a

trade secret exits or of its "use."  *See id.* at 14-30.

In its Rule 50(a) motion for judgment as a matter of law made at trial, Firstbase stated

that its sufficiency challenge was "to all claims alleged."  *See* N.T. 47:17-19, Day 10.  Its

argument, however, was limited to two issues, the first of which related to the breach of contract

claim.  In its second argument, Firstbase asserted that there was no direct evidence of trade-

secret misappropriation and that Harbor failed to present sufficient circumstantial evidence

because it failed to show substantial similarity.

Because the Rule 50(a) motion failed to specifically[7] challenge the sufficiency of the

---

[6]    The legal basis for each argument is addressed in the subsections below.

[7]    The motion for judgment as a matter of law ("JMOL") made at trial must be "sufficiently specific to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient."  *See Lightning Lube*, 4 F.3d at 1172.  It "must at least identify the specific element that the defendant contends is insufficiently supported."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998).  "A motion that identifies one element of a claim is insufficient to permit the district court to grant JMOL for lack of proof of some other, unspecified, element. . . ."  *Tolbert v. Queens Coll.*, 242 F.3d 58, 77 (2d Cir. 2001).  "Sweeping invocations of

evidence to support the unfair competition claim, this argument was waived. *See Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997) (holding that the "defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion"); *Noble Biomaterials v. Argentum Med., LLC*, No. 3:08-CV-1305, 2011 U.S. Dist. LEXIS 109075, at *9 (M.D. Pa. Sep. 23, 2011) (concluding that the defendants waived their right to assert claims "in their renewed motion for judgment as a matter of law pursuant to Rule 50(b) that they did not raise in their original motion for judgment as a matter of law"). Despite the waiver, Firstbase attempts to raise this issue by suggesting that the unfair competition claim arises from the same conduct as the trade secret claim.[8] To the extent the claims are based on different evidence, as Harbor argued to the jury, *see* N.T. 70:23 – 71: 2, Day 10 ("The judge will tell you that unfair competition means a lot of different things. It includes a whole host of bad conduct, things like misrepresentations and unlawful use of confidential information. It is not the same as a trade-secret claim."), the sufficiency challenge was waived. To the extent the claims arise from the same conduct, assuming *arguendo* the claim was not waived, Firstbase's challenge to the sufficiency of the

---

conclusory theories or abstract principles will not suffice: 'The motion must . . . be made with sufficient specificity to allow the district court to understand precisely why the evidence is insufficient.'" *Perdoni Bros. v. Concrete Sys.*, 35 F.3d 1, 3 (1st Cir. 1994) (quoting *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors*, 850 F.2d 803, 810 (1st Cir.), *cert. denied*, 488 U.S. 955 (1988)). The purpose of requiring specificity is also to allow the responding party to seek to correct any deficiencies in the proof. *See Galdieri-Ambrosini*, 136 F.3d at 286.

[8]     Firstbase's contention that "the jury was not instructed on the elements of any basis for unfair competition liability *except* trade-secret misappropriation," *see* Def. Mot. 12 (emphasis in original), is patently incorrect. The Court's jury instruction on the elements of unfair competition was as follows: ". . . In Pennsylvania, a defendant may be liable for unfair competition where there is evidence of, *among other things*, trademark, trade name and patent rights infringement, *misrepresentation, tortious interference with contract*, improper inducement of another's employees, *and unlawful use of confidential information*. . . ." *See* N.T. 176:9-24, Jury Instructions, Day 10 (emphasis added).

evidence for unfair competition fails for the same reasons as the trade secrets claims.  *See AgroFresh Inc.*, 2020 U.S. Dist. LEXIS 222898, at *29 (denying the Rule 50(b) motion because the jury was presented with substantial evidence that the defendants misappropriated at least some trade secrets, which "alone" was sufficient evidence that the defendants committed unfair competition under Pennsylvania law).

Firstbase's challenge to the evidence of misappropriation of trade secrets has two parts: (1) Harbor presented insufficient evidence that a trade secret exits and (2) there was insufficient evidence of "use."  The existence of a trade secret is the first element of a claim for misappropriation of trade secrets.  *See* N.T. 160:2-8, Day 10.  The jury was informed of eight separate trade secrets, but found that Harbor had demonstrated the existence of six trade secrets,[9] which shows the jury's careful consideration of the evidence.  *See* Jury Verdict Form 12.1-12.8, ECF No. 208.  Among the six trade secrets found by the jury are Harbor's Jurisdictional Database and Entity Manager.  *See id.*  The evidence supporting this verdict includes, but is not limited to,[10] the following.

As to the Jurisdictional Database, Harbor's co-founder Megan Danz testified that Harbor exported "tools, tips and know-how" from its central database into a spreadsheet, along with

---

[9]    The jury concluded that Harbor established the existence of the following trade secrets: (a) Jurisdictional Database; (b) Workflow: New users – Domestic Formation Filings/Sign in as Incorporator + Registered Agent; (c) Workflow: Non-Firstbase Users – Domestic Change of Registered Agent in All 50 states (incorporated with a different service); (d) Workflow: Annual Report Filings – Domestic & Foreign in All 50 states; (e) Entity Manager  (dashboard); and (f) Application Programming Interface Documentation (Registered Agent; Business Filings).  The jury concluded that Harbor had not demonstrated the alleged trade secrets: (g) Harbor Compliance's Process Map; or (h) Workflow: Existing Users – Domestic Change of Registered Agent in Delaware or Wyoming (previously incorporated with Firstbase).

[10]    The Court finds that the evidence supporting the jury's verdict, as to all claims, is substantial.  Over the course of the two-week trial, the jury heard the testimony of more than ten witnesses and saw hundreds of exhibits.  The specific evidence mentioned herein supporting the Court's conclusions is meant to be illustrative, not inclusive.

other information requested by Firstbase, and "shared this enormous spreadsheet with them." *See* N.T. 26:12-17, Day 2, Trial 4/9/24, ECF No. 188.  Ms. Danz explained that the Jurisdictional Database was created in Harbor's partnership with Firstbase "to help share some of our secret sauce and make Firstbase successful" by exporting information from more than two hundred tables of information.  *See* N.T. 10:5 – 11:13, 14:8-20, Day 2 Sealed, Trial 4/9/24, ECF No. 198. She testified that the information in these tables was collected over more than ten years of research and work in a constantly changing technology business.  *See* N.T. 10:5 – 11:13, 14:8-20, Day 2 Sealed; N.T. 61: 11-12, Day 1, Trial 4/8/24, ECF No. 187.  Ms. Danz testified that this trade secret and other trade secrets were only shared with Firstbase under confines of the confidentiality agreement.  *See* N.T. 24:5 – 27:3, Day 2.  Harbor's expert Dr. Ricardi Valerdi also testified about the Jurisdictional Database, describing it as a "very, very long" spreadsheet containing a "collection of information -- of proprietary information that provides specific tips and tricks on how to support customers who are trying to do work or file or have a registered agent in each of the fifty states, . . . that Harbor Compliance has learned over time."  *See* N.T. 67:12-21, Day 7 Sealed, Trial 4/16/24, ECF No. 210.  Dr. Valerdi, highlighting the information Firstbase learned directly from Harbor, compared Harbor's Jurisdictional Database with a document provided by Firstbase to its paid customers.  *Id.* at 69:1 – 71:14.  Dr. Valerdi testified that the highly confidential source code in the documents confirmed that Harbor's Jurisdictional Database was in the Firstbase Agent product.  *See id.* 71:15 – 72:24.

Dr. Valerdi testified that Harbor's Entity Manager dashboard, which "Firstbase learned from Harbor," is also part of Firstbase Agent.  *See* N.T. 87:11 - 88:5, Day 7 Sealed.  Dr. Valerdi compared visual depictions of Harbor's Entity Manager to Firstbase Agents' version of the entity manager, pointing out the similarities for the jury.  *See id.*  Dr. Valerdi testified that in addition to

the visual similarities providing evidence of misappropriation, "the process of taking the raw data and displaying it, organizing it, presenting it in a way that makes it usable is the other part of the trade secret that I think should be noted." *See id.* 137:15 – 138:1. The Entity Manager was described as "software that tracks all of your registrations with the Secretary of State." *See* N.T. 24:5 – 27:3, Day 2. Ms. Danz testified that registered agent has "always been a great way to start a relationship with a client, but especially because of our entity manager software we figure out -- our system figures out where else they're registered and we're able to expand and consolidate our relationship. *See id.* 40:4-10. She "started sketching [Entity Manager] in 2015. [Harbor] started building it 2016. 2017, we published to employees. They told me all the ways that it was wrong, compared to the real world of integrating with the Secretary of State. And then finally in 2018, we felt confident enough to publish it to clients." N.T. 23:1-4, 25:10-15, Day 2 Sealed. Ms. Danz testified that Harbor's "technology . . . is really complex code. [She] really thought about patenting some of our search and match technology." *See id.* 23:10-14.

Ms. Danz testified that the Jurisdictional Database and Entity Manager were two of the top-secret things Harbor gave to Firstbase under the confines of the Confidentiality Agreement that she thought helped Firstbase launch quickly. *See* N.T. 104:9-16, Day 2. Dr. Valerdi testified that Firstbase's own business projections from selling their registered agent services was in the neighborhood of 7.6 million dollars. *See* N.T. 90:23 - 91:8, Day 7 Sealed. *See also* N.T. 23:17-18, Day 2 Sealed (Ms. Danz testified that Entity Manager provided "a huge marketing advantage."). From this evidence a reasonable jury could conclude that the Jurisdictional Database and Entity Manager, among other trade secrets, were not readily ascertainable by legitimate means and had independent economic value, thereby meeting the legal definition of a trade secret. *See* 18 U.S.C. § 1839(3) (defining a "trade secret"); 12 Pa. C.S. § 5302 (same);

N.T. 160:23 – 163:17 (Jury Instructions defining a Trade Secret and Readily Ascertainable by Proper Means); *Arnold's Office Furniture, LLC*, 2023 U.S. Dist. LEXIS 97967, at *14 ("A customer list composed of information readily available from a third-party source may have trade secret protection if the party invested significant time and capital to compose such a list."). Harbor therefore satisfied the first element of its trade secrets claims.

As to the second element of a claim for misappropriation of trade secrets, Firstbase challenges the sufficiency of the evidence showing "use." "Use" of the trade secret is one of three different ways to find the second element: misappropriation. *See* N.T. 160:6, 164:21 – 166:2, Day 10. The other two ways misappropriation can occur are acquisition and disclosure. *See id.* 169:25 - 170:7. The jury was instructed that to find misappropriation, "the term 'use' has been broadly defined" and that "marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute use." *Id.* 169:4-12.[11] "Misappropriation has also been defined to include

---

[11]    Firstbase's arguments based on its rewritten jury instruction are frivolous. Firstbase suggests:

> The parties' agreed-upon jury instructions on "Methods of Proving 'Misappropriation'" provided that circumstantial evidence may establish "use" *only if* the jury "f[ound] (1) that Harbor proved that Firstbase had access to a trade secret, and (2) Harbor proved that its product and Firstbase's product are substantially similar." But "[w]here the similarities are limited only to the sorts of coincidental similarities that one would expect from competitors marketing similar products to similar target audiences, those similarities by themselves are not sufficient to show misappropriation."

Def. Mem. 22-23 (citing Jury Instruction 24). This jury instruction actually provided:

> . . . you may also rely on circumstantial evidence in determining whether Firstbase misappropriated a trade secret. However, the circumstantial evidence must still be sufficient to prove by a preponderance of the evidence, that is to make it more likely than not, that Firstbase misappropriated the trade secret. *For example*, circumstantial evidence *may* be sufficient to prove use if you find that Harbor Compliance proved that Firstbase had access to a trade secret, and Harbor

the improper acquisition or disclosure of a trade secret of another without express or implied

consent.  You may find that a trade secret was acquired by improper means if it was acquired by

theft, bribery, misrepresentation, breach, or inducement of a breach of duty to maintain secrecy

or espionage through electronic or other means."  *See id.* 169:25 - 170:7.

      The evidence just discussed, that the Firstbase Agent contained Harbor's Jurisdictional

Database and Entity Manager, showed misappropriation by "use."  *See also* Trial Ex. 634, Tab 1

(Firstbase's public announcement regarding its "exciting product update" that will allow it to

expand into New York, California, Texas and Florida.)  There was also evidence of

misappropriation by acquisition.  *See* N.T. 65:1-14, 67:10-24, Day 2 (discussing internal

communications among Firstbase employees that "we can proceed with them [Harbor] while we

build in parallel, our own RA product" and "[t]he more we can get from them the better,

especially if we truly are going down the route of being our own ra"); *see also* Trial Exs. 350-16

and 350-17.  Consequently, the evidence was sufficient for a reasonable jury to find Firstbase

liable for misappropriation of trade secrets.  *See Berry v. United States*, 312 U.S. 450, 452-53

(1941) (holding that Rule 50(b) "has not taken away from juries and given to judges any part of

---

      Compliance's product and Firstbase product are substantially similar. . . . you must
find that Harbor Compliance offered enough evidence to infer similarity between
Harbor Compliance's product and Firstbase's product. Generic similarity between
products achieving a similar result *may or may not* be sufficient circumstantial
evidence for you to find that Firstbase used a trade secret. When a case such as this
one involves companies in the same or similar industry, the fact that there are minor
similarities between competing products does not *necessarily* mean Firstbase
misappropriated the trade secret. Where the similarities are limited only to the sorts
of coincidental similarities that one would expect from competitors marketing
similar products or to similar target audiences, those similarities by themselves are
not sufficient to show misappropriation.

N.T. 170:18 – 171:24, Day 10 (emphasis added).

the exclusive power of juries to weigh evidence and determine contested issues of fact-- a jury

being the constitutional tribunal provided for trying facts in courts of law").

>    B.    **The verdict was not against the weight of the evidence.**

In its motion for a new trial pursuant to Rule 59(a), *see* Def. Mem. 2, Firstbase argues

that the verdict as to all of Harbor's claims was contrary to the clear weight of the evidence. *See*

*id.* 11-30.

For the reasons discussed in the previous subsection, the verdict on the trade secrets

claims and the verdict on the unfair competition claim, to the extent the claims arise from the

same conduct, were not against the weight of the evidence. *See Cacciavillano v. Ruscello, Inc.*,

No. 95-5754, 1996 U.S. Dist. LEXIS 17155, at *1-2 (E.D. Pa. Nov. 21, 1996) (holding that the

"standard for granting a new trial [under Rule 50(b)] is substantially less demanding than that for

judgment as a matter of law" under Rule 59(a)").

To the extent the unfair competition claim is based on different evidence than trade secret

misappropriation, the verdict was not against the weight of the evidence for the following

reasons. *See Vargo*, 126 F. App'x at 535 ("When determining whether or not a jury's verdict is

against the weight of the evidence, a District Court need never be concerned with whether or not

a motion for judgment as a matter of law has previously been made."); *Williamson v. CONRAIL*,

926 F.2d 1344, 1353 (3d Cir. 1991) (holding that "new trials because the verdict is against the

weight of the evidence are proper only when the record shows that the jury's verdict resulted in a

miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks

our conscience").  There was evidence including, but not limited to, the testimony of Mr. Senna,

a Firstbase employee, that he and Mr. Milastsivy, the owner of Firstbase, had a strategy to be

"inaccurate and misleading" with Harbor.  *See* N.T. 154:10-14, Senna, Day 5, Trial 4/12/24, ECF

No. 191.  Mr. Senna testified about the "plan" to get rid of the exclusivity clause in the

Partnership Agreement and referred to it as "the only leverage" Harbor had on Firstbase.  *See*

N.T. 108:15 – 110:6, Senna, Day 6, Trial 4/15/24, ECF No. 215.  Evidence was also presented

regarding written communications between Mr. Senna, Mr. Milastsivy, and Mr. Sheth, the CEO

of Firstbase.  In one, Mr. Senna wrote that his "only concern is the exclusivity clause. I'm not

sure how to get rid of it."  *See* Trial Ex. 350-38.  Another written communication stated: "we can

proceed with them while we build in parallel, our own RA product."  *See* N.T. 67:10-24, Day 2.

Mr. Sheth wrote to Mr. Senna: "The more we can get from them the better, especially if we truly

are going down the route of being our own ra."  *See* Trial Ex. 350-16.  He also wrote: "i guess

it's temporary but ideally once we have our own infrastructure, we won't need them or anyone

else."  *See* Trial Ex. 350-17.  Ms. Danz testified that no one at Harbor knew its relationship with

Firstbase would only be temporary.  *See* N.T. 68:7-17, Day 2.  Ms. Danz testified that had she

known Firstbase's true intentions, she "obviously not have gotten into a partnership agreement

with [Firstbase] who's trying to take our information and then build a competing product with us.

That's just – that's bad business."  *See id.* 68:7-17.  The jury was free to assess the credibility of

these witnesses and was "free to discard or disbelieve whatever facts are inconsistent with its

conclusion."  *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960) (stating "it is

immaterial that the court might draw a contrary inference or feel that another conclusion is more

reasona[ble]") (internal quotations omitted).  The verdict was supported by this evidence and

does not shock the conscience.  *See Powell*, 766 F.2d at 133-34; *Doeblers Pa. Hybrids, Inc. v.*

*Doebler Seeds, LLC*, 88 F. App'x 520, 523 (3d Cir. 2004) (explaining that liability for the unfair

competition claim was based on the defendants' use of the plaintiff's "own confidential

information to compete against them"); *ITP, Inc. v. OCI Co.*, 865 F. Supp. 2d 672, 683-84 (E.D.

Pa. 2012) (finding that allegations the defendant "lulled [the plaintiff] into the belief that they

had an agreement for an exclusive distributorship" and "became privy to confidential and

valuable information that was . . . used to lure clients away from [the plaintiff]" stated a claim for

unfair competition).

    The verdict on Harbor's breach of contract claim was also not against the weight of the

evidence based on evidence of three separate breaches of the Partnership Agreement (contract).

First, the Partnership Agreement included an exclusivity clause, which Harbor alleged Firstbase

breached by forming relationships with third parties. *See* Agreement 7; N.T. 61:20 – 63:10, Day

2. As discussed above, Firstbase employees testified about the "plan" to get "rid" of the

exclusivity clause in the Partnership Agreement, *see* N.T. 108:15 – 110:6, Day 6 and N.T. 65:23

– 66: 7, Day 2, and the jury saw evidence of written communications between Firstbase

employees showing their intent to build a competing registered agent product while working

with Harbor, *see* N.T. 67:10-24, Day 2. Second, the contract provided for guaranteed minimums

that were not met. *See* Agreement 7. Ms. Danz testified that the Partnership Agreement

included a provision stating "Minimum guaranteed volume of 12,000 units. . . . The partner

agrees if volume falls below 12,000 units per annum, the partner agrees to pay the sum

difference totaling $300,000." *See* N.T. 33:24-34:21, Day 6, sealed, ECF No. 198; Agreement

10. She explained the guarantee meant that, whether or not Firstbase actually sold 12,000 units

and sent Harbor 12,000 units, Firstbase guaranteed $300,000 per year, and it was a two-year

contract. *See id.* N.T. 34:25 – 35:3. Ms. Danz testified that Firstbase did not hit 12,000 units in

either the first or second year of the partnership, nor did it pay the sum difference totaling

$300,000 per year. *See id.* N.T. 35:4-18. Third, there was evidence that Harbor conducted work

for Firstbase but was not paid for its services. These services, otherwise referred to as out-of-

scope services, were categorized as implementation services under the Partnership Agreement.

The Implementation Services section of the Partnership Agreement states:

> Harbor Compliance may, notwithstanding anything to the contrary contained in this Agreement, during the annual Period require the provision of additional services, which are not included in the Scope of the Project as contemplated by this Agreement and project planning meetings (the "Change of Scope"). Examples of change of scope include a redesign of Firstbase.io platform, data structure, API architecture and/or key project manager leaving. Any such Change of Scope shall be undertaken on the terms and conditions as may be mutually agreed between the Parties.

Agreement 9.  The Partnership Agreement further identifies the "standard implementation fees," lists a twenty-four-month duration, and provides a specific hourly rate.  *See id.*  Consistent with this provision, Ms. Danz testified that Harbor billed Firstbase at the hourly rate listed in the Partnership Agreement for services that were expressly requested by Firstbase, but Firstbase never paid.  *See* N.T. 84:23 – 85:14, 86:19 – 87:14, Day 2.  For example, Ms. Danz testified that Firstbase asked Harbor to update its API, but never paid Harbor for the services totaling 294 hours.[12]  *See id.* 49:21 – 52:16.  All this evidence supports the jury's verdict on the breach of contract claim.  *See ATDAmerican Co. v. Krueger Int'l, Inc.*, No. 12-00032, 2014 U.S. Dist. LEXIS 112507, at *21-23 (E.D. Pa. Aug. 12, 2014) (denying the motion for a new trial based on

---

[12]    Firstbase suggested at trial that Harbor's bill for 294 hours for part of the API development exceeded the eighty-hour limit in the Partnership Agreement and needed to first be renegotiated before payment.  *See* N.T. 14:7 – 15:2, Day 3, Trial 4/10/24, ECF No. 199. However, Ms. Danz explained that the bill to which Firstbase was referring was for Harbor's services for formation API, which was out-of-scope work and was separate and distinct from Registered Agent API.  *See id.* 15:10-14 (testifying that Registered Agent API was ready).  It was only the Registered Agent API that had an eighty-hour limit.  *See id.*; Agreement 8 ("Registered Agent Services . . . [the parties] will make an equal investment of service, development and other resources to define the registered agent process, configure the registered agent API, and service the initial clients. Both parties estimate 80 hours each of invested resources. After the initial launch, both parties will continue to work to improve efficiency of the process. If additional resources are necessary both parties will negotiate in good faith to complete the registered agent API integration.").

the weight of the evidence because there was evidence supporting each party's interpretation of the contract and the "jury was free to assess the credibility of all the witnesses").

Moreover, even if the jury's verdict was contrary to the great weight of evidence, Firstbase is not entitled to a new trial because the verdict on all claims did not result in a miscarriage of justice, nor does it cry out to be overturned or shocks the conscience. *See Alvin v. Calabrese*, 455 F. App'x 171, 177 (3d Cir. 2011).

### C.    The jury's damage award for the misappropriation of trade secrets and unfair competition claims was not unreasonable.

Firstbase argues pursuant to Rule 59(a) that the damages awarded on Harbor's unfair competition and trade secret claims were unreasonable on the facts of the case, contrary to the weight of the evidence, and predicated upon speculation and guesswork. *See* Def. Mem. 2. Firstbase asserts: (1) Harbor failed to meet its burden of demonstrating a causal nexus between profits and misappropriations of trade secrets; (2) it was unreasonable and unsupported for the jury to fail to deduct a single dollar from Mr. Urbanchuk's damages figure given the unrebuttable evidence of other factors contributing to Firstbase's profits; (3) the five-year damages period utilized by Mr. Urbanchuk has no basis in the record; (4) the jury's trade secret award was based on speculation and guesswork because they had no way to reliably calculate the value of less than all of the trade secrets; and (5) the unfair competition award was based on Mr. Urbanchuk's burden-shifting analysis, which does not apply to common law theories of damages, i.e., unfair competition. *See id.* at 30. Harbor argues that the first three arguments are barred by the law in this case. *See* Resp. 17-18 (citing Opn., ECF No. 175).

As to the first two arguments, the Opinion dated April 3, 2024, explained that Harbor has the burden to prove Firstbase is liable for misappropriation of trade secrets and to prove Firstbase's profits from the sale of the products containing the trade secrets (casual nexus). *See*

Opn. 16, ECF No. 175.  However, Firstbase has the burden to prove that any portion of these profits were not the result of misappropriation and should be deducted.  *See id.* 16-17 (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205-06 (1942) (holding that the burden of showing that the infringement had no relation to profits is upon the infringer); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 622 (1912) (concluding that the burden shifts to the defendant "after the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are impossible of accurate or approximate apportionment"); *Avco Corp. v. Turn & Bank Holdings, LLC*, 659 F. Supp. 3d 483, 508 n.131 (M.D. Pa. 2023) (awarding disgorged profits because the infringer failed to prove they were not due to infringement)).  Consistent with this law, the Court instructed the jury as follows:

> Misappropriation of trade secrets, calculation of damages.  The determination of unjust enrichment damages is a two-step process. It requires both Harbor Compliance and Firstbase to satisfy a burden of proving a part of the damages.
>
> Harbor Compliance is entitled to recover only the part of Firstbase's profits that are attributable to the misappropriation. Harbor Compliance bears the initial burden of proving, by a preponderance of the evidence, the Firstbase profits, which are attributable to the misappropriation. That is, Firstbase's profits from the sale of products or services containing Harbor Compliance's trade secrets.
>
> You may make an award of Firstbase's profits only if you find that Harbor Compliance proved a causal nexus between Firstbase's misappropriation and the profits Harbor Compliance seeks to disgorge. A causal nexus is found by evidence that the misappropriation is related to the profits Harbor Compliance seeks to disgorge. Stated differently, you must find that Firstbase's misappropriation contributed to the profits Harbor Compliance seeks.
>
> You may not award profits if you find the Firstbase's profits are only remotely or speculatively attributable to the misappropriation. You must decide to what extent Firstbase's sales and profits were attributable to trade secret misappropriation, and whether Harbor Compliance is entitled to all of Firstbase's profits, none of Firstbase's profits, or something in between.
>
> Once you determine the amount of profits with a causal nexus to the misappropriation, the burden is shifted to Firstbase to prove by a preponderance of the evidence what, if any, portion of the profits are attributable to factors other than

misappropriating the trade secrets. Precision is not required as long as reasonable and just apportionment of profits is reached.

Firstbase is entitled to deduct certain expenses associated with earning the profits resulting from the misappropriation. Expenses are all operating costs, overhead costs, and production costs Firstbase incurred in developing or selling the services making up the revenues.

Although Harbor Compliance may proactively consider and deduct expenses from its damages calculation, the burden stays with Firstbase to prove what, if any, specific expenses should be deducted. Your damages award should represent the portion of Firstbase profits that you find are attributable to the misappropriation.

N.T. 173:9 – 175:3, Day 10 (Jury Instruction No. 26).[13] Firstbase does not challenge the jury instructions. Rather, Firstbase contends that the jury's damages award for trade secret misappropriation and unfair competition "does not comport with this instruction." *See* Def. Mem. 33-34 (citing Jury Instruction No. 26).

This instruction does not apply to the jury's award of damages on the unfair competition claim.[14] Harbor's unfair competition claim is supported by evidence in addition to misappropriation of trade secrets, as previously discussed. Harbor's alleged failure to demonstrate a causal nexus between profits and misappropriation is therefore not a proper basis for a new trial on the award for the unfair competition claim. To the extent Firstbase also challenges the reasonableness of the jury's award on this claim, it is discussed below in conjunction with Firstbase's fifth argument.

In challenging the jury's award on the trade secrets claims, Firstbase asserts that Harbor failed to demonstrate a causal nexus, but its argument is based on a misunderstanding of the law. Firstbase confuses (a) Harbor's burden to show a causal nexus between Firstbase's misappropriation and its profits from the sale of the Agent and Start products with (b) Firstbase's

---

[13]    *See also* N.T. 171:25 – 173:8
[14]    The jury was instructed separately on unfair competition damages. *See* N.T. 177:2-11, Day 10.

burden to prove what expenses should be deducted from these profits.  *See* Def. Mem. 33-34

(arguing that the jury's finding that "100% of Firstbase's profits from its Agent and Start

products is attributable to Harbor's alleged trade secrets" is "unsupported" because "even

Harbor's experts admitted that was not the case").  Although Firstbase misconstrues the law,

"jurors are presumed to follow the instructions given them by the court."  *Glenn v. Wynder*, 743

F.3d 402, 407 (3d Cir. 2014) (citing *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987)).

Applying the law correctly,[15] the evidence supports the jury's verdict.  In addition[16] to the

evidence previously discussed establishing that Harbor's trade secrets were part of the Agent and

Start products that it sold to customers,[17] *see Leonard*, 834 F.3d at 395 (explaining that to satisfy

the causal link the plaintiff must show that "the infringement contributed to the infringer's

profits"), there was also evidence suggesting that Firstbase may have lacked the knowledge to

develop this product without the information provided by Harbor, *see, e.g.* N.T. 4:4-12, Day 2

Sealed (Ms. Danz testified that Mr. Sheth was "interested in things like, well, you know, how do

you, how do you actually, you know, run this registered agent network, . . . how do I go about

presenting a change of agent to clients who are not customers of Firstbase. . . .");  N.T. 61:14-22,

Day 2 (Internal communication among Firstbase employees that Mr. Senna "convinced [Harbor]

to share all the annual filing due date per state. LOL. With that info, we can build the reminders

---

[15]    *See* N.T. 173:21 – 174:3 (The jury was instructed that a "causal nexus is found by evidence that the misappropriation is related to the profits Harbor Compliance seeks to disgorge. Stated differently, you must find that Firstbase's misappropriation contributed to the profits Harbor Compliance seeks.")

[16]    As stated in footnote 10, the specific evidence mentioned herein is intended to be illustrative, not inclusive, of the substantial evidence supporting the jury's verdict.  This also applies to the jury's damages verdict.

[17]    *See, e.g.* N.T. 67:12-21, 69:1 – 71:14, 71:15 – 72:24, 90:23 - 91:8, Day 10 Sealed (Dr. Valerdi testified that the Jurisdictional Database trade secret was in the Firstbase Agent and that Firstbase's own business projections from selling their registered agent services was in the neighborhood of 7.6 million dollars).

logic ourselves without using their data.").  Although Firstbase points to contrary evidence

suggesting Firstbase was capable of offering registered agent services without misappropriation,

the jury was "free to discard or disbelieve whatever facts are inconsistent with its conclusion."

*Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960).  *See also Levy v. Schmidt*, 573 F.

App'x 98, 105 (3d Cir. 2014) (denying the Rule 59(a) motion arguing that the jury disregarded

the court's instructions on net profits because the jury's finding was based on a legally sufficient

evidentiary basis).  Harbor also established the amount of Firstbase's profits from the sale of

products containing the trade secrets, including Agent Light, Agent Autopilot, Agent Payroll, in-

app purchases, and incorporation sales, through the testimony of Mr. Gregory Urbanchuk, an

expert witness on economic damages and monetary relief.  *See* N.T. 12:2 – 14:21, Day 8, Trial

4/17/24, ECF No. 217; N.T. 15:1-11, Day 8 Sealed, Trial 4/17/24, ECF No. 211.  Mr.

Urbanchuk, using historical information through July of 2023, initially calculated Firstbase's

historic profits as $2,589,188 and prospective (future) profits as $12,168,211, totaling

$14,757,399.  *See* N.T. 16:8-10, 23:19-21, Day 8 Sealed.  Updated historical information through

December of 2023[18] was subsequently provided to Mr. Urbanchuk, which caused him to amend

his damage calculation to $14,097,598 at the time of trial.  *See id.* 24:16-22.  He explained to the

jury how he reached these amounts.  *See generally id.* 13-25.  Mr. Urbanchuk testified, *inter alia*,

that after calculating Firstbase's revenues on the products, he deducted expenses for agent and

corporation one-time filing fees and a registered agent infrastructure (cost of goods sold) to

---

[18]    Even though the trial occurred in April 2024, December 2023 was the latest date for
which Firstbase reported any financial information.  When questioned regarding the lack of
financial information after this date, Mr. Senna testified repeatedly that he did not know what
Firstbase's income was in January, February, or March because "We haven't closed it yet, the
books."  *See* N.T. 143:14 – 145:22, Day 6 (testifying that the income could be "more or less"
than previous months).

determine profits. *See id.* He also applied a discount rate of eighteen percent "in order to account for the risk of not achieving the profits," and explained to the jury how he decided the applicable rate. *See id.* 21:1 – 23:17. With this evidence, Harbor met its burden of proving profits.

Firstbase then had the burden of proving any amounts that should be deducted from these profits. Mr. Urbanchuk testified that he was unable to deduct other costs from Firstbase profits because "the defendant had indicated that it was not possible to allocate any additional expenses to those revenue line items." *See* N.T. 15:20-23, 16:1-7, Day 8 Sealed. This testimony is consistent with the evidence, or lack thereof, adduced at trial. Although Firstbase argues that it "presented an abundance of evidence that it contributed its own skill, knowledge, and investment of time and resources," it does not cite to any evidence of specific amounts to be deducted. *See* Def. Mem. 35-41. Nevertheless, the evidence was sufficient for the jury to conclude that a "portion of the profits are attributable to factors other than misappropriating the trade secrets." *See* Jury Instruction No. 26. The jury therefore reasonably reduced Firstbase's profits of $14,097,598 by awarding $11,068,044 on the trade secrets claims. *See id.* ("Precision is not required as long as reasonable and just apportionment of profits is reached.").

Firstbase's contention that "it was unreasonable and unsupported for the jury to fail to deduct a single dollar from Mr. Urbanchuk's damages figure," *see* Def. Mem. 30, is plainly frivolous as to the trade secrets award, firstly, because the jury deducted more than three million dollars in assessing damages. Firstbase attempts to support this contention by suggesting that "the jury's award for trade secret misappropriation, 11,068,044 dollars, is simply a pro-rata reduction of the $14.7 million figure based on its finding that only six of eight trade secrets (75% of the trade secrets) were misappropriated." *See* Def. Mem. 33 n.13. However, Mr. Urbanchuk

testified that his "analysis only needs one trade secret to be misappropriated." *See* N.T. 43:5-18, Day 8 Sealed. *See also* N.T. 94:11-20, Day 7 Sealed (Dr. Valerdi opined that holding less than all eight trade secrets does not reduce the value of holding all eight.). Accordingly, whether the jury found proof of misappropriation of all eight trade secrets or of only one trade secret, the evidence showed that Firstbase's profits from the misappropriation totaled $14,097,598. Any award less than this amount was a deduction for Firstbase's expenses.[19] Secondly, Firstbase's contention that "it was unreasonable and unsupported for the jury to fail to deduct a single dollar from Mr. Urbanchuk's damages figure," *see* Def. Mem. 30, lacks merit as it applies to the damages award for unfair competition because, as has been previously explained and will be addressed further below, Jury Instruction No. 26 does not apply to this award and the evidence supporting this claim was not limited to trade secret misappropriation.

The Opinion dated April 3, 2024, rejected Firstbase's third argument, that the five-year damages period utilized by Mr. Urbanchuk has no basis in the record. *See* Opn. 14-15. As explained therein, the record included the parties' Confidentiality Agreement in which they agreed that the economic life of the trade secrets was five years. *See id.* This Agreement was also part of the trial record. *See* Trial Ex. 238 (Confidentiality Agreement dated March 28, 2022). Mr. Urbanchuk testified that "the confidentiality agreement was the most persuasive piece of evidence that [five years] was the life of the trade secrets." *See* N.T. 40:6-9, Day 8 Sealed. Mr. Urbanchuk, who "considered the available evidence" in deciding the life of the trade secrets, explained economic life of trade secrets to the jury. *See id.* 17:18 – 19:15, 40:6-9. He

---

[19]    Firstbase failed to object prior to the jury's release, thereby preventing the Court from inquiring of the jury about how it calculated the award for the trade secrets claims. Because "jurors are presumed to follow the instructions given them by the court," *see Glenn*, 743 F.3d at 407, this Court assumes that the deductions were for Firstbase's expenses.

testified that a "trade secret's only as good if you keep it secret, right. Once you let it out, the value's gone. But there's also, things advance. Technology moves on. After a certain period of time, every trade secret becomes kind of known out in the marketplace." *See id.* 18:11-20 (explaining that economic life also applies to confidential information). The record also showed that Harbor took steps to keep its trade secrets confidential and that at the time of trial (April 2024), the trade secrets remained protected. *See, e.g.* N.T. 148:3-6, Day 2. Additionally, there was testimony that it took Harbor three years to create Entity Manager and more than ten years to collect the information in the Jurisdictional Database. *See* N.T. 10:5 – 11:13, 14:8-20, 23:1-4, 25:10-15, Day 2 Sealed. Accordingly, the jury's award of prospective profits until March 28, 2027, five years after the Confidentiality Agreement was signed, was supported by the weight of the evidence.

Firstbase's fourth argument, that the jury's trade secret award was based on speculation and guesswork because the jury had no way to reliably calculate the value of less than all of the trade secrets, is meritless in light of the testimony of Mr. Urbanchuk and Dr. Valerdi that the misappropriation of one or of all eight trade secrets does not change the financial analysis. *See* N.T. 43:5-18, Day 8 Sealed; N.T. 94:11-20, Day 7 Sealed.[20]

---

[20]     The speculation and guesswork, if any, would be the jury's decision to reduce the award on the trade secrets claims to less than $14,097,598 because Firstbase failed to provide evidence of specific expense amounts to deduct, regarding which Firstbase suggests there was "an abundance of evidence." *See* Def. Mem. 35-36. Regardless, the Court does not find the jury's reduction to be without any basis or to be unreasonable. *See also Kaczkowski v. Bolubasz*, 421 A.2d 1027, 1034 (Pa. 1980) (holding that "predicting lost future earnings entails some degree of speculation[; h]owever, that alone does not justify excluding reliable economic evidence since imprecision is inherent in any computation of lost future benefits"). Furthermore, Harbor does not challenge the jury's award on the trade secrets claims, and this Court may not increase an inadequate award under Rule 59. *See Dimick v. Schiedt*, 293 U.S. 474, 487-88 (1935).

Finally, Firstbase argues that the unfair competition award was based on Mr. Urbanchuk's burden-shifting analysis, which does not apply to common law theories of damages, i.e., unfair competition.  Firstbase suggests that the award cannot stand for three reasons: (1) the same reasons that the award on the trade secrets claims cannot stand, (2) Mr. Urbanchuk did not conduct a proper analysis for a common law theory of damages for unfair competition, and (3) there are no facts to support damages for unfair competition on any other grounds than misappropriation of trade secrets.  Firstbase's first argument is rejected for the reasons previously explained.  Additionally, the jury received separate instructions for calculating damages for misappropriation of trade secrets and for unfair damages.  *Cf.* Jury Instruction No. 26, *with* Jury Instruction No. 30.[21]  The damages instruction for unfair competition does not include the causal link requirement, nor does it contain shifting burdens, both of which were part of Firstbase's challenge to trade secrets damages and therefore inapplicable here.[22]  Firstbase does not challenge the instruction.  "It is well established that, absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court."  *Glenn*, 743 F.3d 407 (citing *Greer*, 483 U.S. 766 n.8).

Jury Instruction No. 26 provides that to award damages on the unfair competition claim, the jury needed only "to determine an amount that will fairly and adequately compensate Harbor

---

[21]    Jury Instruction No. 26 is quoted above.  Jury Instruction No. 30 on unfair competition damages was as follows:

> If you find that Firstbase -- if you find Firstbase liable for engaging in unfair competition practices against Harbor Compliance, you must determine an amount of money damages that will fairly and adequately compensate Harbor Compliance for all the harm it sustained as a result. You may award Harbor Compliance any gain acquired by Firstbase as a result of the unfair competition. These gains can include, but are not limited to, any of Firstbase revenues or profits attributable to the unfair competition. . . .

N.T. 177:2-11, Day 10.

[22]    Firstbase also repeats several arguments based on a misunderstanding of the law.

Compliance for all the harm it sustained." *See* Jury Instruction No. 30. This may include,[23] but is not limited to, Firstbase's profits from sales of the products containing confidential information. *See Donsco, Inc. v. Casper Corp.*, No. 75-63, 1980 U.S. Dist. LEXIS 9850, at *6 (E.D. Pa. Jan. 15, 1980) (holding that "lost profits are recoverable in suits for unfair competition in Pennsylvania" and "a plaintiff may recover prospective profits lost from its established business due to the tortious conduct of defendant"). Because there was distinct evidence supporting the unfair competition claim, the jury could reasonably award additional damages. The jury heard testimony, for example, that Harbor offered Firstbase "some of lowest rates in the industry for us to serve this volume." *See* N.T. 41:10-18, Day 2. Ms. Danz testified that Harbor would never have entered the partnership agreement with Firstbase had it known their intention to take confidential information and build a competing product. *See* N.T. 68:7-17, Day 2. The jury also heard testimony of Harbor's expenses while working with Firstbase, the number of hours it invested in working with Firstbase, and of guaranteed minimum amounts. From this evidence, a jury could reasonably conclude that but for Firstbase's tortious activity, Harbor would have been able to contract with other companies at higher prices. It was therefore reasonable for the jury to consider Mr. Urbanchuk's analysis in determining damages on the unfair competition claim. *See Centrix HR, LLC v. On-Site Staff Mgmt.*, 349 F. Appx. 769, 775 (3d Cir. 2009) (holding that "where a defendant's wrongful conduct renders an exact calculation of damages difficult, however, courts will not permit a defendant to profit from its misconduct

---

[23]     Whether these damages may be duplicative is addressed in the next section. As discussed therein, there is insufficient evidence to show that the jury's award on this claim was based solely on Mr. Urbanchuk's burden-shifting analysis for the trade secrets claim because Firstbase failed to object before the jury was released, thereby preventing the Court from inquiring of the jury. For this reason and given the distinct evidence supporting the different underlying claims, the Court will not reduce the jury's award on the unfair competition claim to $14,097,598.

by allowing the defendant to avoid damages based on the plaintiff's failure to provide precise evidence of damages) (citing Pennsylvania law).

Consequently, after considering the evidence of damages, as well as evidence supporting the unfair competition claim that is distinct from trade secret misappropriation, this Court cannot conclude that the jury's damages award on Harbor's unfair competition and trade secret claims was unreasonable, against the great weight of the evidence, or that a miscarriage of justice will result if the verdict is allowed to stand. *See Levy v. Schmidt*, 573 F. App'x 98, 102-05 (3d Cir. 2014) (holding that because the jury had a "legally sufficient basis to support its finding, mere uncertainty to the amount of damages does not require us to enter a judgment as a matter of law," nor does it mean that the verdict was contrary to the weight of the evidence or was a miscarriage of justice).

### D.    There was evidence on which the jury could award damages on both the trade secrets claims and unfair competition claim that does not amount to a double recovery.

Pursuant to Rule 59(e), Firstbase asserts that the judgment must be modified to eliminate the damages for Harbor's unfair competition claim, which allegedly disgorge the exact same profits the jury awarded for the trade secret claims, because double recovery for the same conduct is prohibited. *See* Def. Mem. 2. Firstbase suggests it is "crystal clear" how the jury arrived at the lesser amount of $11,068,044 as damages for Harbor's trade secret claim by calculating seventy-five percent (75%) of the $14,757,399 figure calculated by Mr. Urbanchuk for the trade secrets claims because the jury found only six of eight trade secrets. *See id.* at 52.

Initially, this Court finds that it was not "crystal clear" how the jury determined damages because Firstbase failed to object to the award before the jury was released, thereby preventing the Court from inquiring of the jury. *See Ateliers De La Haute-Garonne v. Broetje Automation-*

*USA Inc.*, 85 F. Supp. 3d 768, 780 (D. Del. 2015) (denying the defendant's post-trial motion asserting there had been a double recovery because it was "not possible to know how the jury reached its damages verdict and [the defendant's] attacks amount to improper speculation"). After the jury's verdict was read, this Court asked: "Counsel, I'd like to excuse the jury with the thanks of everyone. Any reason not to do so?" *See* N.T. 211:14-15, Day 10.  Firstbase's counsel responded: "Not at all, Your Honor. Thank you." and Harbor's counsel responded: "No. Your Honor." *Id.* at 211:16-17.  Firstbase's speculation as to the jury's decision is not a proper basis to amend the award under Rule 59.  *See Farrington v. Freedom Mortg. Corp.*, No. 20-4432 KMW-AMD, 2024 U.S. Dist. LEXIS 89558, at *5 (D.N.J. May 17, 2024) (refusing to amend judgment under Rule 59(e) because the "Defendant offers no evidence of double recovery other than speculation about the jury's thought process during deliberations").

Moreover, Firstbase does not challenge the jury instructions or the jury verdict form.  *See Ponzini v. PrimeCare Med., Inc.*, 269 F. Supp. 3d 444, 557-58 (M.D. Pa. 2017) (denying the Rule 59(a) motion suggesting that the jury instructions invited a double recovery because without any supporting argument the court "was left merely to speculate" and nothing about instructing on two claims invited a double recovery).  Firstbase also failed to challenge either at the time of trial.[24]  *See* N.T. 3:21-23, 191:4-17, Day 10.

As mentioned above, the jury could have reasonably concluded that but for Firstbase's tortious activity, Harbor would have been able to contract with other companies at higher prices, and awarded damages on the unfair competition claim to compensate Harbor for this harm.[25]

---

[24]    There were objections to the verdict form as it related to the names of the trade secrets, but nothing relevant to the issue of damages.

[25]    This is only one example of additional harm for which the jury could have compensated Harbor.  *See* N.T. 41:10-18, 68:7-17, Day 2.  The evidence discussed herein is illustrative, not inclusive.

Because this harm is not capable of being calculated with precision, it would have been reasonable for the jury to consider Mr. Urbanchuk's calculations as a foundation. Given the distinct evidence supporting the underlying claims and the different types of harm, combined with the fact that there was no reason to reduce the trade secrets claim based on less than eight trade secrets, *see* N.T. 43:5-18, Day 8 Sealed; N.T. 94:11-20, Day 7 Sealed, the Court does not find it "obvious that the jury awarded duplicative damages," as Firstbase suggests. *See* Def. Mem. 52.

### E. The jury's award of damages for out-of-scope services is supported by the evidence and consistent with the language of the Partnership Agreement.

Pursuant to Rule 50(b), Firstbase argues that the damages awarded for out-of-scope invoices are uncollectable as a matter of law and should be subtracted from the jury's verdict on the breach of contract claim.[26] Firstbase asserts the Partnership Agreement provided that Harbor may charge for out-of-scope services only "on the terms and conditions as may be mutually agreed between the Parties," and suggests it is undisputed that Firstbase never agreed to the charges at issue.[27] *See* Def. Mem. 2.

---

[26]    Firstbase incorrectly asserts that the damages for unpaid invoices for out-of-scope work awarded by the jury was $487,919 (of the total damages of $1,090,271). *See* Mem. 53. Rather, the amount awarded by the jury for unpaid invoices was $441,769. This later amount is consistent with Harbor's table summarizing the calculations of monetary relief for the breach claims, which the jury requested to see during deliberations, *see* Jury Ex. 3, as well as trial testimony, *see* N.T. 84:15-18, Day 2 Sealed (Ms. Danz testified that the total time billed for implementation services was 2,325.1 hours, which at $190 an hour results in the amount that was billed: $441,769.).

[27]    This argument was included in Firstbase's Rule 50(a) motion for judgment as a matter of law made at trial. *See* N.T. 47:22 – 48:3, Day 10 (Firstbase argued that the contract required the out-of-scope work be negotiated between the parties in good faith before the invoices were issued, but that it was established during trial no one discussed these charges with Firstbase before the invoices were issued. Thus, by the plain language of the contract, this amount is uncollectible.)

Contrary to this suggestion, there was evidence presented at trial that Firstbase agreed to the charges. Ms. Danz testified that Harbor and Firstbase "talked about all of the work that was out of scope repeatedly." *See* N.T. 86:23-24, Day 2 Sealed. She testified, for example, that the API update was an out-of-scope (implementation) service requested by and billed to Firstbase, but never paid. *See* N.T. 52:10-13, Day 2 Sealed. There was also evidence that the out-of-scope work was billed at the hourly rate agreed to by the parties in the Partnership Agreement. *See* N.T. 84:12-18, 86:19 – 87:14, Day 2; Agreement 9. The Partnership Agreement did not require the type of detailed back-and-forth discussion that Firstbase implied; rather, the evidence was sufficient from which a reasonable jury could properly find mutual agreement and award of damages for unpaid out-of-scope invoices. *See Jackson & Coker, Inc. v. Lynam*, 840 F. Supp. 1040, 1046 (E.D. Pa. 1993) (denying the Rule 50b motion because the "jury was entitled to reject [the defendant's] interpretation of the contract").

Firstbase makes several other arguments in its Rule 50(b) motion that were not raised at trial. Specifically, Firstbase submits that: (1) the breach of contract damages should not include the out-of-scope work because it did not fit into a billable category under the contract terms, (2) the contract term "implementation services" is ambiguous, and (3) the amounts billed are egregious.[28] *See* Def. Mem. 2. These three additional arguments were not included in Firstbase's Rule 50(a) motion for judgment as a matter of law made at trial; therefore, they are waived. *See Williams*, 130 F.3d at 571-72; *Noble Biomaterials*, 2011 U.S. Dist. LEXIS 109075, at *9.

---

[28]     Stated differently, Firstbase argues that Harbor's witnesses were unable to state with specificity what the services were for and therefore labeled them "implementation services," that these witnesses admitted that the Partnership Agreement is less than clear as to what services fit within this definition, and that Harbor did not categorize these services until months after they were allegedly rendered. *See* Def. Mem. 53.

**F.      There was no error in the admission of Dr. Valerdi's testimony.**

Firstbase alleges, pursuant to Rule 59(a), that the Court erred in allowing Dr. Valerdi to discuss facts at trial that were outside the scope of his report and deposition.  *See* Def. Mem. 2, 58-59.  Firstbase also argues that it was prejudiced by Dr. Valerdi's narration of a demonstrative exhibit because his testimony lent "expertise" to Harbor's narrative.  *See id.* 59.  Firstbase contends that Dr. Valerdi, instead of testifying to the opinions in his report, changed his substantive testimony for the first time at trial.  *See id.* 59-61.[29]

Harbor responds, initially, that this argument is barred because Firstbase failed to seek a continuance at trial.  *See* Pl. Mem. 21-22 (citing 11 Fed. Prac. & Proc. Civ. (Wright & Miller) § 2805 (3d ed.) ("A principle that strikes very deep is that a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."); *Kiss v. Kmart Corp.*, 2001 WL 568974, at *6 (E.D. Pa. May 22, 2001)).  Harbor further contends that Firstbase has not met its burden of establishing that the Court committed error that resulted fundamentally in "gross injustice."  *See id.* at 78.  Harbor asserts that the Court's rulings were consistent with Federal Rules of Evidence 703 and 705, as well as the Third Circuit's opinion in *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 423 (3d Cir. 2006) (finding no error in the district court's decision to admit opinion testimony outside the scope of the expert's report).

---

[29]      Firstbase further contends that this issue was compounded by the Court's exclusion of Firstbase's damages expert Chad Hudson to rebut Harbor's profits analysis.  *See* Def. Mem. 62.  This argument lacks merit because, for the reasons set forth in the Opinion dated April 3, 2024, Hudson's opinions were unreliable because he did not apply nor even identify any methodology used to make his calculations.  *See* Opn. 28-29.  Moreover, Mr. Hudson's report was based on incorrect assumptions due to a misunderstanding of the law.  *See id.* 29-31.

At the end of day six of the trial, Firstbase's counsel raised concerns about the demonstrative it expected would be shown to Dr. Valerdi the following day and to Dr. Valerdi's expected testimony to facts.  *See* N.T. 241:20 – 245:10, Day 6.  The Court commented that "traditionally, when you cross examine an expert witness, if the expert witness relies on facts that are either not part of the record or the facts don't exist, that's a subject of attack and impeachment against the expert by cross-examination," but could not make a ruling without knowing the exact testimony.  *See id.* 244:3 – 245:10; *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination.").  The following morning, after reviewing the experts from Dr. Valerdi's deposition submitted by Firstbase, the Court ruled:

> The deposition testimony makes it clear that Dr. Valerdi is not attesting that certain facts are true, nor is he offering an opinion on those facts. Rather, Dr. Valerdi is offering an opinion based on the facts that he was asked to assume are true. Based on the testimony received to date here in the trial, the Court believes there is a sufficient factual foundation for his assumptions. Rule 703 of the Federal Rules of Evidence states that "an expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." So this rule allows counsel to bring to the attention of the expert certain facts and data.
> Rule 705 provides that "an expert may state an opinion and give the reasons for it without first testifying to the underlying facts or data, but the expert may be required to disclose those facts or data on cross-examination." In conjunction, these rules place the burden of exploring the facts and the assumptions underlying the testimony of an expert witness on opposing counsel during the cross-examination process. And so the objections brought to my attention last night are overruled.

N.T. 12:3-24, Day 7, Trial 4/16/24, ECF No. 216.  The Court also reviewed the demonstrative video and heard further argument from counsel.  *See id.* 12:25 – 16:14.  The Court concluded that the video is admissible, thereby overruling the objection, but explained that it would instruct the jury in accordance with Third Circuit Model Civil Instruction 2.8.  *See id.* 15:1-16:4. Immediately before the video was shown to the jury, the Court issued the following instruction:

A video which has not been received in evidence is about to be shown to you in order to help explain or illustrate the testimony and other evidence in this case. This video is not itself proof of any facts. It is not binding on you in any way. If it does not correctly reflect the facts shown by the evidence in the case, then you should disregard the video and determine the facts from the evidence.

N.T. 95:13-22, Day 7 Sealed.

For the reasons explained at trial, Firstbase's arguments lack merit. "[T]he permissible scope of expert testimony is quite broad, and District Courts are vested with broad discretion in making admissibility determinations." *Hill v. Reederei F. Laeisz G.M.B.H.*, 435 F.3d 404, 423 (3d Cir. 2006) (finding no error in the district court's rejection of an objection to expert testimony allegedly exceeding the scope of the expert's report and amounting to undue surprise). Notably, the portions of Dr. Valerdi's trial testimony that Firstbase cites as problematic in its post-trial motion were unobjected to at trial and were in response to Firstbase's questions on cross examination. *See* Def. Mem. 60-61 (quoting N.T. 142:11-25 and N.T. 144:1-6, Day 7). These arguments therefore not only lack merit, the objections were waived. *See Kiss v. Kmart Corp.*, No. 97-7090, 2001 U.S. Dist. LEXIS 6744, at *20-21 (E.D. Pa. May 22, 2001) (holding that "[e]ven if Plaintiff had objected at trial to the admission of testimony on the ground that it was not contained in an expert's report, the objection is without basis in law"); *Hall v. City of Phila. Water Dep't*, No. 94-6340, 1995 U.S. Dist. LEXIS 11795, at *3 (E.D. Pa. Aug. 11, 1995) (holding that the plaintiff waived any objection to the admission of evidence because counsel did not object to the question pertaining to such evidence and, regardless, she was not unfairly prejudiced by the admission into evidence of the same). Moreover, even if the testimony exceeded the scope of his deposition, the Court finds Dr. Valerdi's testimony consistent with his expert report, such that Firstbase was not prejudiced by its admission. *See id.* Firstbase was also not prejudiced by the admission of the demonstrative because the jury was instructed that the

video was not proof of any facts and should be disregarded if it did not accurately reflect the facts as determined by the jury. *See Glenn*, 743 F.3d at 407 (holding that a jury is presumed to follow the court's instructions); *Hall*, 1995 U.S. Dist. LEXIS 11795, at *2 (explaining that Rule 59(a) is limited by Rule 61 of the Federal Rules of Civil Procedure, which states that: "[n]o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial … unless refusal to take such action appears to the court inconsistent with substantial justice"). The request for a new trial based on these evidentiary rulings is denied. *See Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993) (holding that "the district court's latitude on a new trial motion is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, e.g. evidentiary rulings").

## G. Firstbase's request to stay execution of judgment has been denied.

On August 22, 2024, this Court issued an Order denying Firstbase's Motion to Stay Execution of Judgment Pending Post-Trial Motions and Appeal under Federal Rule of Civil Procedure 62(b). *See* ECF No. 265. That Order reasoned that "[e]ven though posting a full bond may not be possible, Defendant's proposed plan does not provide 'adequate as possible' security." *Id.* (citing *Silver v. Mendel*, No. 86-7104, 1992 U.S. Dist. LEXIS 9587, at *3-6 (E.D. Pa. July 8, 1992) (holding that "it is the defendant's burden to demonstrate that posting a bond is impossible or impractical . . . [and] prepare a plan that will supply 'adequate as possible' security")).

For the reasons set forth in this Opinion, the Court also finds that Firstbase is not likely to succeed on the merits. Additionally, given the jury's finding that Firstbase engaged in "willful and malicious" conduct, the public interest does not favor a stay. This is especially true because

the issuance of a stay will substantially injure Harbor if it is unable to start collecting on the hundreds of thousands of dollars that Firstbase has owed it for more than a year, as well as the millions of dollars Firstbase's unlawful behavior has cost Harbor.  A stay is therefore not appropriate.  Moreover, there are no "extraordinary circumstances" to justify waiving the requirement of a supersedeas bond.  *See Grand Entm't Grp., Ltd. v. Star Media Sales, Inc.*, 1992 U.S. Dist. LEXIS 7164 (E.D. Pa. May 18, 1992).

**Plaintiff's Post-Trial Motion**

Harbor filed an omnibus post-trial motion seeking: (1) exemplary damages; (2) reasonable attorney's fees and costs, (3) a permanent injunction, and (4) pre-judgment and post-judgment interest.  *See* Pl. Mem.

**H.    Harbor's request for exemplary damages is denied.**

Harbor argues that it should be awarded the maximum amount of exemplary damages because Firstbase's misappropriation was willful and malicious.  Harbor highlights the duration of Firstbase's misappropriative conduct, Firtsbase's consciousness of the resulting injury to Harbor, and Firstbase's attempts to cover up its malfeasance.   *See* Pl. Mem. 7-19.

Although these factors are relevant to the decision whether to award exemplary damages, they are the same factors used to determine if conduct is willful and malicious.  *See PetroChoice Holdings, Inc. v. Orobono*, No. 2:19-cv-06152-JMG, 2022 U.S. Dist. LEXIS 7380, at *12-13 (E.D. Pa. Jan. 14, 2022) ("To determine whether conduct meets that standard [willful and malicious], courts have considered the duration of misappropriative conduct, the defendant's consciousness of resulting injury, and any efforts to cover up malfeasance (internal citations omitted)).  However, "evidence of [] willful infringement [is] not itself enough to justify an enhanced award."  *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 224 n.22 (3d Cir. 2021).

Accordingly, this Court has considered additional factors, the following of which weigh against awarding exemplary damages.

First, a "defendant's wealth is relevant in calculating exemplary damages." *Hirtle Callaghan Holdings v. Thompson*, No. 18-2322, 2021 U.S. Dist. LEXIS 57888, at *10 (E.D. Pa. Mar. 26, 2021). Firstbase does not have significant wealth and has filed[30] bankruptcy since the judgment in this case.[31] *See Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2014 U.S. Dist. LEXIS 43042, at *47 (W.D. Pa. Mar. 31, 2014) (stating that "an infringer's financial condition is cited as a reason not to grant enhanced damages to the fullest extent if the infringer is in a weak financial position").

The high judgment is also a relevant factor in deciding whether to award exemplary damages because "the purposes of exemplary damages are to punish for a past event and to

---

[30]    *In re Firstbase.IO, Inc.*, Case No. 24-11647 (Bankr. S.D.N.Y. filed September 27, 2024)

[31]    "A primary objective of the bankruptcy law is to afford a deserving debtor an economic rehabilitation or fresh start in life. However, this objective is tempered by an equally important objective and that is to prevent the dishonest debtor's attempt to use the law's protection to shield his or her wrongdoing." *Stanley Supply & Tool, Inc. v. Smallwood (In re Smallwood)*, Nos. 20-42708-nhl, 20-01108-nhl, 2021 Bankr. LEXIS 2667, at *7-8 (Bankr. E.D.N.Y. Sep. 28, 2021) (internal quotations and citations omitted). Since the debt Firstbase owes on the misappropriation claims is based on "willful and malicious" conduct it may not be dischargeable. *See* 11 U.S.C. § 523(a)(6) (exempting from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity"); *Davidcraft Corp. v. Baer (In re Baer)*, 161 B.R. 334, 337 (Bankr. E.D.N.Y. 1993) (concluding that the judgment on claims of tortious interference with existing and prospective business relationship, conversion, misappropriation of trade secrets, unfair competition, and conspiracy were not dischargeable). The jury here heard evidence that, *inter alia*, Firstbase made multiple misrepresentations to Harbor to induce it to enter into the Partnership Agreement, while planning to acquire Harbor's trade secrets so it could cut Harbor out of anticipated profits. *See Squarepoint Ops, LLC v. Sesum (In re Sesum)*, Nos. 20-10794-lgb, 20-01090-lgb, 2024 Bankr. LEXIS 1405, at *23-25 (Bankr. S.D.N.Y. June 13, 2024) (explaining that in deciding dischargeability, courts apply a subjective standard to the willfulness requirement of a deliberate or intentional injury). However, "it is within the exclusive purview of the bankruptcy court to determine whether debt is dischargeable." *Rupert v. Krautheimer (In re Krautheimer)*, 210 B.R. 37, 46 (Bankr. S.D.N.Y. 1997) (citing *Brown v. Felsen*, 442 U.S. 127 (1979)).

prevent future offenses, and the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of a guilty person." *Vivino v. Everlast Sporting Goods Mfg. Co.*, No. 87-1161, 1987 U.S. Dist. LEXIS 8730, at *4 (E.D. Pa. Sep. 25, 1987).  The jury awarded damages in the amount of $11,068,044 on the misappropriation counts and a total award of $27,915,714.00, including punitive damages, for all counts.  As discussed herein, Firstbase will also be responsible for pre-judgment interest on some counts and for post-judgment interest on the total award.  Considering the high award, an additional award of exemplary damages is not necessary to deter future misconduct.  *See AgroFresh Inc.*, 2020 U.S. Dist. LEXIS 222898, at *79 (considering that the defendants were already subject to a significant punitive damages award such that exemplary damages would not add any further deterrent, and declining to award exemplary damages).

Third, the jury's award on the misappropriation and unfair competition counts represents the entire amount of damages requested by Harbor.  As such, the jury's award is sufficient to compensate Harbor.  *See Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 224-25 (3d Cir. 2021) (concluding that the district court appropriately declined to award enhanced compensation because the jury's damage award was sufficient to provide full compensation and accurately reflected true profits).

Fourth, although Firstbase has failed to show that the awards on the trade secrets and unfair competition claims amount to double recovery in light of the distinct evidence of wrongdoing for each claim and distinct harms, the Court is nevertheless mindful of the possibility of some overlap and will not award additional exemplary damages.  *See Mixing Equip. Co. v. Innova-Tech, Inc.*, No. 85-0535, 1988 U.S. Dist. LEXIS 9516, at *14 (E.D. Pa. Aug. 29, 1988) (holding that the court "must consider other equitable concerns" in determining

the amount of exemplary damages to be awarded).  Notably, had the Court found double recovery and reduced the jury's award, it would be inclined to award exemplary damages to account for Firstbase's separate willful misconduct.

For all these reasons, the request for exemplary damages is denied.

## I.    Harbor's request for attorney's fees is denied.

Harbor seeks more than $1,900,000 in attorneys' fees, expenses, and costs, as the prevailing party in its trade secrets claims because the misappropriation was willful and malicious.  *See* Pl. Mem. 25-37.

"Just because a jury finds willful and malicious misappropriation does not necessarily mean that the prevailing party is entitled to attorney's fees."  *Arnold's Office Furniture, LLC*, 2023 U.S. Dist. LEXIS 97967, at *31 (explaining that the motion was rooted primarily in the jury's finding that the defendants acted willfully and maliciously, but "that finding does not, in and of itself, justify an award of attorney fees").[32]  For the reasons set for above in denying exemplary damages, Harbor's request for attorney's fees is also denied.  *Accord Mixing Equip. Co. v. Innova-Tech, Inc.*, No. 85-0535, 1988 U.S. Dist. LEXIS 9516, at *14 (E.D. Pa. Aug. 29, 1988) (holding in a patent infringement case that the "award of exemplary damages and the

---

[32]    The Court notes that although the Confidentiality Agreement signed on March 28, 2022, included a provision entitling the substantially prevailing party to recover attorney's fees and costs, *see* Trial Ex. 238, the Partnership Agreement executed two months later did not include such a provision, *see* Trial Ex. 254 (providing for attorney's fees and costs only in relation to third-party claims).  Harbor's Complaint, although briefly mentioning the confidentiality agreement, relies on the Partnership Agreement as the basis for all claims.  *See* ECF No. 3. Moreover, Harbor's motion for attorney's fees and costs relies on the jury's finding of willful and malicious misappropriation as the basis for its request, not on a contractual provision between the parties in the Confidentiality Agreement.  *See* Pl. Mot. 25.  Accordingly, the decision whether to award attorney's fees lies in the discretion of the Court.

entitlement to attorney's fees are determined by similar equitable factors, although attorney's

fees are awarded [. . . under] a somewhat more stringent standard").

> **J.      Harbor's request for a permanent injunction is denied.**

Harbor seeks a permanent injunction requiring Firstbase to: (1) stop using the trade

secrets, specifically the Firstbase Agent and Firstbase Start products, beyond the date of the

damages award (March 2027); and (2) return and/or destroy all of Harbor's confidential and

proprietary information.[33]

> a.      *The request for a permanent injunction beginning in March 2027 that requires*
> *Firstbase to stop using trade secrets is denied.* [34]

The parties disagree as to whether this Court should apply federal or state law to Harbor's

request for injunctive relief effective in March 2027.  Harbor, while relying on the DTSA and

PUTSA as providing for injunctive relief, cites only to the showing required under PUTSA, *see*

Pl. Mem. 20-25 (citing *PPG Indus. v. Jiangsu Tie Mao Glass Co.*, No. 2:15-cv-00965, 2020 U.S.

Dist. LEXIS 55687 (W.D. Pa. Mar. 31, 2020)), and makes no mention of the required factors

under federal law, including irreparable injury, inadequacy of remedies, balance of hardships,

and public interest, *see id.*; Pl. Reply 7-10, ECF No. 251.  Conversely, Firstbase argues that

Harbor must demonstrate all these federal factors.  *See* Def. Resp. 20-36.

---

[33]     These are the two categories of injunctive relief identified by Harbor in its motion and
supporting briefs, and the focus of argument by Harbor.  To the extent the proposed injunction
exceeds these relief requests, they have also been considered and are discussed herein.  For the
reasons set forth below, all injunctive relief requests are denied.

[34]     Harbor's suggestion that there is a distinction between categorizing the injunction as a
future permanent injunction that begins three years from now, as opposed to a permanent
injunction that begins now with a portion of which that only takes effect as of March 29, 2027,
*see* Pl. Reply, ECF No. 251, is unpersuasive.  Moreover, regardless of how the injunction is
characterized, Harbor has not met its burden of showing that it should be granted.

Firstbase cites *Warman* as "rejecting the same standard Harbor advances here." *See* Def. Resp. 21-22. In *Warman*, the court considered the plaintiff's request for a permanent injunction based on its misappropriation claims under the DTSA and PUTSA. *See Warman*, 2024 U.S. Dist. LEXIS 53453. In the standard of review section, the court stated:

> A plaintiff seeking a permanent injunction must demonstrate that: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Id.* at *7 (quoting *eBay Inc.*, 547 U.S. at 391). The *Warman* court considered the argument, which is also raised here, that the factors under PUTSA should control the court's analysis. *See id.* at *9. However, the court determined it "need not resolve this issue because under Pennsylvania's criteria, the 'proper inquiry is not whether defendant already has used or disclosed, but whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future.'" *See id.* at *10 (quoting *Den-Tal-Ez, Inc. v. Siemens Cap. Corp.*, 566 A.2d 1214, 1232 (Pa. Super. 1989)). The court concluded that the party seeking an injunction failed to show that the defendants intended to use the trade secret in the future, which defeated a showing of irreparable harm. *See id.* at *26. Accordingly, the court essentially found that the injunction failed under both federal and state law. *See generally id.*

Harbor relies on the same cases cited by the party in *Warman* for the proposition that PUTSA factors control whether an injunction should issue. *Cf.* Pl. Mem. 20, *with Warman*, 2024 U.S. Dist. LEXIS 53453, at *10 (both citing *PPG Indus. Inc. v. Jiangsu Tie Mao Glass Co.*, 2020 U.S. Dist. LEXIS 55687 (W.D. Pa. Mar. 31, 2020) and *Kenset Corp. v. Ilanjian*, 600 F. App'x 827, 831 (3d Cir. 2015)). However, Harbor does not address the argument presented in *Warman*, which is also presented here, that these cases are distinguishable because they arose under

diversity jurisdiction and involved injunctions only under PUTSA, not the DTSA.  In *PPG*, the court applied the PUTSA standard after reasoning that "federal courts sitting in diversity must apply state substantive law" and "trendlines . . . point to permanent injunctions being substantive law."  *See PPG Indus.*, 2020 U.S. Dist. LEXIS 55687, at *69-70 (holding that "state substantive law applies to the issuance of a permanent injunction").  Nevertheless, as the *PPG* court explained, the party's injunctive relief request was based solely on PUTSA, not on the court's general equitable powers.  *See id.* at *70.

Consequently, the cases cited by the parties appear to have some internal inconsistencies and are not particularly helpful in deciding the appropriate standard.  There is also conflicting law in this district.  *See, e.g. Marcum v. Columbia Gas Transmission, LLC*, No. 19-3873, 2022 U.S. Dist. LEXIS 241113, at *2-4 n.i (E.D. Pa. July 21, 2022) (stating that although the Third Circuit has not squarely addressed the issue, federal law applies to the determination of a motion for a permanent injunction when a federal court is sitting in diversity "[b]ecause the rule governing injunctions is *procedural*, rather than substantive" (emphasis added)).  Regardless, this Court need not resolve the conflict as Harbor's injunctive relief request fails under both federal and state law because the trade secrets will cease to exist in March 2027.

At trial, Harbor offered evidence that the parties agreed the economic life of the trade secrets is five years from the date of the Confidentiality Agreement, *see* Trial Ex. 238 (Confidentiality Agreement dated March 28, 2022), which is when the proposed injunction will become effective.  Without an economic value, the purported trade secrets will no longer meet the definition of a trade secret under either federal or state law.  *See* 18 U.S.C. § 1839(3) (defining "trade secret" as ". . . information [that] derives independent economic value, actual or potential, from . . ."); 12 Pa.C.S. § 5302 (defining "trade secret" as "information. . . that [d]erives

independent economic value, actual or potential, from . . .").  An injunction is therefore not provided for by either the DTSA or PUTSA.  *See* 18 U.S.C. § 1836(3)(A) (allowing the court to grant injunctive relief to protect a "trade secret"); 12 Pa. C.S. § 5303(a) (PUTSA states that "an injunction shall be terminated when the trade secret has ceased to exist."[35]).  Without a protectable trade secret, there is also no risk of harm from future use as required by both federal and state factors.  *See Warman*, 2024 U.S. Dist. LEXIS 53453, at *26 (concluding that there was no irreparable harm where the defendant had no plans of future use); *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214, 1232 (Pa. Super. 1989) (In deciding whether to issue an injunction prohibiting future use of trade secrets, the court's "focus is necessarily prospective. The proper inquiry is not whether defendant already has used or disclosed, but whether there is sufficient likelihood, or substantial threat, of defendant doing so in the future.").

Harbor's request for a permanent injunction effective in 2027 is therefore denied.[36]

---

[35]    PUTSA's injunction section further provides: "the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation."  12 Pa. C.S.A. § 5303(a).  However, Harbor does not suggest that the injunction will be needed to eliminate commercial advantage.

[36]    To the extent federal law applies, the request for injunctive relief also fails because Harbor failed to show irreparable harm given that the jury awarded Harbor the full amount of monetary damages it requested on the misappropriation claim.  *See TD Bank N.A.*, 928 F.3d at 282 (holding that the availability of adequate monetary damages belies a claim of irreparable injury).  The additional federal factors further dictate against injunctive relief.  Specifically, issuing a permanent injunction in contradiction with the parties' agreement to a five-year life would not be in the public interest.  *See Marblelife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) (stating that "the public interest favors enforcing valid contracts and making parties live up to their agreements).  The balance of equities, another DTSA factor, also weighs in favor of denying injunctive relief for all the reasons discussed.

Of note, the Court does not find that an injunction beginning in March 2027 would amount to double recovery.  *See PPG Indus. v. Jiangsu Tie Mao Glass Co.*, 47 F.4th 156, 163-64 (3d Cir. 2022) (finding that a forward-looking permanent injunction that "covered entirely separate periods of past and potential future use of misappropriated trade secret" did not amount to a double recovery).

      b.       *The request for a permanent injunction for the return of confidential information is denied.*

The request for an injunction requiring Firstbase to return and/or destroy all of Harbor's confidential and proprietary information arises from the breach of contract claim. In the Partnership Agreement (the contract), the parties agreed: "Upon termination of this Agreement all Confidential Information must be returned to the discloser or destroyed." *See* Trial Ex. 254 at ¶ 7.3. Although Harbor relies on the breach of contract claim in seeking injunctive relief, it cites to only the PUTSA factors, which have no application to the requested relief because the confidential information does not involve trade secrets.[37] Firstbase argues that federal law applies. But whether federal law or state law (non-PUTSA) applies,[38] the analysis is the same. *See Waldschmidt v. NVR, Inc.*, No. 18-1372, 2018 U.S. Dist. LEXIS 206559, at *27 n.9 (W.D. Pa. Dec. 7, 2018) ("[T]he Court's analysis remains unchanged regardless of whether it applies Pennsylvania or federal law, and regardless of whether it considers an actionable claim for preliminary or permanent injunctive relief.").

Harbor received an award of monetary damages equal to or greater than the amount requested on the claims for breach of contract and unfair competition,[39] which suggests that its injury can be compensated by monetary damages. *See TD Bank N.A.*, 928 F.3d at 282 (holding

---

[37]    To the extent that any confidential and/or proprietary information covered by the requested injunction is a trade secret or is part of the Firstbase Agent and Firstbase Start products, injunctive relief is denied because Harbor has been compensated for the misappropriation of trade secrets. *See PPG*, 47 F.4th at 163-64 (holding that "an award of injunctive relief ordinarily will preclude a monetary award for a period in which the injunction is effective" (internal quotations omitted)).

[38]    "With regards to a preliminary injunction, district courts use a federal standard. The law is less clear when it comes to permanent injunctions." *Waldschmidt v. NVR, Inc.*, No. 18-1372, 2018 U.S. Dist. LEXIS 206559, at *27 n.9 (W.D. Pa. Dec. 7, 2018) (internal citations omitted).

[39]    Harbor's motion does not base its injunctive relief request on the unfair competition claim, but it has been considered because injunctive relief is requested on this claim in the Complaint.

that the availability of adequate monetary damages belies a claim of irreparable injury). Harbor

offers no argument suggesting otherwise. There is also no contention or evidence that a greater

injury will result if injunctive relief is denied (balance of hardships), and Harbor's only argument

regarding harm pertains to the injunctive relief request to stop using trade secrets in 2027, *see* Pl.

Mem. 20. Harbor cites to the relevant portions of the Partnership Agreement, but "the mere

inclusion of the contractual provision cannot act as a substitute for the requisite showing of

irreparable harm." *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 810 (W.D. Pa. 1995) *See also*

*Synthes USA Sales, LLC v. Harrison*, 38 Pa. D. & C. 5th 278, 294 n.3 (C.P. 2014) (stating that

while "express agreements are a factor confirming the necessary elements for issuance of an

injunction," they do "not relieve the court of its duty to make a finding whether an injunction

should be issued"). Further, while there is a generalized public interest in the "enforceability of

confidentiality agreements," *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir.

2010), an overly broad injunction, such as the one proposed here, does not serve the public

interest, *see Gray Holdco, Inc. v. Cassady*, No. 2:09-cv-1519, 2010 U.S. Dist. LEXIS 2466, *12

(W.D. Pa. Jan. 13, 2010) (concluding that the injunction, which was overly broad was "not

protective of any public interest").[40]

    In finding that the proposed injunction is overly broad, the Court notes the following:

The proposed injunction restrains Firstbase's ability to "possess, obtain *(from whatever source)*,

use, copy, and/or disclose . . . any Confidential Information . . ., whether having existed, now

existing, or *to be developed, regardless of how obtained*. . . , including, *without limitation*, . . . ."

---

[40]    Although a court may narrow a proposed injunction, this Court will not do so here because Harbor has failed to establish that an injunction should issue. *See Eagleview Corp. Ctr. Ass'n v. Citadel Fed. Credit Union*, 150 A.3d 1024, 1030 (Pa. Commw. Ct. 2016) (refusing to narrow the injunction because the party did not meet the prerequisites for an injunction).

*See* ECF No. 23-6 (emphasis added). Such broad relief extends beyond what was contemplated in the Partnership Agreement[41] and the litigation claims. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 193 (2000) (holding that in awarding injunctive relief "federal courts should aim to ensure the framing of relief no broader than required by the precise facts" (internal quotations omitted)); *Mallet & Co. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021) ("The description of the conduct enjoined should be narrowly tailored to reach only those acts that closely relate to the unlawful conduct giving rise to an entitlement to injunctive relief."). Additionally, the proposed injunction does not specifically identify the "confidential" information and impermissibly leaves too much to guesswork.[42] *See id.* (stating that "an injunction ought not leave too much 'guesswork' for the Defendants").

The proposed injunction is also overly broad in that it seeks to enjoin lawful conduct. The proposed injunction enjoins Firstbase from "acting in any manner that . . . is or may be detrimental, inimical or injurious to the interests, goodwill, business, assets or reputation of Harbor Compliance; (ii) disparaging or criticizing Harbor Compliance or their respective businesses, products, services, owners, managers, employees, and/or operations. . .; and/or (iii) otherwise doing or saying anything that disrupts the good morale of employees of Harbor . . . ." *See* ECF No. 23-6. These restrictions impermissibly infringe on Firstbase's rights and impede

---

[41]    The Agreement defines "Confidential Information" as "information disclosed by a Party to the other Party under this Agreement that is marked as confidential or would normally be considered confidential under the circumstances. Confidential Information includes, but is not limited to, the terms and conditions of this Agreement, financial information, business models, software, reports, techniques, and prices." *See* Trial Ex. 254 at ¶ 7.3.

[42]    Firstbase argues that the "confidential information" sought to be enjoined, which includes, *inter alia*, customer rate cards, quoting procedures, and customer lists, was never discussed or proven at trial. *See* Def. Resp. 27-28. Firstbase further asserts that at trial Harbor took the "broadest possible view of what constitutes 'confidential information.'" *Id.* at 30. Harbor does not address these arguments in its reply.

lawful competition.  *See* Restatement 3d of Unfair Competition, § 35, comment c ("The constitutional right of free expression as applicable to commercial speech may also affect the scope of injunctive relief in unfair competition cases[, and . . .] restrictions on speech that extend beyond those reasonably necessary to prevent the wrongful conduct may infringe on protected rights."); *Tory v. Cochran*, 544 U.S. 734, 738 (2005) (holding that the Constitution "forbids" the issuance of an injunction that amounts to an overly broad restraint upon speech (citing *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968) ("An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.")); *PG Publ'g Co. v. Pittsburgh Typographical Union #7*, 304 A.3d 1227, 1242 (Pa. Super. 2023) (concluding that the permanent injunction was overly restrictive in that it infringed on the appellants First Amendment rights).  *See also Mallet*, 16 F.4th at 390 ("Injunction orders should not restrain competitors from engaging in lawful business activities."); *Lazovitz v. Lazovitz*, 1982 Phila. Cty. Rptr. LEXIS 71 (Phila. Ct. C.P. Fe. 16, 1982) (modifying the injunction "so that Defendant would not be restricted in his business affairs").

For all these reasons the request for a permanent injunction for the return of confidential information is denied.

### K.    Harbor's request for pre-judgment interest is granted in part.

Harbor seeks pre-judgment interest at the rate of 6% per annum, beginning March 28, 2022,[43] until the amended judgment is entered.  *See* Pl. Mem. 38.  Harbor suggests that the decision to grant pre-judgment interest is left to the discretion of the district court.  *See id.* at 37

---

[43]    The Non-Disclosure Agreement was signed on March 28, 2022.

(citing *ECEM European Chem. Marketing B.V. v. Purolite Co.*, 451 Fed. Appx. 73, 79 (3d Cir. Nov. 14, 2011)).

Pre-judgment interest on Count I, breach of contract, must be awarded because the damages were calculated based on unpaid invoices and outstanding guaranteed minimums (definite or readily ascertainable amounts).  *See* Jury Ex. 3.  Even though the amount of the unpaid invoices were not specified in the contract, the amounts are capable of determination with mathematical precision.  *See Am. Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d 1050, 1057 (3d Cir. 1982); *Bedrock Envtl. Servs., Inc. v. Liberty Mgmt., LLC.*, No. 3:23-CV-1578, 2024 U.S. Dist. LEXIS 62133, at *4-5 (M.D. Pa. Apr. 2, 2024) (awarding pre-judgment interest "as a matter of right" on the breach of contact claims arising from unpaid invoices).  Firstbase's dispute regarding the invoices does not change their character.  *See id.* ("Restatement of Contracts § 337(a) (bona fide dispute over liability or amount of damages in contract action does not defeat right to pre-judgment interest).").  Moreover, even if prejudgment interest was not mandatory, this Court would exercise its discretion and award prejudgment interest in order to restore Harbor to the position it would have been in had these amounts been timely paid.  *See Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 175 (3d Cir. 2001) ("Pre-judgment interest may be awarded to parties prevailing on contract claims at the discretion of the trial court 'in accordance with equitable principles.").

"Pre-judgment interest in Pennsylvania contract cases . . . is calculated from the time the money becomes due or payable."  *Am. Enka Co.*, 686 F.2d at 1056.  "Unless otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of 6% per year."  *Talen Energy Mktg., LLC*, 2021 U.S. Dist. LEXIS 27140, at *10-11. *See also McDermott v. Party City Corp.*, 11 F. Supp. 2d 612, 632 (E.D. Pa. 1998) ("Under Pennsylvania law, unless

otherwise specified by the parties, the rate of prejudgment interest is calculated as simple interest at a rate of six percent per year." (citing P.S. § 202)).

The damages in Count I are based on amounts that became payable at different times. Thus, applying the 6% rate, prejudgment interest is calculated as of the date of this Opinion as follows: pre-judgment interest in the amount of $5,305.18 is awarded on the first invoice ($36,926.50) from September 15, 2022,[44] and in the amount of $38,561.22 on the second invoice ($478,695.50 minus $36,926.50 equaling $441,769) from August 24, 2023.[45] *See Talen Energy Mktg., LLC*, 2021 U.S. Dist. LEXIS 27140, at *12 (awarding pre-judgment interest on each of nine unpaid invoices as of the date they became due).  Pre-judgment interest is awarded in the amount of $75,366.20 on the outstanding guaranteed minimums totaling $648,502 as of March 1, 2023.[46] *See Garden State Tanning, Inc. v. Mitchell Mfg. Grp., Inc.*, No. 98-4789, 2000 U.S. Dist. LEXIS 10739, at *9 (E.D. Pa. July 21, 2000) (awarding pre-judgment interest from the date of the first demand on the guaranty was sent).  Pre-judgment interest is awarded in the total amount of $119,232.60 for Count I.

As to the misappropriation claims in Counts III and IV, pre-judgment interest is awarded on part of the damages.  To the extent the damages are based on prospective profits, pre-judgment interest is denied.  *See Poleto v. Conrail Corp.*, 826 F.2d 1270, 1278 n.14 (3d Cir. 1987) ("Future economic harms must similarly be excluded from the adjustment of prejudgment interest, for interest adjustment would be antithetical to adjusting such a future stream of money

---

[44]    *See* Exs. 70-77, 546

[45]    Payment was due fifteen (15) days after the invoice date.

[46]    The Partnership Agreement provides that Firstbase agreed to pay the guaranteed minimums "[a]t the conclusion of the Term of the Agreement," which was unilaterally terminated before the above-captioned action was filed on March 1, 2023.  Accordingly, the first demand for payment of the guaranteed minimums was when the original Complaint was filed on March 1, 2023.

to its present value."); *Helpin v. Trs. of the Univ. of Pa.*, 969 A.2d 601, 621 (Pa. Super. 2009)
(finding that the trial court did not err in denying prejudgment interest because "prejudgment
interest would have been duplicative because the jury's damage award primarily consisted of
damages for lost future earnings and not for lost past earnings"). The Court finds that the jury,
which awarded the full amount of prospective profits requested by Harbor, is sufficient to fully
compensate Harbor for that portion of its damages and that adding pre-judgment interest would
not be equitable. However, to the extent the damages in Counts III and IV are based on
historical profits in the amount of $2,589,188, pre-judgment interest is necessary to fully
compensate Harbor and is therefore awarded. *See Booker v. Taylor Milk Co.*, 64 F.3d 860, 868
(3d Cir. 1995) (holding that there is a "strong presumption in favor of awarding prejudgment
interest, except where the award would result in unusual inequities" (internal quotations
omitted)).

Harbor suggests that pre-judgment interest should be awarded from the time the Non-
Disclosure Agreement was signed, but there is no indication the jury found that Firstbase's
misappropriation began on this date. Accordingly, Harbor has failed to meet its burden on this
point. *See Leonard*, 834 F.3d at 397-98 (holding that "a prevailing party moving for an award of
prejudgment interest must provide the district court with sufficient information to calculate the
interest"). However, the "difficulty in calculating prejudgment interest is generally not a basis to
deny an interest award." *Id.* In its discretion, this Court will calculate pre-judgment interest at a
rate of 6% as of the date of the filing of the Complaint on March 1, 2023. *See AgroFresh Inc.*,
2020 U.S. Dist. LEXIS 222898, at *87 (calculating prejudgment interest on the DTSA and
PUTSA claims on the date the complaint was filed where the plaintiff failed to persuade the

court of an earlier date). Pre-judgment interest is awarded on Counts III and IV in the amount of $1,286,315.80.

For all the reasons previously discussed and considering the jury's award of punitive damages on the unfair competition claim, Count V, this Court finds that pre-judgment interest is not needed to make Harbor whole as to this claim. *See Smith v. Int'l Total Servs.*, No. 95-2038, 1997 U.S. Dist. LEXIS 16236, at *37 (E.D. Pa. Oct. 9, 1997) (denying pre-judgment interest where the plaintiff recovered punitive damages as well as compensatory damages because the plaintiff had already been adequately compensated). This Court also notes that there may[47] be some overlap between the damages awarded on Count V with the damages awarded on the misappropriation of trade secrets counts. For these reasons and in light of the damages awarded on the other counts, this Court finds that awarding pre-judgment interest on Count V would be inequitable and is denied. *See id*.

**L.    Harbor's request for post-judgment interest is granted.**

Post-judgment interest is mandatory under 28 U.S.C. § 1961(a). *See Dunn v. Hovic*, 13 F.3d 58, 62 (3d Cir. 1993) (holding that "post-judgment interest is awarded by statute as a matter of law so it is automatically added, whether or not the district court orders it"). Post-judgment interest begins to run from the date judgment was entered. *See id.* at 61-62 (holding that post-judgment interest is awarded as of the date of the original judgment even if the award is later reduced on appeal because the jury's calculation was too high, provided that the entire award was not vacated). Therefore, Harbor's request for post-judgment interest at the rate designated under 28 U.S.C. § 1961(a) is granted as to the judgment amount of $27,915,714.00 from April 23, 2024. Post-judgment interest is awarded on the pre-judgment interest award ($1,405,548.40)

---

[47]    The issue of duplicative damages is addressed in further detail herein.

as of the date of this Opinion and accompanying Order.  *See Russo v. Abington Mem'l Hosp.*

*Healthcare Plan*, 257 F. Supp. 2d 784, 790 (E.D. Pa. 2003) (awarding post- judgment interest on

the award of pre-judgment interest as of the date it was awarded).  Interest is computed daily

until paid in full.  *See* 28 U.S.C. § 1961(b).

## V.    CONCLUSION

For the reasons discussed herein, Firstbase's post-trial motion is denied.  The verdict on

Harbor's breach of contract claim was not against the weight of the evidence based on evidence

of three separate breaches of the Partnership Agreement (contract) relating to exclusivity,

guaranteed minimums, and unpaid invoices.  The weight of the evidence also supported Harbor's

unfair competition claim because, *inter alia*, Firstbase employed a strategy to be "inaccurate and

misleading" with Harbor to gain an unfair advantage in the marketplace.  Firstbase waived its

right to challenge to the sufficiency of the evidence for the unfair competition claim.  There was

sufficient evidence to support the misappropriation of trade secrets claims based on testimony

about the confidential nature of the trade secrets and that Firstbase's Agent product embodied

Harbor's trade secrets.  The substantial evidence supporting these claims shows that the

misappropriation of trade secrets and unfair competition claims were based on separate conduct.

Considering this evidence, coupled with the evidence of damages, this Court cannot conclude

that the jury's damages award on Harbor's unfair competition and trade secret claims was

unreasonable, against the great weight of the evidence, or that a miscarriage of justice will result

if the verdict is allowed to stand.  Because there was separate evidence of harm for which the

jury could award damages on both the trade secrets claims and unfair competition claim, there

was no double recovery.  Finally, this Court did not err in allowing Dr. Valerdi to testify about

facts allegedly outside the scope of his report because Firstbase was permitted to cross-examine

him about this information and suffered no prejudice.  Firstbase's post-trial motion is therefore denied in its entirety.

Harbor's post-trial motion is granted in part and denied in part.  Harbor's request for a permanent injunction is two-fold.  To the extent Harbor seeks an injunction effective in March 2027 requiring Firstbase to stop using the trade secrets, it is denied because the trade secrets will cease to exist.  To the extent Harbor moves for an injunction for the return of confidential information, it is denied because Harbor has failed to make the requisite showing and because the proposed injunction is overly broad.  Harbor's request for exemplary damages is also denied.  Although the misappropriation was based on willful and malicious conduct, Firstbase's financial status (bankruptcy) and the large monetary judgment afford adequate deterrence for future misconduct.  Further, the jury awarded the entire amount of damages requested by Harbor, without reduction, and this Court has awarded partial prejudgment interest.  For all these reasons, Harbor's request for attorney's fees is also denied.  Harbor's request for pre-judgment interest is granted as to the damages awarded on Count I and on parts of Counts III and IV from the dates discussed herein, but denied in all other respects. Harbor's request for post-judgment interest is granted.

A separate order follows.

BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge